**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| TYLER BAKER and LORA GRODNICK, each individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*.<br><br>v.<br><br>CAPITAL ONE FINANCIAL CORPORATION and DISCOVER FINANCIAL SERVICES, INC.<br><br>*Defendants*. | Civil Action No. 1:24-cv-1265<br><br><br><br>**CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

PARTIES ............................................................................................................................. 3

I.     PLAINTIFFS ............................................................................................................. 3

II.    DEFENDANTS ......................................................................................................... 3

JURISDICTION AND VENUE ........................................................................................... 5

FACTS ................................................................................................................................. 6

I.     INTERCHANGE FEES ............................................................................................. 6

     A.     Interchange Fee Revenue and Rewards Programs ................................... 6

     B.     The Vertically Integrated Credit Card Companies .................................. 8

     C.     Capital One's Agreements with Visa and Mastercard ........................... 11

II.    CAPITAL ONE'S PLANNED MERGER WITH DISCOVER ................................... 13

     A.     Capital One Announces A Merger with Discover ................................. 13

     B.     Capital One's Investor Conference Call and the Plan to Maintain Horizontal
Agreements with Visa and Mastercard Post-Merger ............................. 14

     C.     The Announced Merger Faces Backlash and Competitive Concerns .................. 19

III.   THE RELEVANT MARKETS ................................................................................. 20

     A.     The General Credit Card Market ........................................................... 20

          1.     General Credit Cards Are a Distinct Submarket .......................... 20

          2.     The Relevant Geographic Market is the United States ................. 26

          3.     Market Participants and Concentration ......................................... 27

     B.     The Credit Card Payment Processing Market ........................................ 28

          1.     The Credit Card Payment Processing Market Is a Distinct
Submarket ................................................................................... 28

          2.     The Relevant Geographic Market is the United States ................. 33

          3.     Market Participants and Concentration ......................................... 33

IV.   THE PAYMENT NETWORK AND ISSUER REWARDS BARRIER TO ENTRY ....... 36

V.    THE MERGER WILL SUBSTANTIALLY LESSEN AND HARM COMPETITION,
INJURING PLAINTIFFS AND THE CLASS ................................................................ 39

     A.     The Merger Will Strengthen the PNIRBE ............................................ 39

     B.     The Merger Will Increase Market Concentration in the General Credit Card
Market ................................................................................................. 41

     C.     The Merger Will Eliminate Discover as a Vertically Integrated Competitor with
Capital One, which Will Increase Prices, Including by Reducing the Amount of
Interchange Fees Remitted to Customers as Credit Card Rewards ..................... 42

| | | |
|---|---|---|
| D. | The Merger Will Facilitate Horizontal Collusion in the Credit Card Payment Processing Market | 43 |
| E. | The Merger Will Result in Direct, Horizontal Agreements among Competitors in the Credit Card Payment Processing Market | 44 |
| F. | The Merger Will Increase Prices for Consumers and Reduce Consumer Choice | 45 |

CLASS ACTION ALLEGATION ................................................................................. 45

REALLEGATION AND INCORPORATION BY REFERENCE ............................... 48

CLAIMS FOR RELIEF ............................................................................................... 48

COUNT I ...................................................................................................................... 48

COUNT II ..................................................................................................................... 50

PRAYER FOR RELIEF ............................................................................................... 52

## INTRODUCTION

1.      This action seeks to enjoin the merger of Capital One and Discover—a merger that will lead to a substantial lessening of competition, and attendant harm to consumers like Plaintiffs, in two important U.S. antitrust markets, the General Credit Card Market and the Credit Card Payment Processing Market.

2.      Capital One is one of the nation's largest issuers of general purpose credit cards, which are connected to one of two credit card payment networks—Visa or Mastercard. Capital One competes with other general credit card issuers—*e.g.,* J.P. Morgan Chase—on credit card rewards (like cash back and travel points) for cardholders. Competition is what allows Americans that use general purpose credit cards to get a higher percentage of the money they charge to their cards back as rewards from issuers like Capital One. Of particular importance to this competitive landscape are vertically integrated card issuers—American Express and Discover—which own and operate their own credit card payment networks, and as a result put significant price pressure on the largest issuers of Visa- and Mastercard-affiliated charge cards, including Capital One.

3.      The proposed merger will eliminate one of two vertically integrated General Credit Card Market firms from the competitive landscape, seriously reducing price pressure on Capital One and other major issuers.

4.      Even more concerning—and *per se* illegal—are the implications of the proposed merger on the U.S. Credit Card Payment Processing Market. There are only four firms in this market, which underlies trillions of dollars in credit card transactions per year in the United States—Visa, Mastercard, American Express, and Discover. Visa and Mastercard are the dominant credit card payment processors, with a combined near-monopoly share of 87%. They have a long history of colluding to raise prices (interchange fees) and harm consumers (credit card holders and merchants that pay such fees). In fact, Visa and Mastercard have previously been sued for colluding

1

with Capital One to anticompetitively inflate interchange fees. Previously, however, Capital One has been a vertical counterparty of Visa and Mastercard, with whom it maintains express agreements setting interchange fees and other price-related terms.

5.      The proposed merger will disrupt this relationship, and upend the already highly-concentrated Credit Card Payment Processing Market. With the merger, one of the nation's largest issuers of Visa- and Mastercard-serviced charge cards (Capital One) will become Visa and Mastercard's horizontal competitor—and take control of one of these firms' two meaningful competitors.

6.      Given Capital One's web of express agreements, including on price-related terms, with Visa and Mastercard, one familiar with the U.S. antitrust laws might expect that Capital One plans to exit its relationship with Visa and Mastercard after acquiring Discover. After all, if Capital One were to maintain its status as a major issuer for—and contractual counterparty of—Visa and Mastercard, then one of these leviathans' only serious competitors in the Credit Card Payment Processing Market would be regularly negotiating prices in that market *with Visa and Mastercard*. Yet that is *exactly* what Capital One's CEO has promised to do after the challenged merger closes. Capital One plans to operate one of four competitors in the historically price-fixed Credit Card Payment Processing Market, and *expressly agree on interchange fees with two of the three others*.

7.      At the same time, both markets impacted by the proposed merger—the General Purpose Credit Card Market and the Credit Card Payment Processing Market—are protected by a powerful barrier to entry born of network effects and technological and contractual barriers. This barrier to entry, the Payment Network and Issuer Rewards Barrier to Entry ("PNIRBE"), has protected both incumbent card issuers and incumbent credit card payment processors for years, and has made both these markets highly resistant to entry as a historical matter. The proposed

2

merger will supercharge this barrier to entry, sealing off two relevant markets from competition and harming consumers like Plaintiffs—two Capital One credit card holders—and others that pay inflated interchange fees in the process.

8.      Plaintiffs, on behalf of themselves and a putative class of similarly situated persons, seek appropriate injunctive relief to halt, unwind, or otherwise remediate the anticompetitive impact of the challenged Capital One-Discover merger.

## PARTIES

### I.      PLAINTIFFS

9.      Plaintiff Tyler Baker is a domiciled resident of Underhill, Vermont. Mr. Baker has a Capital One Quicksilver card, which he opened in or around November 2019; a Capital One Platinum card, which he opened in or around April 2020; and a Discover card that he opened in or around September 2023. Mr. Baker uses each of these cards monthly or nearly monthly.

10.     Plaintiff Lora Grodnick is a domiciled resident of Skillman, New Jersey. Ms. Grodnick has a Neiman Marcus-branded Capital One card that she opened in or around October 2016, a Bergdorf Goodman-branded Capital One card that she opened in or around November 2017, a Saks Fifth Avenue-branded Capital One Card that she opened in or around November 2016, and a Capital One Platinum card that she opened in or around November 2008. Ms. Grodnick uses each of these cards regularly.

### II.     DEFENDANTS

11.     Defendant Capital One Financial Corporation ("Capital One") is a Delaware corporation headquartered at 1680 Capital One Drive, McClean, Virginia.

12.     Capital One offers banking, credit card, auto loans, and other financial services. It is one of America's largest banks and the third largest issuer of Visa and Mastercard credit cards.

13.     As Capital One states in its 2022 Annual Report, filed on S.E.C. Form 10-K:

> We were the third largest issuer of Visa ("Visa") and Mastercard ("Mastercard") credit cards in the U.S. based on the outstanding balance of credit card loans as of December 31, 2022. In addition to credit cards, we also offer debit cards, bank lending, treasury management and depository services, auto loans and other consumer lending products in markets across the U.S. As one of the nation's largest banks based on deposits as of December 31, 2022, we service banking customer accounts through digital channels and our network of branch locations, cafes, call centers and automated teller machines ("ATMs").

14.    Capital One generated approximately $36.8 billion in revenue in 2023 according to its Q4 2023 filing on Form 10-Q. In 2022, Capital One's net revenue was approximately $34.3 billion, with approximately $22.3 billion in revenue attributable to its credit card business segment.

15.    Defendant Discover Financial Services ("Discover") is a Delaware corporation headquartered at 2500 Lake Cook Road, Riverwoods, Illinois.

16.    Discover is a digital banking and payment services company. It provides digital banking and payment products.

17.    Discover's digital banking line of business includes credit cards, private student loans, personal loans, home loans, and deposits.

18.    Discover's payment services business includes its credit and debit card business, as well as its payment processing network line of business.

19.    As part of its payment processing business, Discover maintains direct relationships with merchants as well as relationships with "Network Partners" that facilitate transactions for Discover-enabled cards where merchants do not have direct relationships with Discover.

20.    Discover operates the Discover Network, which processed $224.572 billion in transactions in 2023, $218.738 billion in 2022, and $188.960 billion in 2021. Including its Pulse Network, transactions through its Network Partners, and the Diners Club network, Discover

processed a total of $589.158 billion in network transactions in 2023 $549.857 in 2022, and $503.517 billion in 2021.

21.     Discover Card volume was $232.785 billion in 2023, $224.477 billion in 2022, and $192.755 billion in 2021.

## JURISDICTION AND VENUE

22.     This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 7 and 16 of the Clayton Act (15 U.S.C. §§ 18 and 26). Plaintiffs and the proposed class seek equitable relief, including an injunction preventing the merger of the Defendants, as well as reasonable attorneys' fees.

23.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).

24.     Venue is appropriate in this district under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Capital One transacts business within this district, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this district. Indeed, Capital One is headquartered in this district at 1680 Capital One Drive, McLean, Virginia, and carries out significant activities there and elsewhere in the district.

25.     The Court has personal jurisdiction over Defendants. Capital One is subject to general jurisdiction in the state of Virginia, where Capital One maintains its headquarters and its principal place of business. Discover is subject to jurisdiction in Virginia both from its own commercial activities and because it seeks to merge with Capital One, which is headquartered in the state.

**FACTS**

**I.     INTERCHANGE FEES**

**A.     Interchange Fee Revenue and Rewards Programs**

26.     Interchange fees are fees collected on every credit card transaction in the United States. An interchange fee is typically charged as a percentage of each transaction and is withheld from merchants that accept credit cards.

27.     The interchange fee is split among the payment processor, which operates a "network" that facilitates credit card transactions, and the issuer, which is typically a bank or financial institution that provides credit to a credit card holder.

28.     Credit card issuers use the revenue from their interchange fee portion to provide credit card rewards. Credit card rewards are provided through rewards programs designed to incentivize the use of an issuer's credit card.

29.     Virtually every major credit card issuer provides rewards and books the cost of these rewards against revenue from interchange fees.

30.     As Capital One explains in its 2022 Annual Report, filed on S.E.C. Form 10-K, about its interchange fee revenue and rewards program:

> We offer products, primarily credit cards, which include programs that allow members to earn rewards based on account activity that can be redeemed for cash (primarily in the form of statement credits), gift cards, travel, or covering eligible charges. The amount of rewards that a customer earns varies based on the terms and conditions of the rewards program and product. The majority of our rewards do not expire and there is no limit on the amount of rewards an eligible card member can earn. Customer rewards costs, which we generally record as an offset to interchange income, are driven by various factors such as card member purchase volume, the terms and conditions of the rewards programs and rewards redemption cost. We establish a customer rewards reserve that reflects management's judgment regarding rewards earned that are expected to be redeemed and the estimated redemption cost.

31.     The interchange fee amount that a credit card issuer such as Capital One receives is the result of negotiations with the payment processors used by the issuer. The two largest payment processors, which provide services to most credit cards in the United States, are Visa and Mastercard.

32.     Although, as explained below, some credit card companies handle their own payment processing, most credit cards use Visa and Mastercard as their payment processor. For this latter group of credit cards, a large customer base of cardholders generally provides bargaining power when negotiating an interchange fee split with Visa and Mastercard.

33.     Certain retailers and merchants are also able to bargain with Visa and Mastercard to lower interchange fees, which generally reduces an issuer's profitability from rewards programs and from its credit card business overall.

34.     As Capital One explains in its 2022 Annual Report:

> Some major retailers have sufficient bargaining power to independently negotiate lower interchange fees with MasterCard and Visa, which could, in turn, result in lower interchange fees for us when our cardholders undertake purchase transactions with these retailers.

35.     Mastercard and Visa are payment processors for most of the credit cards in the United States, and process the majority of credit card transactions in the United States. According to the Nilson Report, which provides research and analysis concerning the credit card business, there were 827 million general purpose credit cards in circulation in the United States in 2022. Approximately 385 million were Visa cards (~46.5%), and 309 million were Mastercard cards (~37.4%), together comprising 83.9% of all general purpose credit cards in U.S. circulation.

36.     As to purchase volume, Visa processed $2.84 trillion in transactions in 2022, which was approximately 52% of the credit card transaction volume in the United States, with Mastercard

processing $1.32 trillion, approximately 24%. Together, Mastercard and Visa process 76% of the transaction volume in the United States.

37.     As explained below, the remaining payment processors—namely, Discover and American Express—are vertically integrated, meaning they both issue credit cards and process payments made through them. These vertically integrated networks are generally not open to unaffiliated card issuers.

38.     According to Wallethub, Capital One is the third largest issuer of Mastercard and Visa credit cards in the United States (and the fourth largest card issuer overall) by purchase volume. As of 2022, approximately 42% of Capital One's credit cards ran over Visa's payment processing network, and 58% ran over Mastercard's.

39.     Because of the number of Mastercard and Visa cards it issues, Capital One has bargaining power over the share of interchange fees it retains from its cardholders' transactions, which in turn allows Capital One to provide greater or more valuable rewards to its customers.

### B.     The Vertically Integrated Credit Card Companies

40.     Two major credit card companies simultaneously issue credit cards and handle payment processing for those cards—Discover and American Express.

41.     As an article titled, "Amex—The Largest Financial Closed Loop Ecosystem," dated Nov. 14, 2022, explains:

> Amex is a closed-loop ecosystem that directly owns the relationship with both its merchants and card members. On the contrary, Visa and Mastercard are open-loop ecosystems. Both are open card networks that will work with third parties (merchant acquirers, merchant processors, issuer processors, payment issuers) which will own the relationship with merchants and card members. With a close-loop ecosystem, Amex accesses unique data on both its card members and its merchants that can be leveraged to create an unique value proposition for each of them (e.g., having a higher spending limit on its credit cards for B2B businesses, having the best cash-back

program for B2Ccard members or giving marketing tools to merchants to target Amex's card members).

Amex is a vertically integrated model combining card issuing, merchant acquiring and card network. It improves unit economics and it gives you access to richer data that you can leverage to offer unique products to both merchants and consumers. This model is Amex's main moat creating both differentiation and a more attractive financial profile compared to most other players in the payments value chain.

42.    Discover operates a similar business. Like American Express, Discover both issues credit cards and handles payment processing for those cards. As Discover's 2023 Annual Report, filed on S.E.C. Form-10K, depicts, Discover handles the entire transaction chain for its credit cards:



43.    A June 28, 2023 article in Nerdwallet explains:

Discover and American Express are different from Visa and Mastercard in a very important way.

Visa and Mastercard process credit card transactions, but they don't actually issue credit cards. Your credit card may say "Visa" or "Mastercard" on it, but it is issued by a bank like Chase or Citi. You don't have an account with Visa or Mastercard. You have an account with the bank, which sends you your statement, receives your payments, gives you rewards and so on.

9

> Discover and American Express, by contrast, process transactions and issue their own cards. You can have an account with Discover or an account with American Express.

44.     This closed-loop model eliminates the need to split interchange fees with a payment processor, allowing both Discover and American Express to retain the full interchange fee charged to a merchant.

45.     This allows Discover and American Express to remit greater or more valuable rewards to their customers as an inducement to use their credit cards, resulting in a higher volume of interchange fees, and in the long run more profits for Discover and American Express from credit card interest.

46.     As Discover explains in its 2023 10-K, it competes with other credit card issuers through its rewards program:

> Our credit card business also competes on the basis of reward programs and merchant acceptance. We compete for accounts and utilization with cards issued by other financial institutions (including American Express, Bank of America, JPMorgan Chase, Capital One and Citibank) and, to a lesser extent, businesses that issue their own private label cards or otherwise extend credit to their customers. In comparison to our largest credit card competitors, our strengths include no annual fees, cash rewards, conservative portfolio management and strong, 100% U.S.-based customer service. Competition based on rewards and other card features and benefits continues to be strong. . . .

47.     Discover and American Express, by virtue of their closed-loop business model, apply pressure on issuers, such as Capital One, to remit greater rewards to remain competitive.

48.     Although Visa and Mastercard were historically accepted more widely than Discover and American Express, as of 2020, Discover and American Express are accepted at 99% of U.S. merchants that accept credit cards. This means that rewards-based competition is a material means of obtaining product differentiation and market share from other issuers.

49.     The existence of closed-loop, vertically integrated competitors Discover and American Express incentivizes issuers that use open-loop networks, such as Visa and Mastercard, to negotiate higher shares of the interchange fees charged on each transaction, thereby allowing those issuers to provide rewards that are competitive with American Express and Discover.

50.     Indeed, issuers that use Visa and Mastercard are similarly constrained in how much of the interchange fee they can obtain and remit to their customers, whereas Discover and American Express maintain more flexibility. Overall, the existence of two vertically integrated and closed-loop rivals makes the market more competitive and puts price pressure on Visa and Mastercard issuers, including Capital One, largely through competition over rewards remittance.

**C.     Capital One's Agreements with Visa and Mastercard**

51.     As the third largest issuer of Mastercard and Visa credit cards, Capital One maintains longstanding relationships and agreements with both companies for its credit cards.

52.     Capital One exclusively uses Visa and Mastercard payment networks for its credit cards, with 42% of its credit cards using Visa and 58% running through Mastercard.

53.     Capital One maintains long-term agreements with Visa and Mastercard to provide payment processing systems for its credit cards.

54.     These agreements set forth the material terms of the relationship—namely, the amount of the interchange fees to be charged on transactions through Capital One's cards, as well as the shares of the interchange fees to be allocated to Visa and Mastercard, on the one hand, and Capital One on the other.

55.     The companies have had a history of anticompetitive conduct and collusion, particularly as to interchange fees. Indeed, in 2005, Capital One was sued for fixing interchange fees with Visa and Mastercard. Capital One (among other issuers), along with Visa and Mastercard, settled this class action lawsuit in 2019 for approximately $5.54 billion.

56.     Moreover, Visa and Mastercard have routinely been the subject of antitrust investigations by the United States government, particularly over interchange fees.

57.     Indeed, both payment processors have been sued by the United States Department of Justice for colluding on interchange fees, including for debit transactions, which have as a result been regulated by statute and regulation to cap the interchange fees charged.

58.     Visa and Mastercard were also recently sued by peer-to-peer payment company Block for colluding on interchange fees. As Forbes reported in a July 25, 2023 article titled, "Block Sues Mastercard and Visa Alleging Inflated Merchant Fees":

> Block is accusing payment-card networks and their member banks of charging inflated fees and using their market power to sustain anticompetitive practices.
>
> Block alleges in a lawsuit filed July 14 that member banks involved with each network colluded to sustain network fees, called interchange, at a level above what would be tolerated in a competitive market. The complaint, filed in the federal court for the Eastern District of New York cites an "Honor All Cards" policy that requires merchants to accept all cards, regardless of the issuing bank, on the Visa or Mastercard networks. ***Since merchants are not allowed to pick and choose which cards they accept, the issuing banks do not compete to win the favor of merchants, according to the suit. Member banks agree to default fees set by Visa and Mastercard so they are not incentivized to undercut each other on price and instead benefit from inflated fees, the suit argues.***
>
> As a result, there are no forces driving interchange fees down and merchants have few options for avoiding them. Interchange fees are set at varying levels depending on the type and size of the merchant and the consumer's card, according to the suit. Credit card interchange fees typically range between 1% and 2.5%. . . .

(emphasis added).

59.     In part, because of the large market concentration in the payment processing market, Visa and Mastercard have large incentives to collude on interchange fees.

60.     Nonetheless, because neither company issues credit cards, their profitability remains subject to their negotiated fee split with credit card issuers—a material aspect of competition between Visa and Mastercard, which are generally the only payment processors available to non-American Express or Discover affiliated issuers.

61.     Put simply, Visa and Mastercard compete with each other for credit card issuers, and they do so by offering larger shares of the interchange fees collected from each transaction. This, in turn, allows issuers to compete for credit card customers by remitting greater amounts to their customers as rewards.

62.     Having largely eliminated competition concerning the breadth of payment processor acceptance, including through policies such as the "Honor All Cards" policy at the heart of the Block litigation, Visa and Mastercard primarily compete on the share of interchange fees they allow issuers to keep.

## II.     CAPITAL ONE'S PLANNED MERGER WITH DISCOVER

### A.     Capital One Announces A Merger with Discover

63.     On February 19, 2024, Capital One announced that it would acquire its direct horizontal competitor, Discover, in a $35 billion all-stock deal.

64.     As The Wall Street Journal reported in a February 19, 2024 article titled, "Capital One Is Buying discover Financial for $35 Billion":

> Capital One said it will buy Discover Financial Services for more than $35 billion, a deal that will marry two of the largest credit-card companies in the U.S.
>
> Under the terms of the all-stock deal, Discover shareholders are set to receive 1.0192 Capital One shares for each Discover share, representing a premium of about 27% based on Discover's closing price Friday. After the deal closes, Capital One shareholders will hold roughly 60% of the combined company, with Discover shareholders owning the rest.

65.     As the article further explained, the merger would provide Capital One with not only control over one of its largest card issuer competitors, but also a position in the payment processing market alongside Capital One's longstanding counterparties Visa and Mastercard.

> Buying Discover would give Capital One, a credit-card lender with a market value of little over $52 billion, a network that would vastly increase its power in the payments ecosystem.

> Card networks are critical to enabling transactions and setting fees that merchants pay when consumers shop with credit cards. Though much smaller than Visa and Mastercard, Discover is one of the few competitors to those companies in the U.S. and it is one of a small number of card issuers that also has a payments network.

66.     The announced merger had one obvious effect—it provided Capital One entrée into the payment processing business.

**B.      Capital One's Investor Conference Call and the Plan to Maintain Horizontal Agreements with Visa and Mastercard Post-Merger**

67.     On February 20, 2024, Capital One's management held an investor conference call, a transcript of which was filed with the SEC. Capital One's CEO, Richard Fairbank, noted that Capital One's merger with Discover would provide Capital One with "vertical integration"— namely, Discover's payment processing business. As Fairbank explained, the Discover merger would provide Capital One with a payment processing "network":

> Slide 8 summarizes the benefits from owning a payment network. Owning a network allows us to enjoy the benefits of vertical integration. Owning a network allows us to deal more directly with merchants rather than a network intermediary, create more value for merchants, small businesses and consumers, and capture the additional economics from vertical integration.

> Let me take a moment to double-clock on the impact of working more directly with merchants, as we think it's a critical part of the strategic rationale and how we provide them more value. Our broader strategy over time has been to get closer to merchants. This includes our investment in Capital One Shopping, which is another direct merchant relationship.

14

68.    As Fairbank further explained, Capital One's post-merger strategy will be to migrate only a small part of its credit card business to Discover—and over time:

> So here's what we're going to do on the credit card side, we will move some of our credit card volume over to the network to enhance its scale and will lean hard into further building the brand and the perceived acceptance of the credit card network here in the United States. We will also work to build greater international acceptance. Over time, we will move a growing portion of our Credit Card business to the Discover Network.
>
> In total, across debit and credit, we expect to add over 25 million Capital One cardholders and over $175 billion in Capital One purchase volume by 2027. This will be a step-change in the scale of the network and we will grow it from here. This injection of volume and investment in the network will help Discover by competitive with the leading networks.

69.    On the conference call, Capital One CFO Andrew Young provided more detail regarding a planned migration of a subset of Capital One's cards to the Discover Network:

> On the network, we intend to begin migration of credit card and debit spend to the Discover Network in the second quarter of 2025. We expect that migration to drive $175 billion of purchase volume to the Discover Network by 2027, resulting in $1.2 billion of synergies. And while we see additional revenue opportunities across the combined enterprise, we have not modeled any revenue synergies beyond those I just covered.

70.    Fairbank further explained that without the merger, breaking into the payment processing network business would be "nearly impossible":

> I'll conclude this morning on slide 27. Pulling way up, the acquisition of Discover is a singular opportunity. It propels Capital One into the global payment network space, something that would be nearly impossible to achieve organically. The combination will create a leading Consumer Banking and payments platform with unique capabilities, powerful brand, and a franchise of more than 100 million customers that spans the marketplace.
>
> It combines high growth credit card and banking businesses with a global payments network at scale. It leverages Capital One's technology transformation and digital capabilities across the significantly larger customer franchise. It delivers compelling

financial results, and it offers the potential for unparallel *[sic]* strategic and economic upside over the long-term.

71.     Fairbank was clear that a payment network was a rare asset, difficult to replicate organically, including because of network effects and feedback loops:

> First of all, the network side of the business. We all kind of revel in the fact that a network is a very, very rare asset. There are very few of them and it's just—I don't think people are going to be building any of these any time soon because it's such a chicken-and-egg problem to ever get one started. You show up at a merchant and say, we'd like to sign up for our new network and they say, how many customers do you have? And we go, well that's where you come in. And the customers are asking similar questions.
>
> So it's a remarkable thing to build a network. And over 40 years, patiently, they built a network with really just essentially universal acceptance here in the United States. So, that was something that was remarkable. And we have always had a belief that the Holy Grail is to be able to be an issuer with one's own network so that one can deal directly with merchants. And from merchants to consumers, it's all part of one comprehensive relationship. So, that is part of— that's one part of the appeal. We sort of had awe about that aspect.

72.     In the same breath as expressing "awe" over Discover's payment processing network, Fairbank also extolled Discover's interchange-fee-funded rewards program:

> Another big part of it was watching how—the credit card business that they built. They were the pioneers in cashback. They created cashback before any of the rest of us thought of it. And in fact, not just were first, they build a big lead in that business and were the dominant brand in cashback probably for a good decade.
>
> We at some point said, gosh, we got to get in on some of that and came out with our Quicksilver card. But that came from our admiration of what they had built there. So, on the product side, I think what has always characterized them is very customer focused products that are simple and just work backwards from what excites customers. So that has impressed us.

73.     Fairbank continued to explain that the payment network business was the result of a "flywheel," an analogy for a feedback loop, and network effects. Fairbank explained that because of network effects, Capital One would retain its agreements with Visa and Mastercard. Capital

One's plan was clear—it planned to operate post-merger as both a counterparty to, and a direct horizontal competitor with, Visa and Mastercard:

> I mean, we were very drawn to this deal and kind of way at the top of the list was the benefit of having a network. And we are very excited about that. And we look at that rare unique asset that Discover has and we're struck by the—fundamental challenge it faces is a scale problem. They've done everything else the best they can. They just don't have enough scale, even in the US, to get what they want done; and then, of course, international as well.

> So in looking at that rare and valuable asset, for us to be able to take whatever volume we can and add it to that really helps in a way that's even more than adding scale to almost anything is helpful. But the network business, there's a reason it's called a network because it has network effects associated with it. Or to use another metaphor, there's a flywheel that gets turning when you add more scale to that.

> I do want to also pull up though and say that we have been partners with Visa and Mastercard for a long time. They have built a breathtaking, amazing international global network that stands alone in a lot of the reach, acceptance, brand and capabilities it has; and we're reverential about that. And so, we're talking about making a network that is way, way smaller than those and give it a chance to get a threshold, scale, pick up momentum; and, as we said, over time, we're going to lean in and build the strength, the acceptance, the brand, and the perceived acceptance and credibility of this network, and then keep moving volume over as we get more traction along the lines.

> But I do believe as far out as we can see, I think that partnering with Visa and Mastercard would be important. They'll be very important partners with use because there's a lot of value that they still can add to our customers. And at the end of the day, we're going to always work backwards from what works best for our customers and how we can win on their behalf.

74.    Fairbank's post-merger plan would result in Capital One maintaining, negotiating, and renegotiating agreements with Visa and Mastercard for Capital One credit card interchange fees, while at the same time serving as Visa and Mastercard's direct horizontal competitor in the payment processing market. Fairbank was asked about this post-merger dynamic at the conference call, but brushed the structural competitive problem aside:

17

Q. . . And then on the credit side, following up on the comments that you just made, since there are elements of the payments business where you'll be competing with Visa and Mastercard, given some of those partner versus competitor dynamics, is it fair to conclude that they've sort of been receptive to that sort of coexistence of that partner versus competitor relationship?

[Fairbank:] And just to comment on that for a second, one of the nice things about vertical integration is that one can add the network margin which otherwise was something the networks collect. We get a chance to add the network margin and that enhances the vertical integration. I mean, that just enhances the economics of the move.

With respect to partnering and competing with Visa and Mastercard at the same time; we have strong relationships with both Visa and Mastercard that go back to our founding days. And it's not unusual for companies to be both competitors and customers of one another. In the credit card markets alone, U.S. Bank and Amex are, for example, a clear example. Amex is a network for US Bank and other card issuers, but Amex also competes against those same companies as a card issuer.

So PayPal and Mastercard; PayPal issues their credit card on Mastercard. So, there, it is—in the marketplace, it's not unusual for companies to be both competitors and customers of one another in different aspects of what these companies do. And we don't see this as an issue. In fact, we look forward to continuing to partner with Visa.

And with respect to your question about how we would go out and market our national banking strategy, I think it's going to feel exactly like it does now, Capital One with a very salient story, talking about the full service digital-first bank that we have with Capital One and we've got the same story. And along the way, we're to partner with Visa and Mastercard in this journey.

75.    Fairbank did not address the elephant in the room. None of the examples he provided involved a credit card company allocating its cards to Visa and Mastercard and simultaneously operating a vertically integrated credit card payment processing network. Contrary to Fairbank's statements, Capital One would be adopting an unprecedented business model post-merger. Moreover, it would be doing so with post-merger horizontal competitors that Capital One itself has a history of colluding with—Mastercard and Visa.

C.     **The Announced Merger Faces Backlash and Competitive Concerns**

76.     The reaction to the announced merger resulted in widespread opposition from regulators and industry participants.

77.     On February 25, 2024, members of Congress, including Senator Elizabeth Warren, wrote a letter to the Board of Governors of the Federal Reserve and the Office of the Comptroller of the Currency urging them to block the transaction:

> With nearly $500 billion in assets, Capital One is currently the nation's ninth-largest bank. By acquiring Discover, Capital One would add a network of 305 million cardholders to its base of more than 100 million customers, consolidating the credit card market and limiting customer choice. This merger would make Capital One the nation's sixth-largest bank, and largest credit card issuer, with over $200 billion in outstanding credit card loans.

78.     The letter noted that both Capital One and Discover had a long history of compliance failures and exploitation of their customers:

> Capital One has a concerning history of mistreating consumes. In 2012, the CFPB ordered the bank to refund $140 million to 2 million consumers with low credit scores and low credit limits who were misled into paying for costly add-on products. In 2019, Capital One's shoddy risk-management practices resulted in a hacker gaining access to more than 100 million credit card applications and customer accounts. Discover's record of compliance failures also raises concerns. In October 2023, it reached a sweeping consent order with the FDIC that required further action to address "'violations of, and consumer harm related to' various consumer financial laws."

79.     Republican Senator Josh Hawley wrote to the Department of Justice on February 21, 2024, urging the United States to act to block the merger:

> On February 19, Capital One—one of America's largest and most powerful banks—announced its plans to acquire Discover Financial Services for $35 billion, bringing 300 million Discover card users into its existing fold of 100 million customers. As the Wall Street Journal reported, this merger will create "the third largest credit-card issuer by purchase volume" and the "sixth largest U.S. bank by assets."

19

> This is destructive corporate consolidation at its starkest. If consummated, this merger will create a new juggernaut in the credit card market, with unprecedented powers to extort American consumers. This cannot be allowed to happen.

80.     Lawmakers decried only one notable aspect of the merger—an increase in concentration in the credit card market. As explained below, an additional threat to consumers arises from Capital One's control over Discover's payment processing network, positioning it as a direct horizontal competitor with Mastercard and Visa.

## III.     THE RELEVANT MARKETS

81.     The proposed merger impacts two relevant markets. First, the merger reduces competition in the market for general credit cards (the "General Credit Card Market"), and second, the merger reduces competition in the market for credit card payment processing (the "Payment Processing Market").

### A.     The General Credit Card Market

82.     The market for general credit cards is a distinct submarket of the market for consumer debt products, including credit cards. Several relevant factors indicate that general credit cards are a distinct product in a distinct submarket.

#### 1.     General Credit Cards Are a Distinct Submarket

83.     ***Industry and public sources recognize the General Credit Card Market as a separate economic entity, and General Credit Cards have peculiar characteristics and uses.*** General credit cards are distinct from other consumer debt products because they allow a cardholder to incur debt for virtually any consumer purchase, so long as the credit card is accepted by a merchant.

84.     To begin with, unlike credit cards that can be used only at a specific store, general credit cards can be used anywhere. Store cards are different products from general credit cards

because they are tied to benefits at a particular store and are essentially loyalty cards with narrow purchasing power.

85.     As U.S. News explained in a January 31, 2019 article titled, "How Are Store Cards Different from General Credit Cards?":

> A store credit card is essentially a loyalty card with buying power, giving you benefits for shopping at a store that general cards likely can't match. You're given special consideration and deals because you're using the store's own card to make your purchase.

86.     Many store cards are "closed-loop," meaning they cannot generally be used at other stores.

87.     General credit cards are open-loop, meaning they rely on a payment processor, such as Mastercard or Visa to process transactions. These credit cards are accepted by a wide range of merchants, and payments are processed and settled by Visa, Mastercard or some other payment processing network.

88.     Credit cards also generally provide rewards for expenditures on the credit card. These rewards include cash back, airline miles, consumer product credits and gift cards, and other perks. Although there is a wide range of rewards categories, most rewards have generally accepted cash-equivalent value.

89.     In addition, general credit cards allow their users to maintain a credit balance, or to revolve a balance from month to month. Debit cards, however, do not generally provide for credit, nor do they provide rewards for expenditures.

90.     Because general credit cards can charge uncapped interchange fees, they almost universally provide incentive rewards as part of the overall price of the credit card, which includes the interest rate charged for maintaining a balance on the card, and in some cases, other fees, such as annual membership fees.

91.     As the Consumer Financial Protection Bureau (CFPB) explains in an October 2023 reported titled "The Consumer Credit Card Market," interest payments almost always exceed the rewards provided for consumers that carry a credit card balance:

> The dollar value of rewards earned by general purpose cardholders exceeded $40 billion for mass market issuers in 2022. Transaction accounts, or those where the cardholder pays the full statement balance each month, are increasingly benefitting from credit card use. But, when a consumer revolves a balance on their credit card, the cost of interest and fees almost always exceeds the value of rewards the consumer may have earned. Cardholders' rewards redemptions have increased, but consumers still forfeit hundreds of millions of dollars in rewards value each year.

92.     Even as to customers that do not maintain a balance on their credit cards, however, there is a cost to each credit card transaction, as merchants generally incorporate the interchange fees they are charged into the price of their goods.

93.     As Investopedia explains in a February 27, 2024 article titled "Interchange Rate: Definition, Calculation Factors, Examples":

> Some merchants pass on the interchange fee directly to their customers as an additional surcharge, especially for transactions under a certain amount. The majority of businesses, though, include transactional costs into their products and services.

94.     In other words, all cardholders will generally pay higher costs in the form of passed-on interchange fees than the value of the rewards they obtain as a result of their credit card transactions.

95.     Notably, other forms of consumer debt do not include passed-on interchange fees. For example, closed-loop store cards do not generally charge interchange fees, as the cards are not accepted widely and do not require a payment processor such as Visa or Mastercard to process and settle transactions.

96.     In addition, general credit cards are unsecured debt, and thus do not depend on liens or contingent title to an underlying asset. They are issued based on the creditworthiness of the borrowers—namely, the credit score maintained by one of the credit rating agencies (*e.g.*, Equifax).

97.     ***Unique production facilitie****s*. General credit cards require several unique production facilities. To begin with, general credit cards require a payment processing network in order to consummate transactions. These payment processors include Visa, Mastercard, Discover, and American Express.

98.     General credit cards also require fraud detection and loss mitigation resources. All general credit card products provide fraud detection, including automatic systems designed to detect fraudulent or unauthorized transactions.

99.     In connection with these systems, credit cards maintain infrastructure designed to challenge fraudulent or unauthorized transactions, including reversing charges and investigating and/or reporting credit card fraud.

100.    Credit cards also maintain infrastructure for "charge-backs" to merchants that process unauthorized or fraudulent credit card transactions.

101.    General credit cards require credit rating and reporting systems to assess creditworthiness. Credit card companies rely on credit ratings such as FICO scores, which are maintained by Credit Reporting Agencies (CRAs) such as Equifax or Experian.

102.    General credit card products depend on statistical and machine learning models that determine the likelihood of default, the appropriate amount of credit to extend, and the likely interchange fees that will be generated by a customer.

103.    Finally, general credit cards depend on debt collection infrastructure. Because general credit card debt is unsecured, credit card companies maintain infrastructure designed to collect credit card debt from delinquent account holders.

104.    This infrastructure includes allocating collections to third-party vendors that pursue credit card debt on behalf of the credit card company or purchase outstanding debt from the credit card company at a fraction of its face value.

105.    ***Distinct customers/consumers.*** General credit card consumers seek a means of carrying general, revolving debt. Unlike specialized forms of credit, which may require a security interest or payment by a maturity date, credit card customers perpetually revolve balances until they are paid off.

106.    General credit card customers also require widespread acceptance among merchants. To a general credit card customer, a secure loan for a consumer product is not reasonably interchangeable with the credit provided by a credit card.

107.    General credit card customers also do not regard ATM or debit cards as reasonably interchangeable with credit card products because those cards do not allow them to carry a revolving debt load and do not allow for unsecured credit in connection with transactions.

108.    General credit card customers also regard credit cards as vehicles for shorter term credit than secured debt. For example, because of the generally higher interest rate, general credit card customers do not buy real property or a car using a credit card, as doing so would expose them to exponentially growing interest and principal amounts over the longer life of such products. As such, credit cards are not viewed as reasonably interchangeable with long-term debt products.

109.    ***Distinct prices and sensitivity to price changes.*** Credit card interest rates are distinct from interest rates charged for other products, including secured products. For example,

while a real property mortgage interest rate will remain close to the risk-free rate set by government debt products, credit card interest rates are multiples greater.

110.    Specifically, credit card interest is related to the "prime rate," which is derived from the risk-free interest rates set by the Federal Reserve. As Bankrate explains in a January 31, 2024 article titled "How the Fed affects credit cards":

> Your card rates are tied to the prime rate, to which issuers add a markup to arrive at your card's interest rate. The prime rate, in turn, is based on the Fed's target interest rate. This means that when the Fed starts hiking its target rate, the prime rate also goes up.
>
> And when the prime rate goes up, variable interest rates soon follow. In fact, interest rates on credit cards have been moving up over the last two years, with the national average APR at 20.74 percent in late January, up from 16.34 percent in March 2022.

111.    In addition, credit card interest rates are offset by the value of rewards remitted to the subscriber, whereas other debt products do not have such an offsetting price component. Credit card companies compete over customers by providing these rewards from their share of the interchange fees they collect. As such, the amount of rewards provided to credit card customers is sensitive to the share of the interchange fees an issuer can obtain from each transaction.

112.    Integrated credit card issuers that operate their own payment networks create increased competitive pressure to increase the amount of rewards provided by all credit card issuers in the market, as such companies do not have to split interchange fees with a payment processing company such as Mastercard and Visa.

113.    Credit card interest rates are also sensitive to trends in consumer-related default rates, whereas other debt products, such as real property mortgages, do not set prices based on such factors.

114.    ***Specialized vendors.*** Credit card products rely on specialized vendors. For example, credit card products base credit decisions on reporting by CRAs such as Equifax, which issue a FICO score or similar credit rating for each credit card customer.

115.    In addition, specialized vendors track and compare rewards programs. For example, vendors such as The Points Guy provide comparisons of rewards programs, while at the same time marketing credit cards to consumers.

116.    Other related, specialized vendors include travel agencies (*e.g.*, American Express Travel) and affiliated companies designed to facilitate redemptions from rewards programs.

### 2.    The Relevant Geographic Market is the United States

117.    The relevant geographic market in this case is the United States general credit card market. This market is distinct because anti-money laundering, consumer protection, and banking regulation laws are distinct within the United States.

118.    Credit card products outside of the United States are subject to different regulatory constraints, business models, and fee structures.

119.    For example, in Europe, credit card transaction fees are capped by regulation. As CMSPI explains in a May 3, 2022 article titled, "How Do U.S. Card Fees Compare Internationally?":

> In Europe, for example, consumer credit cards are regulated so fees are capped at 0.3% per transaction. China and Australia have similar regulations resulting in average credit card interchange rates of 0.45% and 0.5% respectively. In Canada, while no regulation is in place regarding credit card fees, Visa, Mastercard have agreed to limit their fees on average to 1.40%. In the U.S., there are no fee constraints, voluntary card network agreements, or network routing competition on credit cards, making U.S. credit interchange fees some of the highest in the world.

120.    These and other distinctions in the United States make foreign credit cards unavailable to U.S. persons, and the prices for credit cards issued to U.S. persons are distinct from those outside of the United States.

### 3.    Market Participants and Concentration

121.    Consumers in the United States have approximately 589.6 million active credit card accounts.

122.    The largest issuer of credit cards in terms of number of accounts is Citibank, with 95 million active accounts in 2020. The largest credit card issuer in terms of payment volume is Chas Bank, which facilitated $1.143 trillion in 2022 payments.

123.    Among the top 15 credit card issuers, the top 5 process 77.7% of their collective market payment volume.

124.    In 2022, Capital One was fourth in purchase volume among the issuers, with $535 billion in transaction volume. Discover processed approximately half that transaction volume—$211 billion.



125.     According to Nilson (as reported by Statista), in 2022 JPMorgan Chase maintained the largest market share in terms of purchase volume, with approximately 20.96% ($1.143 trillion, out of $5.452 trillion total); American Express had approximately 18.84% ($1.027 trillion, out of $5.452 trillion total); Citi had approximately 10.33% ($563 billion, out of $5.452 trillion total); Capital One had 9.81% ($535 billion, out of $5.452 trillion total); Bank of America had 8.82% ($481 billion, out of $5.452 trillion total); Discover had approximately 3.87 % ($211 billion, out of $5.452 trillion total); U.S. Bank had approximately 3.50% ($191 billion, out of $5.452 trillion total); and other issuers combined constituted 23.86% of the market ($1.301 trillion, out of $5.452 trillion total).

126.     The U.S. General Credit Card Market is moderately concentrated. The Herfindahl-Hirschman Index (HHI) of the market shares above, a commonly accepted measure of market concentration, is 1,671.5 (if the other issuers are regarded as a whole).

127.     The United States Department of Justice, according to its Horizontal Merger Guidelines, considers HHIs between 1,500 and 2,500 to be moderately concentrated, and markets in which the HHI is more than 2,500 points to be highly concentrated.

128.     If the merger between Capital One and Discover is consummated, the HHI would increase to 1,747.46.

**B.     The Credit Card Payment Processing Market**

129.     The market for credit card payment processing is a distinct submarket of the market for payment processing. Several relevant factors indicate that credit card payment processing is a distinct product in a distinct submarket.

**1.     The Credit Card Payment Processing Market Is a Distinct Submarket**

130.     ***Industry and public sources recognize the Credit Card Payment Processing Market as a separate economic entity, and Credit Card Payment Processing has peculiar***

*characteristics and uses.* The market for credit card payment processing is widely recognized as a distinct market. The participants in this market, including Visa, Mastercard, American Express, and Discover, are often referred to as payment "networks" or payment processors.

131.    As online payment company Stripe explains on its website:

> Credit card networks provide the communication system that issuing banks and businesses use to process credit card transactions. The networks and issuers authorize and process credit card transactions, set the transaction terms, and move payments between customers, business, and their banks. Major credit card networks include Visa, Mastercard, American Express, and Discover, but there are others.

132.    Credit card payment processors provide credit card issuers with a means of processing and settling transactions. Visa and Mastercard are the largest credit card payment processors. They are also the two primary credit card payment processors that make their services available to issuers—but they do not themselves issue credit cards. American Express and Discover are the only major credit card payment processors that both issue credit cards and process credit card payments through their own networks.

133.    As CNET explains in an October 6, 2023 article titled, "What's the Difference Between Visa, Mastercard, American Express and Discover Cards?":

> American Express and Discover are the only major processors that also issue cards. If you have a Visa or Mastercard, it's always going to be linked to an issuing bank such as Capital One or Barclays. American Express and Discover may offer cards through separate issuers too, but they have the capacity to issue their own cards. For instance, Discover serves both as issuer and processor for its Discover it Cash Back card.

134.    The market is publicly recognized as comprising firms that facilitate credit card transactions from start to finish. As CNET explains in the same article:

> American Express, Discover, Mastercard and visa are the four major credit card processing networks that oversee every card transaction from start to finish. Their job includes approving or declining a

purchase, protecting shoppers and merchants from fraud and making
sure money flow to and from the appropriate accounts.

135.    Credit card payment processing is different from other means of payment
processing. This is because credit card payment processing is tied to the use of credit cards, which
are taken as payment by merchants with contractual relationships with the payment processor.

136.    Credit card payment processing includes infrastructure designed specifically for
credit card transactions. For example, payment processors maintain the infrastructure needed for
rapid transaction settlement. Credit card payment processing also requires infrastructure necessary
for fraud prevention and chargebacks.

137.    Credit card issuers and cardholders require fast transaction speeds to facilitate a
large volume of payments. As such, credit card payment processing must be significantly faster
than other payment methods, such as checks, wire transfers, and money orders. The Visa and
Mastercard credit card payment networks can process thousands of transactions per second.

138.    Credit card payment processing must also accommodate both large and small
transactions. For other forms of payment processing, many everyday transactions are too small to
justify the expense of the transfer medium. For example, the cost of a wire transfer may exceed
the value of a pack of gum purchased from a grocery store.

139.    Credit card payments are facilitated by credit card payment processors in exchange
for a portion of the interchange fee charged to merchants (and passed on to
purchasers/cardholders).

140.    Credit card payment processors primarily compete based on the interchange fees
they charge, the portion of the interchange fee they retain as part of their split with issuers, and the
breadth of their network.

141. Network breadth is determined by each credit card payment processor's merchant relationships. Each network must enter into sufficient agreements with merchants and acquirers such that card holders can be assured that their credit cards will be generally accepted when they make purchases.

142. ***Unique production facilities***. There are unique production facilities associated with credit card payment processing. To begin with, credit card payment processors must provide point-of-sale technology that can scan credit card information, transmit it to the payment processor, and receive a response—typically within seconds.

143. Both Visa and Mastercard provide direct point-of-sale hardware, but also set forth protocols for third parties to manufacture and deploy such devices.

144. Most transactions are transmitted to and from credit card payment processors through an Internet connection. Credit card payment processors must therefore provide both security (*e.g.*, authentication) and encryption for the transactions they facilitate.

145. Credit card processors also require issuers to deploy their products widely. While American Express and Discover issue their own credit cards, Visa and Mastercard do not and must rely on credit card issuers to deploy credit cards that use their credit card payment processing services.

146. Credit card payment processors must also maintain technology, infrastructure, and agreements to facilitate contactless payments, such as through Apple Pay and/or using a near-field communications (NFC) reader.

147. ***Distinct customers/consumers.*** Credit card payment processors have distinct customers. Specifically, their customers are credit cardholders that enter into transactions with merchants, as well as the merchants that accept their credit cards.

148.    For credit card payment processors that do not operate their own credit card network, they rely on third-party issuers to provide a customer base of cardholders. All credit card payment processing networks, however, must maintain agreements with merchants.

149.    Unlike other forms of payment processing, credit card payment processing uniquely caters to customers that seek to use credit cards. These customers are distinct from other users of payment systems, such as Venmo or Cash App, which do not require an issued credit card to make and receive payments.

150.    ***Distinct prices and sensitivity to price changes.*** Credit card payment processors charge prices distinct from other payment systems. Specifically, credit card payment processors charge interchange fees, which typically range from 1.15-3.25%.

151.    For credit cards, the amount of interchange fee a credit card payment network can charge is uncapped and subject to competition among the four major credit card processors. For debit cards, on the other hand, interchange fees are capped by statute and regulation.

152.    Moreover, the portion of interchange fees that a credit card payment processor will retain, as opposed to split with an issuer, depends on whether the payment processor issues its own credit cards. It will also depend on the leverage and size of an issuer as a portion of a credit card payment processing network's overall transactions. In other words, a major issuer may obtain a different split of the interchange fees than a smaller issuer.

153.    The fees paid to credit card payment processors are ultimately paid by credit card holders that make purchases, as merchants either directly pass on those fees to their customers or include the fees in the price of their goods.

154.    ***Specialized vendors.*** Credit card payment processors use specialized vendors, such as third-party security providers, transaction acquirors, providers of point-of-sale systems, and issuers that use the credit card payment processing networks for their credit cards.

### 2.    The Relevant Geographic Market is the United States

155.    The relevant geographic market in this case is the United States credit card payment processing market. This market is distinct because anti-money laundering, consumer protection, interchange fee, and banking laws are distinct within the United States.

156.    Payment networks within the United States also facilitate transactions in the U.S. Dollar. International transactions may require a currency exchange by the issuer.

157.    Moreover, U.S. issuers in some cases block Visa and Mastercard credit card transactions in countries with high levels of fraud or that are fraught with regulatory constraints, including China, Syria, Iran, North Korea, Romania, Ukraine, Saudi Arabia, and South Africa.

### 3.    Market Participants and Concentration

158.    The credit card payment processing market is comprised primarily of four credit card payment processing companies: Visa, Mastercard, American Express, and Discover.

159.    The four principal U.S. credit card payment processors facilitated more than $20 trillion in transactions in 2022. Visa and Mastercard have the largest combined share, with Mastercard facilitating 32.8% of the total transaction volume and Visa 58.3%.



160.    In terms of the number of credit cards in circulation using each network, Visa and Mastercard again exceed Discover and American Express by a large margin. Visa had 363 million cards in circulation in 2021 and 353 million in 2020. Mastercard had 273 million cards in circulation in 2021 and 246 million in 2020. In comparison, Discover had 60.6 million cards in circulation in 2021 and 60.2 million cards in circulation in 2020. American Express had 56.4 million cards in circulation in 2021 and 53.8 million in 2020.

161.    According to Statista, Visa has the largest Credit Card Payment Processing Market share based on the value of transactions, followed by Mastercard. Together, Visa and Mastercard have a dominant share of the Credit Card Payment Processing Market.



162.    Specifically, in 2022, Visa had a 61% share of the market, Mastercard had 25.5%, American Express had 11.3%, and Discover had a 2.2% share. Combined, Mastercard and Visa have 87% of the market share for U.S. credit card payment processing.

163.    The U.S. credit card payment processing market is highly concentrated. The Herfindahl-Hirschman Index (HHI) of the market shares above, a commonly accepted measure of market concentration, is 4,503.

164.    The United States Department of Justice, according to its Horizontal Merger Guidelines, considers HHIs between 1,500 and 2,500 to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points to be highly concentrated. The Credit Card Payment Processing Market, with an HHI of 4,503 based on the above market shares, is therefore (very) highly concentrated per the DOJ's guidelines.

**IV.     THE PAYMENT NETWORK AND ISSUER REWARDS BARRIER TO ENTRY**

165.    Both the General Credit Card Market and the Credit Card Payment Processing Market are protected by a powerful barrier to entry, which arises from a series of network effects and feedback loops. This barrier to entry is called the Payment Network and Issuer Rewards Barrier to Entry ("PNIRBE").

166.    To begin with, credit card holders will not sign up for and use a credit card that is not generally accepted by merchants. Thus, the more widespread the acceptance of a credit card, the more valuable the credit card becomes. In other words, there is a direct network effect that results from a critical mass of merchants accepting a credit card.

167.    Credit card issuers, however, require a payment processing network to facilitate a transaction, and the acceptance of their credit cards depends on the size of the credit card processing network used by the issued credit card.

168.    Payment processors can obtain interchange fees from merchants and purchasers only if their credit cards are accepted by a critical mass of merchants. Without widespread acceptance, a credit card payment processor is not viable and cannot charge interchange fees.

169.    The result is, as Capital One CEO Richard Fairbank explained at his conference call concerning the challenged merger, a "chicken or the egg" problem. To create a new credit card payment network, an entrant must have access to a large number of cardholders in order to incentivize merchants to accept cards using the entrant's network.

170.    If the new credit card payment network issues its own credit cards, it will have to obtain interchange fees to fund rewards to credit card customers. Without acceptance as a payment network, however, the new entrant does not have sufficient interchange fees to obtain customers, and as a result, cannot convince enough merchants to accept cards using the new payment network.

171.    If a new credit card payment network relies on third-party issuers to obtain a critical mass of customers to justify merchant adoption, it would need widespread adoption to convince third-party issuers to adopt the payment network. However, without a critical mass of merchants that accept cards using the new payment network, issuers will not adopt the new entrant's payment network.

172.    The result is a self-reinforcing feedback loop that creates a powerful barrier to entry surrounding the Credit Card Payment Network Market.

173.    On the credit card issuer side, the PNIRBE also creates a significant barrier to entry. A new credit card issuer can either provide the payment processing for its credit cards or contract with either Visa or Mastercard (the only two credit card payment processors that are generally open to third-party issuers). Contracting with Visa and Mastercard, however, requires the new entrant to split the interchange fees resulting from transactions using the credit card it issues.

174.    Because a new credit card entrant must fund rewards to customers using its share of the interchange fees, and because it cannot negotiate a favorable split with Visa or Mastercard in comparison to incumbent credit card issuers, it cannot readily fund rewards sufficiently competitive to obtain market share from other issuers.

175.    This feedback loop therefore also protects the issuer side of the market from entry, allowing incumbent credit card issuers to charge higher prices in the form of fees, interest, and lower rewards.

176.    The PNIRBE can be disrupted only with the existence of a viable entrant at scale in the Credit Card Payment Processing Market or from price competition from a vertically integrated payment network/credit card issuer entrant in both the Credit Card Payment Processing and General Credit Card Markets.

177.    There has been no successful entry in the Credit Card Payment Processing Market in the last several decades. The same four credit card payment processors have occupied the entire market without any challenge or price competition from an entrant credit card payment processing network.

178.    Visa and Mastercard, which are not vertically integrated, together maintain a monopoly share of the Credit Card Payment Processing Market. Over many years, there has neither been a Credit Card Payment Processing entrant nor a General Credit Card entrant of sufficient size and scale to displace or diminish the two companies' duopoly.

179.    The vertically integrated firms, Discover and American Express, maintain a minority share of the Credit Card Payment Processing Market and the General Credit Card Market. Their share of each market has not materially changed during the class period.

180.    Moreover, new technologies, including peer-to-peer payment systems and cryptocurrencies, have emerged in the last decade. These new technologies can achieve high transaction throughputs. The incumbent credit card payment processors, on the other hand, use relatively archaic technology to facilitate transactions, but have felt no competitive pressure from new technology or firms that use new technology to facilitate payments.

181.    As explained above, companies such as Block, which leverage peer-to-peer and cryptocurrency technologies, have attempted to enter the Credit Card Payment Processing market and have been directly excluded by Visa and Mastercard's agreements with merchants. Indeed, Block recently filed suit to enjoin this anticompetitive practice. Such an agreement excluding potential credit card payment processing rivals would not be possible if the Visa and Mastercard were not protected from competition by the PNIRBE.

182.    Put simply, Visa and Mastercard are capable of preventing entry into the Credit Card Payment Processing Market because the PNIRBE protects their combined monopoly from competition. In fact, all four of the existing U.S. credit card payment processing networks (Visa, Mastercard, American Express, and Discover) enjoy insulation from competition and *de novo* entry as a direct result of the PNIRBE, including through their large networks of agreements with merchants and credit card holders.

183.    With respect to credit card issuers, the top five issuers dominate the U.S. General Credit Card Market. Not a single new entrant has been able to take significant market share from the top five incumbent issuers in many years. This is a direct result of the feedback loops and network effects that create the PNIRBE.

## V.    THE MERGER WILL SUBSTANTIALLY LESSEN AND HARM COMPETITION, INJURING PLAINTIFFS AND THE CLASS

184.    The announced merger, if consummated, will directly harm competition in both the General Credit Card Market and the Credit Card Payment Processing Market, including by strengthening the PNIRBE protecting both markets from competition and new entrants.

### A.    The Merger Will Strengthen the PNIRBE

185.    The merger, if consummated, will strengthen the powerful feedback loops and network effects that give rise to the PNIRBE protecting both the General Credit Card and Credit Card Payment Processing Markets.

186.    To begin with, Capital One's acquisition of one of the two vertically integrated credit card companies, Discover, will result in less price pressure on Capital One's combined business to remit a higher share of the interchange fees to customers as rewards.

187.    Indeed, because of Discover's vertically integrated business, it is able to retain the entirety of the interchange fees generated by its cards, which in turn allows Discover to provide

greater and more valuable rewards to customers. Discover uses these rewards to obtain market share in the General Credit Card Market.

188.    After the merger, Discover's interchange fees will inure entirely to Capital One, relieving the pressure to compete with a vertically integrated issuer that can retain entire interchange fees to use to fund credit card rewards.

189.    As a result, Capital One will compete with only one remaining vertically integrated firm that retains the full interchange fee.

190.    This significant reduction of competition from a vertically integrated competitor will result in higher prices for Capital One customers, particularly because Capital One will remit less of the interchange fees it collects to its customers in the form of rewards.

191.    The result is a strengthening of the PNIRBE as a result of the challenged merger, as entrant firms will have to either vertically integrate and bootstrap their own credit card payment processing network—which Capital One's CEO has publicly asserted is nearly impossible—or enter an agreement with Visa and Mastercard, resulting in an interchange fee share no greater than the larger incumbent credit card issuers, including Capital One.

192.    Capital One's addition of Discover credit cards to its business will also result in a significant strengthening of the PNIRBE. Specifically, a larger base of cardholders means that Capital One can increase the size of the Discover network, while at the same time continue issuing Visa and Mastercard credit cards (as its CEO has noted Capital One plans to do). This directly reduces the value of American Express's competing (and price-checking) payment processing network and requires new issuers to enter into agreements with Visa and Mastercard as a condition of entry.

193.    Capital One will have both a large payment network and a larger base of credit cards. This will create a positive feedback loop—or flywheel, as Capital One's CEO calls it—that will fortify Capital One's position in both the Credit Card and Credit Card Payment Processing Market, and as a result, strengthen the barrier to entry for new entrants. Indeed, a new entrant will have to obtain credit card customers and market share from Capital One as a precondition for entry in both the General Credit Card and Credit Card Payment Processing Markets. The resulting flywheel will increase switching costs and make it more difficult to collect enough of a share of interchange fees to provide competitive rewards or to otherwise lower prices.

**B.    The Merger Will Increase Market Concentration in the General Credit Card Market**

194.    The proposed merger will consolidate two of the top credit card issuers in the General Credit Card Market. This will reduce price competition, including on the share of interchange fees remitted to customers as rewards.

195.    The proposed merger will result in a single entity with 13.68% of the General Credit Card Market, increasing the market's concentration to an HHI measure of 1,747.46 from its current 1,671.5.

196.    Because Capital One is a bank, the merger will likely result in higher prices for consumers. As the February 25, 2024 letter from lawmakers to the Federal Reserve Board of Governors and the Office of the Comptroller of Currency points out:

> With nearly $500 billion in assets, Capital One is currently the nation's ninth-largest bank. By acquiring Discover, Capital one would add a network of 305 million cardholders to its base of more than 100 million customers, consolidating the credit card market and limiting consumer choice. This merger would make Capital One the nation's sixth largest bank, and largest credit card issuer, with over $200billion in outstanding credit card loans.
>
> This merger is bad for consumers. The banking and credit card industries are already highly concentrated: today, the six largest

bank holding companies control more assets than all other bank holding companies combined. Consolidation in the banking sector causes "high prices and more fees, lower deposit rates, less access to credit, bank branch closures, and job cuts." In addition to harming consumers and small businesses, bank consolidation poses increased systemic risk in the financial system, "reducing the number of smaller banks and creating even more too big to fail banks."

197.    The consolidation of Discover's assets with Capital One is additionally dangerous because of Capital One's status as a bank. As a CFPB study and report revealed in February 2024, "large banks charge higher interest rates than small credit card issuers, with '[n]early half of the largest credit card issuers'—including Capital One—'offering cards with maximum purchase APR over 30%.'" The report also found that "large credit card issuers charge average fees that are 70% higher than those charged by small institutions. These higher rates and fees can cost consumers hundreds of dollars annually."

**C.    The Merger Will Eliminate Discover as a Vertically Integrated Competitor with Capital One, which Will Increase Prices, Including by Reducing the Amount of Interchange Fees Remitted to Customers as Credit Card Rewards**

198.    Capital One's acquisition will eliminate competition from one of only two vertically integrated competitors to Capital One in the General Credit Card Market. Vertically integrated competitors, because they retain all of the interchange fees charged through their credit cards, are able to provide greater and more valuable rewards to customers. This, in turn, lowers prices in the General Credit Card Market by forcing competitors, including Capital One, to issue greater and more valuable rewards.

199.    The proposed merger would eliminate significant general credit card competition from a vertically integrated firm (Discover), leaving only one such firm, American Express, in the market. The result will be to lessen competition in the United States General Credit Card Market,

including by lessening (likely eliminating entirely) downward price pressure from one of the two vertically integrated general credit card firms in the market.

**D.    The Merger Will Facilitate Horizontal Collusion in the Credit Card Payment Processing Market**

200.    Visa, Mastercard, and Capital One have a history of collusion. They were sued for fixing and manipulating interchange fees and have settled claims for billions of dollars.

201.    The proposed merger would realign Capital One as a horizontal competitor of Visa and Mastercard in the Credit Card Payment Processing Market.

202.    Although Capital One could move its existing cardholders off the Visa and Mastercard networks and vertically integrate through the Discover network, the company has stated that it will not shift all of its credit cards to Discover, but rather will continue its longstanding relationship with Visa and Mastercard while at the same time issuing credit cards that use the Discover Network.

203.    This mixed model creates a dangerous incentive for the companies to collude on interchange fees. To avoid the threat that Capital One will move its cardholder base to Discover, Visa and Mastercard may provide Capital One with a larger share of the interchange fees in exchange for refraining from expanding the Discover credit card payment processing network. Moreover, because Capital One will no longer face competition from vertically integrated Discover, it will have no incentive to remit its increase share of the interchange fees to its customers as rewards.

204.    The net effect will be higher interchange fees, which are passed on to cardholders; fewer rewards because of decreased competition from vertically integrated Discover; and the insulation of Visa and Mastercard from competition in the Credit Card Payment Processing Market.

205.   The likelihood of collusion is significantly greater given the companies' history of anticompetitive conduct and anticompetitive agreements.

**E.   The Merger Will Result in Direct, Horizontal Agreements among Competitors in the Credit Card Payment Processing Market**

206.   Capital One currently maintains express agreements with Visa and Mastercard to facilitate payments for the credit cards it issues. These agreements include express terms concerning interchange fees, the split of interchange fees, and other price terms central to credit card transactions.

207.   At present, Capital One is vertically aligned with Visa and Mastercard. After the proposed merger, however, Capital One would become Visa and Mastercard's direct, horizontal competitor.

208.   It would be *per se* illegal under the United States antitrust laws for Capital One to maintain agreements with its direct, horizontal competitors on prices—particularly interchange fees.

209.   Nonetheless, Capital One, through its CEO and CFO, has stated that it will continue to maintain its express agreements with Mastercard and Visa while it also operates the Discover credit card payment network.

210.   Maintaining express agreements with Visa and Mastercard that set prices for Capital One credit cards, while at the same time competing with Visa and Mastercard in the Credit Card Payment Processing Market will result in a naked restraint on trade—namely, direct agreements on price and output in the Credit Card Payment Processing Market.

**F.**      **The Merger Will Increase Prices for Consumers and Reduce Consumer Choice**

211.     The merger will increase interest rates, increase interchange fees while decreasing rewards remitted to credit card customers, and reduce the ability of consumers to opt out of the Visa and Mastercard stranglehold over the Credit Card Payment Processing Market.

212.     Indeed, because of the merger and the strengthening of the PNIRBE, new entrants in the General Credit Card Market will have no choice but to contract with Visa and Mastercard at inflated interchange rates and fee splits, reducing their ability to compete with Capital One-issued credit cards (as well as with other major credit card issuers).

213.     Moreover, as recognized by the CFPB, because of Capital One's increased post-merger size as a bank, it will be able to charge higher interest rates and fees.

214.     As a result of the merger, Capital One would no longer face competition from vertically integrated Discover, which because of its full share of interchange fees from transactions through its cards, could absent the merger afford to provide higher credit card rewards to customers, putting competitive pressure on Capital One to provide greater and more valuable rewards.

215.     Finally, because the post-merger Capital One will be a direct, horizontal competitor with Visa and Mastercard, its existing contracts would set prices in the Credit Card Payment Processing Market, including interchange fees and fee splits. As such, interchange fees post-merger will be anticompetitively inflated.

### CLASS ACTION ALLEGATION

216.     The Class's claims all derive directly from a course of conduct by Defendants. Defendants have engaged in uniform and standardized conduct toward the class.

217.     Defendants did not materially differentiate in its actions or inactions toward members of the class. The objective facts on these subjects are the same for all Class members.

218.    Within the Claim for Relief asserted by the Class, the same legal standards govern. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2).

219.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

<strong>The Class</strong>

220.    Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

> All persons, entities, and/or corporations in the United States who directly or indirectly paid interchange fees as merchants or credit card holders from July 22, 2020 through the present.

221.    Excluded from the Class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

<strong>Numerosity and Ascertainability</strong>

222.    The Class in this action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Millions of persons, entities, and/or companies nationwide pay interchange fees to companies such as Mastercard, Visa, Discover, and American Express. Individual joinder of all Class members is impracticable.

223.    The Class is ascertainable because its members can be readily identified using the records of the interchange providers or through economic analysis of the portion of the passed-on interchange fee paid by credit card holders as part of each purchase.

224.    Plaintiffs anticipate providing appropriate notice to the certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after the class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## Common Issues

225.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(2) because questions of law and fact that have common answers that are the same for the Class exist.

226.    Common issues include, without limitation, the following questions of law and fact for the Class:

a.    Whether the Merger may substantially lessen competition in the Interchange Market.

b.    Whether Defendants' impending Merger violates Section 7 of the Clayton Act.

c.    Whether Capital One's post-merger agreements concerning interchange fees will violate Section 1 of the Sherman Act.

d.    Whether Defendants' impending unlawful conduct will be a substantial contributing factor in the injury to members of the Class.

## Typicality

227.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because for the proposed Class, the identified Plaintiffs' claims are typical of the claims of other Class members and arise from the same course of conduct by Defendants. The relief the Class's named Plaintiffs seek is typical of the relief sought by the absent Class members.

## Adequate Representation

228.    Plaintiffs will fairly and adequately represent and protect the interest of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting antitrust and consumer class actions.

229. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

**Indivisible Remedy**

230. The equitable and injunctive relief sought is an indivisible remedy, as a single injunction or declaratory judgment would provide relief to each member of the class.

**REALLEGATION AND INCORPORATION BY REFERENCE**

231. Plaintiffs reallege and incorporate by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claim for Relief asserted on behalf of the Class.

**CLAIMS FOR RELIEF**

**COUNT I**
**Section 7 of the Clayton Act**

232. The merger will the effect of substantially lessening competition and tending to create monopoly in the Credit Card Payment Processing Market and the General Credit Card Market.

233. As alleged in this Complaint, if the merger is consummated, the merger will substantially strengthen the PNIRBE, which will insulate Capital One from competition and competitive entry in both the Credit Card Payment Processing Market and the General Credit Card Market.

234. The merger will also result in the elimination of competition from one of the two large vertically integrated credit card issuers in the General Credit Card Market, leaving only American Express after the merger. As explained above, this reduction in competition will directly result in a reduction in credit card rewards remitted to credit card customers from interchange fees.

235.    Indeed, Discover, as an independent, vertically integrated credit card company, retains all of the interchange fees charged through its cards, and therefore its existence has the effect of forcing Capital One and other General Credit Card market participants to compete on price, particularly on the portion of the interchange fees remitted to customers.

236.    After the merger, this competitive force will greatly diminish, reducing competitive pressure on Capital One to remit greater and more valuable credit card rewards to its customers in order to maintain and obtain market share.

237.    Moreover, the existence of Discover as an independent, vertically integrated payment processing network places price pressure on Visa and Mastercard, as they must compete with Discover to decrease interchange fees that are charged to merchants and passed on to cardholders. After the merger, this competitive price pressure will greatly diminish.

238.    The merger will also realign Capital One as a direct, horizontal competitor of Visa and Mastercard, creating incentives to collude—and the likelihood of collusion—on interchange fees. Indeed, Capital One, Visa, and Mastercard have a history of anticompetitive conduct and collusion as to interchange fees, and have settled claims for violations of the antitrust laws.

239.    The merger will also increase concentration in the General Credit Card Market, which will result in higher prices, including in the form of fewer and less valuable rewards, higher interest rates, higher purchase prices (as a result of passed on interchange fees), and higher credit card fees.

240.    Finally, because Capital One intends to maintain its agreements with Visa and Mastercard after the merger, which include express terms on price, output, and product features, the post-merger entity will result in naked horizontal restraints in the Credit Card Payment

Processing Network and the strengthening of the PNIRBE protecting Capital One from competition in both Credit Card Payment Processing and General Credit Card Markets.

241.    As a result of this harm to competition, Plaintiffs and members of the class will pay higher prices, receive fewer and less valuable credit card benefits, pay higher fees (including interchange fees) and receive reduced and less efficient credit card products. Moreover, they will have far less consumer choice. Plaintiffs are therefore injured in ways that the antitrust laws were meant to protect against. They accordingly have antitrust injury and standing to bring suit.

242.    The merger is a transaction in interstate commerce, as it involves the merger of two large credit card companies operating out of different states. Moreover, the merger will affect markets and products that use the instrumentalities of interstate commerce, including the Internet.

243.    Plaintiffs and members of the Class seek an injunction preventing the consummation of the merger. In the alternative, Plaintiffs seek divestiture, disclosure or other court-ordered relief to mitigate any post-merger anticompetitive harm resulting from Capital One's merger with Discover.

244.    Plaintiffs and members of the Class also seek to recover their costs of suit, including attorneys' fees.

## COUNT II
## Section 1 of the Sherman Act

245.    Capital One has made clear that it intends to maintain agreements with Visa and Mastercard for a large portion of its Capital One-issued credit cards.

246.    These agreements contain express terms setting the price of credit card payment processing transactions, including the amount of interchange fees, the services that will be provided, and the amount of the interchange fees to be split among the Visa and Mastercard on the

one hand, and Capital One on the other. These are central terms for services in the Credit Card Payment Processing Market.

247.     If the merger is consummated, Capital One would become the direct, horizontal competitor of Visa and Mastercard in the Credit Card Payment Processing Market.

248.     As such, the agreements on price and output that Capital One intends to maintain with its post-merger competitors violate Section 1 of the Sherman Act because they are naked restraints on trade.

249.     Capital One's post-merger agreements with Visa and Mastercard will therefore be a *per se* violation of Section 1 of the Sherman Act.

250.     In the alternative, the post-merger agreements between Capital One and its direct competitors, Visa and Mastercard, would violate the Rule of Reason.

251.     As explained above, the agreements among horizontal competitors would strengthen barriers to entry, including the PNIRBE, increase switching costs, and decrease price competition in both the Credit Card Payment Processing and General Credit Card Markets.

252.     The anticompetitive harm resulting from these agreements will substantially outweigh any procompetitive benefits (to the extent any at all exist). Indeed, none of the horizontal agreements between Capital One, on the one hand, and Visa and/or Mastercard on the other, are required to provide Capital One's credit card products. To the contrary, Capital One can route its credit cards post-merger entirely through the Discover Network. Capital One admits as much, as it has told its investors it plans to increase the number of credit cards using the Discover Network after the merger.

253.     In addition, the Discover credit card payment processing network is reasonably interchangeable with Visa and Mastercard, and there is no technical or business reason to operate

through Visa's and Mastercard's credit card payment processing networks, in addition to the to-be-owned-and-operated Discover network, post-merger.

254.     Indeed, as Capital One CEO's told investors in a conference call following the merger announcement, Discover is widely accepted by merchants. There is no legitimate business or technical reason for Capital One to rely on Visa and Mastercard for payment processing services for its credit cards post-merger—that is, other than the anticompetitive effects of maintaining direct agreements with horizontal competitors on interchange fees and prices.

255.     Capital One's post-merger agreements with Visa and Mastercard are agreements in interstate commerce, including because they govern transactions across state lines, including using the Internet.

256.     Plaintiffs and members of the Class will be injured by the anticompetitive agreements if they continue after the consummation of the merger because they will pay higher interchange fees and face a loss of consumer choice as a direct, proximate result of the anticompetitive agreements. As such, Plaintiffs are harmed in the way in which the antitrust laws were meant to protect against and have antitrust standing and injury to bring suit.

257.     Plaintiffs and members of the Class seek an injunction preventing the consummation of the merger and the resulting violation of Section 1 of the Sherman Act. In the alternative, Plaintiffs seek divestiture, disclosure or other court-ordered relief to mitigate any post-merger anticompetitive harm resulting from Capital One's agreements with Visa and Mastercard.

258.     Plaintiffs and members of the Class also seek to recover their costs of suit, including attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.      Enter an order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B.      Enter a judgment declaring that Defendants have committed the violations of law alleged in this case;

C.      Award Plaintiffs the cost of this action, including reasonable attorneys' fees and expenses and expert fees;

D.      Award declaratory relief;

E.      Issue an injunction preventing the Merger, or in the alternative, requiring pre-closing divestiture or disclosure to remedy any anticompetitive effects of the combination;

F.      Grant further relief as this Court may deem just and proper.


Dated:  July 22, 2024                              Respectfully submitted,

Brian J. Dunne (*p.h.v. forthcoming*)              /s/ Andrew M. Williamson
bdunne@bathaeedunne.com                            Andrew M. Williamson (VSB No. 83366)
Edward M. Grauman (*p.h.v. forthcoming*)           awilliamson@bathaeedunne.com
egrauman@bathaeedunne.com                          Yavar Bathaee (*p.h.v. forthcoming*)
**BATHAEE DUNNE LLP**                              yavar@bathaeedunne.com
901 South MoPac Expressway                         Andrew C. Wolinsky (*p.h.v. forthcoming*)
Barton Oaks Plaza I, Suite 300                     awolinsky@bathaeedunne.com
Austin, TX  78746                                  **BATHAEE DUNNE LLP**
(213) 462-2772                                     445 Park Avenue, 9th Floor
                                                   New York, NY 10022
                                                   (332) 322-8835