**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| TYLER BAKER, *et al.*, | |
| *Plaintiffs*, | |
| | |
| v. | Civil Action No. 1:24-cv-1265 |
| | |
| DISCOVER FINANCIAL SERVICES, INC., *et al.*, | Judge Anthony J. Trenga |
| *Defendants.* | |

**Defendants' Memorandum in Support of Their Motion to Dismiss or Alternatively to Stay**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

A.    The Credit-Card Industry ..................................................................................... 4

B.    The Proposed Transaction ..................................................................................... 5

C.    Regulatory Review ................................................................................................ 6

D.    This Case ............................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

I.    The Court should dismiss the Complaint because Plaintiffs have not satisfied Article III's "case or controversy" requirement ................................................................................. 9

II.    Plaintiffs have failed to plausibly allege an antitrust violation ............................................ 16

A.    Plaintiffs fail to plausibly allege that the Proposed Transaction will violate Section 7 of the Clayton Act ......................................................................................................... 16

B.    Plaintiffs have not alleged a valid Section 1 claim ............................................. 22

III.   Plaintiffs have not alleged that they will suffer an irreparable injury or that they satisfy the other elements required for a permanent injunction ................................................................. 26

CONCLUSION .................................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs v. Adelphia Supply USA*,
  No. 15-cv-5826, 2018 WL 8967057 (E.D.N.Y. Aug. 7, 2018) ...............................................24

*Ali v. Hogan*,
  26 F.4th 587 (4th Cir. 2022) ...................................................................................................9

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994)....................................................................................................25

*AT&T Mobility LLC v. Bernardi*,
  No. 11-cv-03992, 2011 WL 5079549 (N.D. Cal. Oct. 26, 2011) ..........................................11

*AT&T Mobility LLC v. Smith*,
  No. 11-cv-5157, 2011 WL 5924460 (E.D. Pa. Oct. 7, 2011) .................................................11

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) .................................................................................................14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................................16, 19

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)...................................................................................................25

*Cassan Enters. v. Avis Budget Grp., Inc.*,
  No. 2:10-cv-01934 (W.D. Wash. Mar. 11, 2011) ..................................................................11

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)......................................................................................................10–11, 14

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir. 2002) .................................................................................................22

*David v. Summit Comty. Bank*,
  1:15-cv-179, 2015 WL 12516770 (E.D. Va. June 15, 2015)..................................................26

*DeHoog v. Anheuser-Busch InBev*,
  899 F.3d 758 (9th Cir. 2018) ...........................................................................................17, 19

*Delco LLC v. Giant of Maryland*,
No. 07-cv-3522, 2007 WL 3307018 (D.N.J. Nov. 8, 2007) ....................................27

*DeMartini v. Microsoft Corp.*,
662 F. Supp. 3d 1055 (N.D. Cal. 2023) ...............................................................11, 15

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ..............................................................................22, 24

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
123 F.3d 301 (5th Cir. 1997) ....................................................................................25

*Francis v. Giacomelli*,
588 F.3d 186 (4th Cir. 2009) ..............................................................................16, 25

*FTC v. Meta Platforms*,
654 F. Supp. 3d 892 (N.D. Cal. 2023) ...............................................................18–19

*FTC v. Tronox Ltd.*,
332 F. Supp. 3d 187 (D.D.C. 2018) .........................................................................21

*Goines v. Valley Community Servs. Bd.*,
822 F.3d 159 (4th Cir. 2016) ......................................................................................5

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
48 F.4th 656 (6th Cir. 2022) .....................................................................................18

*Jones v. Bank of Am. Corp.*,
No. 4:09-cv-162, 2010 WL 6605789 (E.D. Va. Aug. 24, 2010) ..............................26

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ..................................................................................16

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)...................................................................................................23

*Loren Data Corp. v. GXS, Inc.*,
501 F. App'x 275 (4th Cir. 2012) .............................................................................26

*Menders v. Loudoun Cnty. Sch. Bd.*,
65 F.4th 157 (4th Cir. 2023) .....................................................................................12

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
948 F. Supp. 2d 538 (D. Md. 2013)..........................................................................25

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)........................................................................................26

*Moore Corp. v. Wallace Computer Servs., Inc.*,
  907 F. Supp. 1545 (D. Del. 1995).....................................................................21

*Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*,
  No. 12-cv-395, 2012 WL 3655459 (W.D. Pa. Aug. 27, 2012)....................11, 27

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984)..........................................................................................25

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998)........................................................................................10

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)...............................................................................4, 22–24

*S. Austin Coalition Comm. Council v. SBC Commc'ns Inc.*,
  191 F.3d 842 (7th Cir. 1999)......................................................................11, 13

*Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*,
  655 F. Supp. 3d 52 (D. Conn. 2023).................................................................16

*SAS Inst., Inc. v. World Programming Ltd.*,
  952 F.3d 513 (4th Cir. 2020).............................................................................26

*Scoggins v. Lee's Crossing Homeowners Ass'n*,
  718 F.3d 262 (4th Cir. 2013).......................................................................10, 13

*South Carolina v. United States*,
  912 F.3d 720 (4th Cir. 2019).............................................................................15

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)........................................................................................14

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021)..................................................................*passim*

*SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*,
  754 F. App'x 235 (5th Cir. 2018).......................................................................15

*Taleff v. Southwest Airlines Co.*,
  828 F. Supp. 2d 1118 (N.D. Cal. 2011).............................................................27

*Texas v. United States*,
   523 U.S. 296 (1998)................................................................................................1, 10, 13

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)...........................................................................................................15

*Trump v. New York*,
   592 U.S. 125 (2020).............................................................................................9–11, 13

*United States v. AT&T Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018) ...............................................................................16

*United States v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) ......................................................................................17

*United States v. Brewbaker*,
   87 F.4th 563 (4th Cir. 2023)
   ...........................................................................................................3, 18, 23, 25

*United States v. Michigan Nat'l Corp.*,
   419 U.S. 1 (1974)......................................................................................................13–14

*United States v. Visa, U.S.A., Inc.*
   344 F.3d 229 (2d Cir. 2003)............................................................................................18

*Whalen v. Albertsons Cos. Inc.*,
   No. 23-cv-00459, 2023 WL 4955141 (N.D. Cal. Aug. 2, 2023) ..................................1, 11, 15

*Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*,
   379 U.S. 411 (1965)...........................................................................................................12

*Wild Va. v. Council on Environ. Quality*,
   56 F.4th 281 (4th Cir. 2022) ..............................................................................................9

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
   588 F.3d 659 (9th Cir. 2009) ...........................................................................................19

**Federal Statutes**

12 U.S.C. § 1828..............................................................................6, 8, 10, 12, 13, 28

12 U.S.C. § 1842..................................................................................6, 8, 10, 12, 28

12 U.S.C. § 1849......................................................................................6, 8, 12, 13

15 U.S.C. § 18 ............................................................................................7, 16

**State Statutes**

Del. Code Ann. tit. 5, § 843 ........................................................................6, 10

**Other Authorities**

*Actions Taken Under the Federal Deposit Insurance Corporation Improvement*
    *Act*, 78 Fed. Res. Bull. 717 (1992) ...........................................................21

*Bank of Montreal*, FRB Order No. 2023-01, Federal Reserve (Nov. 19, 2019) .......................7, 13

*BB&T Corp.*, FRB Order No. 2019-16, Federal Reserve (Nov. 19, 2019) ...............................7, 13

*Centerstate Bank Corporation*, 2017 WL 6997251 (2017) ..........................................22

*Citizens Banking Corporation*, 2006 WL 3851162 (2006) ..........................................21

*Columbia Banking System, Inc.*, 2022 WL 16753716 (2022) ........................................22

*First Horizon National Corporation*, 2017 WL 5586311 (2017) ....................................22

*First Horizon National Corporation, First Horizon Bank*, 2020 WL 4274182 (2020) ................22

*Gateway Bank & Trust Co.*,
    2004 WL 1772457 (2004) .....................................................................21

*Hancock Holding Company*, 2011 WL 2115103 (2011) ...............................................22

*Orders Issued Under Bank Holding Company Act, Huntington Bancshares Incorporated*,
    107 Fed. Res. Bull. 27 (2021) ..............................................................22

*Orders Issued Under Bank Merger Act, Centura Bank*,
    83 Fed. Res. Bull. 1023 (1997) .............................................................21

*Orders Issued Under Sections 3 and 4 of the Bank Holding Company Act, Boatmen's*
    *Bancshares, Inc.*,
    74 Fed. Res. Bull. 821 (1988) ..............................................................21

*Orders Issued Under Sections 3 and 4 of the Bank Holding Company Act, Louisiana*
    *Bancshares, Inc.*,
    72 Fed. Res. Bull. 154 (1986) ..............................................................21

*Orders Issued Under Section 3 and 4 of the Bank Holding Company Act, Southern National Corporation*,
81 Fed. Res. Bull. 307 (1995) ................................................................................21

*Orders Issued Under Section 3 of the Bank Holding Company Act, 1st Source Corporation*,
93 Fed. Res. Bull. C77 (2007) ........................................................................21–22

*Orders Issued Under Section 3 of the Bank Holding Company Act, First Interstate Bancorp, First Interstate Bank of California*,
75 Fed. Res. Bull. 708 (1989) ................................................................................21

*Orders Issued Under Section 3 of Bank Holding Company Act, The Marine Corporation, Marisub of Wisconsin, Inc.*,
71 Fed. Res. Bull. 795 (1985) ................................................................................21

*Orders Issued Under Section 4 of the Bank Holding Company Act, U.S. Bancorp*,
77 Fed. Res. Bull. 342 (1991) ................................................................................21

*Regions Financial Corporation, Regions Bank*, 2006 WL 3382414 (2006) ..............................21

*U.S. Bank National Association*, Conditional Approval #1298, Office of the Comptroller of the Currency (Oct. 14, 2022) ............................................................................7

**INTRODUCTION**

In this antitrust case, two cardholders seek to circumvent three ongoing bank regulatory reviews, as well as review by the U.S. Department of Justice, and block Capital One's proposed $35 billion acquisition of Discover. But Plaintiffs' claims, which depend entirely on the acquisition being approved, are too contingent on unknown future events and too speculative to satisfy Article III. They are also implausible. Among other failings, the Complaint acknowledges that the transaction will, if completed, reduce concentration in one affected market and barely affect it in the other. And Plaintiffs make no effort to allege key requirements, like irreparable injury, for the relief they seek. For all these reasons, the Court should dismiss Plaintiffs' claims.

*First*, Plaintiffs' claims fail Article III's basic "case or controversy" requirements: ripeness and injury-in-fact. As to ripeness, through the Bank Holding Company Act and the Bank Merger Act, Congress created a specific process for reviewing proposed bank mergers, including their competitive impact. Here, that process requires regulatory approval by the Board of Governors of the Federal Reserve System ("Federal Reserve") and the Office of the Comptroller of the Currency ("OCC"), as informed by DOJ's views. The Delaware State Bank Commissioner is also reviewing the proposed merger. Plaintiffs' claims that the transaction will harm competition are premature given that when, whether, and under what conditions the banking regulators will approve the transaction is not yet known. *See Texas v. United States*, 523 U.S. 296 (1998). Courts regularly dismiss merger challenges for lack of ripeness in such circumstances. *E.g., Whalen v. Albertsons Cos. Inc.*, No. 23-cv-00459, 2023 WL 4955141, at *1 (N.D. Cal. Aug. 2, 2023). And separate from the regulatory contingency, Plaintiffs' theoretical claims of future harm are too speculative and remote to give rise to Article III standing.

*Second*, Plaintiffs' claims under Section 7 of the Clayton Act do not plausibly allege that the merger will harm competition. Antitrust buzzwords aside, Plaintiffs challenge two aspects of the transaction: (1) a vertical combination of Discover's credit-card payment network, which connects merchants and issuers in credit-card transactions, with Capital One's business as a credit-card issuer and (2) a horizontal combination of Capital One's and Discover's businesses of issuing credit cards.

As to the first challenge, the Complaint itself alleges that the vertical aspect of the merger will *deconcentrate* the payment-network market, which alone is a basis to reject the Section 7 claim. Unable to allege undue concentration, Plaintiffs instead assert that Discover's network is being eliminated in some way. But that is obviously not right. As part of Capital One, the Discover network will continue to operate and, according to the Complaint, take share from the more dominant Visa and Mastercard. Plaintiffs also speculate that, at some unidentified point in the future, Visa and Mastercard "may" offer a better share of the interchange fee paid by merchants on each transaction for Capital One to degrade the Discover network. Plaintiffs offer no facts to support this allegation, which makes no economic sense. As the Complaint separately alleges, an issuer can make more money and gain a competitive advantage by using its own network.

Nor are there plausible allegations that combining Capital One's and Discover's credit-card-issuing businesses would unduly concentrate the market for issuing general-purpose credit cards, the baseline for challenging a horizontal transaction. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021). With roughly 4,000 issuers and at least two issuers with significantly more purchase volume than the post-merger entity will have, adding Discover's alleged 3.87% share to Capital One's alleged 9.81% share would have no meaningful impact on competition. Although Plaintiffs purport to use the Herfindahl-Hirschman Index, which

approximates concentration, Plaintiffs manipulate the math. Instead of squaring the share of *each* market participant as the index requires, they combine thousands of competitors into one fictional participant with a *market-leading 24%* share. Predictably, this yields an incorrect result, suggesting that the market is considerably more concentrated than it actually is. In any event, the negligible increase in market concentration resulting from the merger is well below accepted thresholds for competitive concern.

*Third*, Plaintiffs have not plausibly alleged an unreasonable restraint of trade under Section 1 of the Sherman Act. Plaintiffs primarily point to Capital One's planned dual-distribution model, by which it will offer both cards that use its own network (Discover) and cards that use third-party networks (Visa and Mastercard). But the Fourth Circuit has held that there is nothing inherently anticompetitive about a dual-distribution model. *United States v. Brewbaker*, 87 F.4th 563, 580–81 (4th Cir. 2023), *petition for cert. filed* No. 24-124 (Aug. 5, 2024). And Plaintiffs fail to offer economically or logically coherent allegations of how increasing options for cardholders by creating a new product—Capital One cards on the Discover network—reduces consumer welfare under either a *per se* or rule-of-reason analysis.

*Fourth*, Plaintiffs do not even try to plead the elements required to secure the drastic remedy of a permanent injunction. To obtain such relief, Plaintiffs must not only succeed on the merits, but they must also show a significant threat of irreparable injury and that the public interest and the equities favor an injunction. *See Steves & Sons*, 988 F.3d at 705. Not one of these elements is even mentioned in the Complaint.

In all, this Court should dismiss the Complaint (or at a minimum stay the proceedings) because Plaintiffs' claims are not ripe and because Plaintiffs lack standing. Alternatively, this

Court should dismiss the Complaint for failure to state a plausible antitrust claim or to plead a basis for injunctive relief.

## BACKGROUND

### A. The Credit-Card Industry

Credit-card transactions involve (1) an entity (typically a bank) that issues a card to a consumer, (2) a payment network, which provides the means of processing the transaction, and (3) in the case of Visa and Mastercard, an acquiring bank, which processes payments on behalf of a merchant. Compl. ¶¶ 132, 134.[1]

There are four major credit-card networks: Visa, Mastercard, American Express, and Discover. *Id.* ¶ 4. "Visa and Mastercard are the dominant credit card payment processors, with a combined near-monopoly share of 87%." *Id.* As of 2022, "Visa had a 61% share of the market, Mastercard had 25.5%, American Express had 11.3%, and Discover had 2.2%." *Id.* ¶ 162. Payment networks are a two-sided market that need to attract both merchants and customers to work. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018). Thus, from an antitrust perspective, what matters are competitive effects on the platform "as a whole," not simply the prices charged to one side or the other. *Id.* at 547.

Credit-card issuers compete in various ways, including by offering customers lower interest rates and fees and better credit-card rewards. Compl. ¶¶ 2, 29, 90. The credit-card issuance market is flush with competitors. Plaintiffs themselves recognize the existence of more than 15 issuers, *id.* ¶ 123, and a report from the Consumer Financial Protection Bureau ("CFPB") relied

---

[1] Because this case is at the pleadings stage, this Background section assumes the facts alleged in the Complaint are true, but Defendants reserve the right to challenge those allegations later.

on in the Complaint indicates that there are "nearly 4,000."[2] According to the Complaint, as of 2022, JPMorgan Chase had 20.96% of the issuer market, American Express had 18.84%, Citi had 10.33%, Capital One had 9.81%, Bank of America had 8.82%, Discover had 3.87%, U.S. Bank had 3.5%, and all other issuers combined had 23.86%. Compl. ¶ 125.

Credit-card transactions typically include an "interchange fee," which is negotiated by the payment network, paid by the merchant, and then split between the network and the credit-card issuer, and in the case of Visa and Mastercard, the acquiring bank. *See id.* ¶ 27. American Express and Discover "both issue credit cards and process credit card payments through their own networks." *Id.* ¶ 132. According to the Complaint, this vertical integration allows those firms to capture the entirety of interchange-fee revenue and thus offer "greater and more valuable rewards to customers." *Id.* ¶ 187.

## B. The Proposed Transaction

In February 2024, Capital One agreed to acquire Discover in a deal valued at approximately $35 billion (the "Proposed Transaction"). *Id.* ¶ 63. Capital One owns a bank that issues credit cards. *Id.* ¶ 12. Capital One does not operate its own payment network, but instead uses Visa's and Mastercard's networks. *See id.* ¶ 38. Discover also owns a bank that issues credit cards, but unlike Capital One, it operates a credit-card payment network to process its own transactions. *See id.* ¶¶ 16–18.

---

[2] The Consumer Credit Card Market at 4, CFPB (Oct. 2023), https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2023.pdf; *see* Compl. ¶ 91 (citing and quoting CFPB report); *see Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (explaining that, in deciding a motion to dismiss, courts can "consider documents that are explicitly incorporated into the complaint by reference").

Through the Proposed Transaction, Capital One plans to inject greater competition into the payment-network market. As Capital One has stated, it plans to shift a significant and growing portion of its credit-card-transaction volume to Discover's payment network and will work to improve the network's scale and international acceptance. *See id.* ¶¶ 68, 73. The merger will therefore bring volume to Discover's networks and reduce Visa's and Mastercard's dominant shares. *Id*.

According to the Complaint, the Proposed Transaction would combine Capital One's 9.81% market share as a credit-card issuer with Discover's 3.87% share. *Id.* ¶ 125. The combined firm would be the third-largest competitor with a combined share of 13.68%. *Id.* Many significant competitors will remain after the merger, including JPMorgan Chase, American Express, Citi, and Bank of America, among others. Indeed, JPMorgan Chase will have a substantially larger market share.

### C.  Regulatory Review

The Proposed Transaction is subject to a robust regulatory regime specific to bank mergers. Unlike most mergers, bank mergers require *ex ante* regulatory approval by banking regulators. Here, the Proposed Transaction requires three regulatory approvals. Because it would merge two bank holding companies, it requires approval by the Federal Reserve. 12 U.S.C. § 1842(a). Because it would merge two banks, it requires approval by OCC. *Id.* § 1828(c)(2). Because Discover's bank is chartered in Delaware, the Proposed Transaction requires approval from the Delaware State Bank Commissioner. Del. Code Ann. tit. 5, § 843(a)–(c). Also, DOJ provides input to the federal banking regulators on the impact to competition. *See* 12 U.S.C. §§ 1828(c)(4), 1849(b)(1).

Defendants filed applications with the Federal Reserve, OCC, and Delaware's State Bank Commissioner in March 2024.[3] Each agency is currently reviewing the Proposed Transaction, which cannot close unless and until all three agencies approve it. The Federal Reserve and OCC have issued multiple rounds of information requests and conducted a public hearing, as did the Delaware Commissioner.[4] At the end of their process, the banking regulators can reject the merger, approve the merger, or approve the merger with conditions.[5] Those decisions will be memorialized in written orders that are typically extensive for a transaction of this sort.[6]

Congress requires banking regulators to apply different and broader standards for evaluating bank mergers than just the competitive standard applied under Section 7 of the Clayton Act.[7] The federal banking regulators must consider a wide range of issues in addition to

---

[3] Application to the Board of Governors of the Federal Reserve System (Mar. 20, 2024), *available at* https://www.federalreserve.gov/foia/files/capital-one-application-20240320.pdf; Interagency Bank Merger Act Application to OCC (Mar. 20, 2024), *available at* https://www.comptrollerofthecurrency.gov/topics/charters-and-licensing/public-comment/capital-one-merger.pdf; Application for Authority of an Out-of-State Bank Holding Company (Mar. 21, 2024), *available at* https://banking.delaware.gov/wp-content/uploads/sites/73/2024/08/Capital-One-Financial-Corporation-Application-public.pdf.

[4] *See* OCC, Public Meeting on the Proposed Acquisition by Capital One of Discover (Jul. 19, 2024), https://www.occ.gov/news-events/events/files/event-public-meeting-on-proposed-acquisition-by-capital-one.html.

[5] *See, e.g., BB&T Corp.*, FRB Order No. 2019-16, Federal Reserve (Nov. 19, 2019), *available at* https://www.federalreserve.gov/newsevents/pressreleases/orders20191119a.htm, (approving BB&T / SunTrust Merger with conditions).

[6] *See, e.g.*, *BB&T Corp.*, FRB Order No. 2019-16, Federal Reserve (Nov. 19, 2019) (80-page order approving merger), *available at* https://www.federalreserve.gov/newsevents/pressreleases/orders20191119a.htm.; *Bank of Montreal*, FRB Order No. 2023-01, Federal Reserve (Jan. 17, 2023) (53-page order approving bank merger), *available at* https://www.federalreserve.gov/newsevents/pressreleases/orders20230117a.htm; *U.S. Bank National Association*, Conditional Approval #1298, Office of the Comptroller of the Currency (Oct. 14, 2022) (14-page order approving merger), *available at* https://www.occ.gov/news-issuances/news-releases/2022/nr-occ-2022-128.html.

[7] Section 7 prohibits a merger that "may . . . substantially . . . lessen competition." 15 U.S.C. § 18.

competition, including "the financial and managerial resources and future prospects of the company or companies and the banks concerned," "the convenience and needs of the community to be served," supervisory factors, managerial resources, anti-money-laundering efficacy, and the overall stability of the United States financial system. 12 U.S.C. §§ 1842(c)(2), (c)(3), (c)(5), (c)(6), (c)(7). In addition, the federal banking regulators must consider the competitive effects of the merger and may approve an otherwise anticompetitive merger if necessary for the "convenience and needs of the community to be served." *Id.* §§ 1828(c)(5)(B), 1842(c)(1)(B). Courts reviewing bank mergers must apply competition standards "identical with those" applied by the banking regulators. *Id.* §§ 1828(c)(7)(B), 1849(b)(1).

Following approval, the parties must wait between 15–30 days to close to allow time for an antitrust challenge. *Id.* §§ 1828(c)(6), 1849(b)(1). Parties may also challenge the Federal Reserve's approval order directly within 30 days of the order. *Id.* § 1848.

### D.  This Case

Amid the agencies' ongoing merger-review process, two Capital One cardholders—Tyler Baker (who also has a Discover card) and Lora Grodnick—filed this putative class action seeking to block the Proposed Transaction. Compl. ¶¶ 9–10. The two seek to represent a sweeping class of *all merchants and cardholders* in the United States who have been party to a credit-card transaction in the last four years. *Id.* ¶ 220. Plaintiffs bring claims under Clayton Act Section 7, which prohibits mergers that may substantially lessen competition, and under Sherman Act Section 1, which prohibits agreements that unreasonably restrain trade. *Id.* ¶¶ 232–44, 245–58. Plaintiffs make no mention of the ongoing regulatory process or framework discussed above.

As to Clayton Act Section 7, Plaintiffs allege that the Proposed Transaction will harm competition in the payment-network market, asserting that it will reduce the number of

independent competitors (even though Discover will continue to exist post-transaction), *id.* ¶ 236, and create "incentives to collude," *id.* ¶¶ 238, 240. Plaintiffs further speculate that at some point in the future, Visa or Mastercard may offer Capital One a better share of interchange-fee revenue to degrade Discover's network. *Id.* ¶ 203. Plaintiffs also allege that the Proposed Transaction will harm competition in the general-credit-card market by unduly concentrating the market and by removing Discover's competitive pressure. *Id.* ¶¶ 234–36, 239.

As to Sherman Act Section 1, Plaintiffs assert that the existing vertical agreements between Capital One as an issuer and Visa and Mastercard as networks will suddenly become illegal post-transaction, suggesting either that dual-distribution arrangements are illegal *per se* or that the antitrust laws somehow require Capital One to only use one network. *Id.* ¶¶ 249–52. But dual-distribution arrangements are common and generally legal, and antitrust law favors offering customers more choices, not fewer.

## ARGUMENT

I.   **The Court should dismiss the Complaint because Plaintiffs have not satisfied Article III's "case or controversy" requirement.**

Plaintiffs bear the burden of pleading facts sufficient to show that they have satisfied Article III's "case or controversy" requirement. *Ali v. Hogan*, 26 F.4th 587, 595–96 (4th Cir. 2022) (standing generally); *Wild Va. v. Council on Environ. Quality*, 56 F.4th 281, 293 (4th Cir. 2022) (ripeness). To satisfy Article III, Plaintiffs must allege facts showing (1) that their claims are ripe (*i.e.*, not dependent on contingent future events) and (2) that they have suffered or will imminently suffer a cognizable injury in fact. *Trump v. New York*, 592 U.S. 125, 131 (2020).[8] Because Plaintiffs have not adequately alleged either, the Court should dismiss the case.

---

[8] Unless otherwise noted, internal quotation marks, citations, and alterations are omitted from quotations throughout.

### A. Plaintiffs' claims should be dismissed as unripe.

Plaintiffs have not shown and cannot show that their claims are ripe for adjudication. Ripeness presents a "threshold question of justiciability." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013); *see Trump*, 592 U.S. at 131 (2020). To determine whether a claim is ripe, courts consider its fitness for adjudication and the hardship on the parties from withholding adjudication. *Texas v. United States*, 523 U.S. 296, 300–01 (1998); *Scoggins*, 718 F.3d at 269–70. A claim is not fit for adjudication if it is "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump*, 592 U.S. at 131. Where, as here, claims depend on the outcome of ongoing agency action, they are unlikely to be ripe. *See Trump*, 592 U.S. at 134; *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–34 (1998).

Here, Plaintiffs' claims depend entirely on the Proposed Transaction occurring. But as the Complaint concedes, the Proposed Transaction has not yet occurred. *See* Compl. ¶ 243. Instead, as discussed above, three different agencies must approve the Proposed Transaction before it can close. Without those approvals, the Proposed Transaction cannot close. 12 U.S.C. § 1842(a) ("It shall be unlawful, except with the prior approval of the [Federal Reserve] . . . for any bank holding company to merge or consolidate with any other bank holding company."); *id.* § 1828(c)(2) ("No insured depository institution shall merge or consolidate with any other insured depository institution . . . except with the prior written approval of [the OCC] . . . ."); Del. Code Ann. tit. 5, § 843(a)–(c).

Defendants believe that each agency *should* approve the Proposed Transaction, which will benefit American consumers and enhance competition. But whether, when, and under what conditions (if any) the Proposed Transaction *will* be approved is unknown at this time. *See Texas*, 523 U.S. at 300 (explaining that where courts "have no idea whether or when" the basis for a claim might occur "the issue is not fit for adjudication"); *see also Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 414 (2013) (refusing to endorse Article III "theories that rest on speculation about the decisions of independent actors"). Indeed, the facts surrounding the Proposed Transaction are still developing. For example, Capital One recently announced a $265 billion community investment plan in connection with the Proposed Transaction.[9] Thus, Plaintiffs' case, which is "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all," is unfit for adjudication. *See Trump*, 592 U.S. at 131.

Courts have repeatedly rejected attempts by private antitrust plaintiffs to challenge mergers still undergoing regulatory review. *Whalen*, 2023 WL 4955141 (dismissing complaint); Order, *Cassan Enters. v. Avis Budget Grp., Inc.*, No. 2:10-cv-01934 (W.D. Wash. Mar. 11, 2011), ECF No. 39 (same); *S. Austin Coalition Comm. Council v. SBC Commc'ns Inc.*, 191 F.3d 842 (7th Cir. 1999) (Easterbrook, J.) (affirming dismissal); *see also AT&T Mobility LLC v. Bernardi*, No. 11-cv-03992, 2011 WL 5079549 (N.D. Cal. Oct. 26, 2011) (enjoining parallel arbitration); *AT&T Mobility LLC v. Smith*, No. 11-cv-5157, 2011 WL 5924460 (E.D. Pa. Oct. 7, 2011) (same); *cf. Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc*., No. 12-cv-395, 2012 WL 3655459, at *7 (W.D. Pa. Aug. 27, 2012) (rejecting ripeness argument raised *after* approval by the FTC while recognizing that ripeness concerns exist before approval). Although one recent private suit challenging a merger was not dismissed as unripe, there, it was "undisputed that [a] statutory bar" preventing the merger from closing was "not in effect." *DeMartini v. Microsoft Corp.*, 662 F. Supp. 3d 1055, 1061 (N.D. Cal. 2023). *DeMartini* does not apply on its own terms here, where *three* different statutory bars apply.

---

[9] *Capital One Announces Five-Year, $265 Billion Community Benefits Plan in Connection with Discover Acquisition to Advance Economic Opportunity and Financial Well-Being*, https://investor.capitalone.com/news-releases/news-release-details/capital-one-announces-five-year-265-billion-community-benefits.

Allowing this case to proceed now, while the regulatory review process is ongoing, undermines the regulatory scheme Congress created for bank mergers. Congress enacted a process that (1) requires prior regulatory approval, reflecting the congressional determination that bank mergers require specialized expertise, (2) requires the bank regulators to consult with DOJ on competition issues, (3) requires the banking regulators to consider an array of factors, including the overall stability of the financial system, not just the merger's effect on competition, (4) modifies the normal antitrust standard to require banking regulators to consider the "convenience and needs" of the community,[10] (5) lays out a specific process and timeline for any antitrust challenge, and (6) requires courts to apply standards "identical with those" applied by the regulators.[11]

In all, this reflects a congressional judgment that the banking regulators (with input from DOJ) should be the first and primary evaluators of a proposed bank merger. As the Supreme Court explained in an analogous context in *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, the bank regulatory process is "designed to permit an agency, expert in banking matters, to explore and pass on the ramifications of a proposed bank holding company arrangement." 379 U.S. 411, 420 (1965). "[T]o permit a district court to make the initial determination," the Court reasoned, "would substantially decrease the effectiveness of the statutory design." *Id.* Likewise, here, allowing Plaintiffs to proceed with their case now is impossible to square with the process Congress set up. *See also Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 162 (4th Cir. 2023) (explaining that Article III's case or controversy requirement is essential for the separation of powers).

---

[10] 12 U.S.C. §§ 1828(c)(5)(B), 1842(c)(1)(B).

[11] 12 U.S.C. §§ 1828(c)(7)(B), 1849(b)(1).

Allowing this case to proceed now would also be inefficient. If the Federal Reserve and the OCC approve the Proposed Transaction, they will issue thorough reports detailing the findings of their investigation, their analysis, and their reasons for approving the deal.[12] Considering that this Court must apply standards "identical with those" applied by the regulators, 12 U.S.C. §§ 1828(c)(7)(B), 1849(b)(1), the Court should have the benefit of the regulators' reports before proceeding. *See also Trump*, 592 U.S. at 134 ("Letting the Executive Branch's decisionmaking process run its course . . . brings more manageable proportions to the scope of the [case]."). If the regulators do not approve the Proposed Transaction, then that too resolves this case.

Plaintiffs face no hardship in waiting for the regulatory review process to conclude. According to the Complaint, Plaintiffs are not undergoing any harm now and cannot face even the threat of harm until regulatory approval occurs. *See S. Austin*, 191 F.3d at 845 ("When delay is harmless to the plaintiff, the best response to an unripe suit is dismissal."); *Scoggins*, 718 F.3d at 270–71 (explaining that hardship is measured by imminency of a significant threat of injury).

Because "it [is] too speculative whether the problem [Plaintiffs] present[] will ever need solving . . . this matter is not ripe for adjudication," *Texas*, 523 U.S. at 302, and the Court should dismiss the case.

**B.   Alternatively, the Court should stay these proceedings until they are ripe.**

At the very least, the Court should stay the proceedings until they become ripe. The Supreme Court did just that in *United States v. Michigan Nat'l Corp.*, 419 U.S. 1 (1974). There,

---

[12] *See, e.g.*, *BB&T Corp.*, FRB Order No. 2019-16, Federal Reserve (Nov. 19, 2019) (80-page order approving merger), *available at* https://www.federalreserve.gov/newsevents/pressreleases/orders20191119a.htm; *Bank of Montreal*, FRB Order No. 2023-01, Federal Reserve (Jan. 17, 2023) (53-page order approving bank merger), *available at* https://www.federalreserve.gov/newsevents/pressreleases/orders20230117a.htm.

DOJ sued to block a merger that the Federal Reserve had approved but OCC had not yet. *Id.* at 2. Ambiguity in the overlap between the Bank Merger Act and the Bank Holding Company Act made it unclear whether DOJ was required to sue following Federal Reserve approval or had to wait until OCC also approved the deal. *Id.* at 6. The Court stayed the proceedings until OCC had finished its review, reasoning that "[t]he same procedure has generally been followed when the resolution of a claim cognizable in a federal court must await a determination by an administrative agency having primary jurisdiction." *Id.* at 4–5.

Should this Court not dismiss the case on ripeness grounds, at a minimum, it should stay the proceedings pending a decision from the regulators.

### C. Plaintiffs fail to adequately allege an injury in fact.

To have standing to sue, Plaintiffs must allege a legal injury that is "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Because Plaintiffs rely exclusively on an alleged future injury, they must show that the injury is "certainly impending." *Clapper*, 568 U.S. at 409. "[A]llegations of *possible* future injury are not sufficient." *Id.*

Here, the Complaint merely alleges that Plaintiffs may be injured sometime in the future, although the Complaint never even speculates when. *See Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017) ("[A]s the Supreme Court has emphasized repeatedly, an injury-in-fact must be concrete in both a qualitative and temporal sense."). For example, Plaintiffs suggest that, at some unidentified point in the future, Visa and Mastercard "may" agree to give Capital One a higher share of interchange revenue in exchange for Capital One degrading Discover's network. Compl. ¶ 203. Plaintiffs also allege that Visa, Mastercard, and Capital One may have an "incentive" to collude on interchange fees paid by merchants. *Id.* ¶¶ 203, 238. And Plaintiffs then allege that

some unidentified merchants will pass on those interchange fees and raise prices on some unidentified goods, which will *then* harm some unidentified cardholders. *Id.* ¶ 204.

All of this is speculative, and none of it is "certainly impending." *See SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 754 F. App'x 235, 240 (5th Cir. 2018) (affirming dismissal of merger challenge for lack of Article III standing where plaintiff alleged that the defendant *might* in the future stop licensing a product to plaintiff). Even putting aside regulatory contingency, Plaintiffs' claims—on their own terms—rest on a "highly attenuated chain of possibilities" insufficient to satisfy Article III's injury-in-fact requirement. *See South Carolina v. United States*, 912 F.3d 720, 727 (4th Cir. 2019).[13] As in a recent merger challenge, "Plaintiffs offer no credible allegations to ground these predictions," so Article III standing is lacking. *See Whalen*, 2023 WL 4955141, at *1; *see also DeMartini*, 662 F. Supp. 3d at 1061 (explaining, in dismissing part of a merger challenge for lack of Article III standing, that standing "is not dispensed in gross" and plaintiff must allege that they specifically will be injured).

In sum, two cardholders should not be able to launch a sweeping class action to block a $35 billion bank merger currently undergoing regulatory review on the unsupported supposition that Capital One, Visa, and Mastercard "may" reach a harmful agreement at some unidentified future time. Without a ripe claim and a cognizable injury in fact, Article III does not allow Plaintiffs to proceed.

---

[13] Plaintiffs' proposed class definition highlights the disconnect between the Complaint and Article III's requirements. For example, it purports to include all *merchants* who have paid an interchange fee. But the Complaint does not allege that merchants will suffer an injury, instead alleging that merchants will pass on any potential higher interchange fees to cardholders. *Id.* ¶ 204; *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (holding that a class must have Article III standing for each claimed injury to obtain relief).

## II.     Plaintiffs have failed to plausibly allege an antitrust violation.

To survive a motion to dismiss, the Complaint must allege facts plausibly showing that Plaintiffs are entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs cannot rely on "unadorned conclusory allegations" or mere "labels and conclusions." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). Further, given the enormous expense of discovery in antitrust cases and the attending risk that a plaintiff may seek to "extort large settlements" through meritless cases, it is particularly important that antitrust plaintiffs satisfy this standard. *Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042, 1047 (9th Cir. 2008). Plaintiffs here have not done so.

### A.  Plaintiffs fail to plausibly allege that the Proposed Transaction will violate Section 7 of the Clayton Act.

Section 7 of the Clayton Act prohibits transactions that "substantially . . . lessen competition or tend to create a monopoly." 15 U.S.C. § 18. Plaintiffs do not plausibly plead that this will occur in either of the two markets—payment networks and general credit cards—they allege are affected by the Proposed Transaction.

### 1.  Plaintiffs' allegations do not show that the Proposed Transaction will harm payment-network competition.

Because Capital One does not operate a payment network, bringing together Capital One's credit-card issuance with Discover's payment network is a vertical combination. Courts have long acknowledged that such combinations "often generate efficiencies and other procompetitive effects." *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018); *see Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp*., 655 F. Supp. 3d 52, 79 (D. Conn. 2023) ("Because a company's vertical expansion will ordinarily be for the purpose of increasing its efficiency, which is a prototypical valid business purpose, vertical expansion, without more, does not violate the antitrust laws."). Unsurprisingly, successful challenges to vertical transactions are rare. Nothing in the Complaint plausibly suggests that this is one of those rare instances.

Plaintiffs do *not* allege that the Proposed Transaction will increase concentration in the network market. Rather, the Complaint shows that the Proposed Transaction will *decrease* concentration and *benefit* competition by growing the Discover network and making it a more effective competitor to Visa and Mastercard, which have a "near-monopoly share of 87%." Compl. ¶ 4. By comparison, "Discover ha[s] a 2.2% share." *Id.* ¶ 162. Specifically, Plaintiffs allege that, post-transaction, Capital One will move some credit-card volume *from* Visa and Mastercard *to* Discover's network, thus *deconcentrating* the market. *Id.* ¶¶ 68–69. And it plans to "keep moving volume over [as Capital One] get[s] more traction along the lines." *Id.* ¶ 73. Indeed, as the Complaint notes, Capital One plans to "enhance [Discover's] scale," build greater perceived acceptance and international acceptance, and inject "volume and investment in the network [that] will help Discover [be] competitive with the leading networks." *Id.* ¶ 68. Defendants are unaware of any case finding that such a merger violated Section 7.

Especially against that backdrop, Plaintiffs' various attempts to allege anticompetitive effects are "too speculative to state a claim." *See DeHoog v. Anheuser-Busch InBev*, 899 F.3d 758, 765 (9th Cir. 2018) (dismissing Section 7 claim); *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (holding that, in a vertical merger, the plaintiff "must make a fact-specific showing that the proposed merger is likely to be anticompetitive").

*First,* Plaintiffs allege that somehow the Proposed Transaction will result in the "elimination" of Discover as a vertically integrated competitor, "leaving only American Express." *Id.* ¶ 234. This makes no sense. Plaintiffs allege that there are two vertically integrated payment networks today: Discover and American Express. *See id.* ¶¶ 49, 158. Post-transaction, there will still be two vertically integrated payment networks: Discover (operated by Capital One) and American Express. Nothing is being eliminated.

*Second*, Plaintiffs allege in conclusory terms that Capital One, Visa, and Mastercard would have "incentives to collude . . . on interchange fees" after the merger. *Id*. ¶ 238. But Plaintiffs never raise any facts supporting this allegation. Bald assertions of "strong incentives to collude" are mere "conjecture." *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 668 (6th Cir. 2022). And they are insufficient to state a claim.

Rather than allege supporting facts, Plaintiffs seem to suggest that there is something inherently suspect about dual distribution—*i.e.*, Capital One will issue cards on its own network (Discover) and third-party networks (Visa and Mastercard). *See* Compl. ¶ 203. But the Fourth Circuit has squarely rejected the argument that there is anything inherently anticompetitive about dual distribution. *Brewbaker*, 87 F.4th at 580–81 (4th Cir. 2023). To the contrary, such arrangements are both common and typically procompetitive. *Id.*; *see also* Compl. ¶ 74 (alleging that American Express and U.S. Bank are currently in such an arrangement). Indeed, in *United States v. Visa, U.S.A., Inc.*, the Second Circuit held that Visa and Mastercard had violated the antitrust laws by prohibiting banks that issued their cards from issuing Discover or American Express cards. 344 F.3d 229, 243 (2d Cir. 2003). Here, Plaintiffs insist the opposite is true, apparently arguing that Capital One must *limit* its cards to a single network. This theory fails as a matter of law.

*Third*, Plaintiffs allege that "[t]o avoid the threat that Capital One will move its cardholder base to Discover, Visa and Mastercard *may* provide Capital One with a larger share of the interchange fees in exchange for refraining from expanding the Discover credit card payment processing network." Compl. ¶ 203 (emphasis added). But Plaintiffs offer no factual allegations supporting this conspiracy theory, and such guesswork about the possibility of improper payoffs by Visa or Mastercard after the merger is insufficient to survive a motion to dismiss. *See FTC v.*

18

*Meta Platforms*, 654 F. Supp. 3d 892, 927 (N.D. Cal. 2023) (explaining that courts are "wary of any inquiry that strays too close to the specters of ephemeral possibilities" by stacking many "a priori inferences" on top of one another); *DeHoog*, 899 F.3d at 765.

This theory also makes no economic sense. *See Twombly*, 550 U.S. at 565 (evaluating complaint "in light of common economic experience"); *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) ("On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is plausible in light of basic economic principles."). The Complaint repeatedly indicates that acquiring Discover's payment network is a driving rationale for the Proposed Transaction. Compl. ¶¶ 66–67, 70–72. Plaintiffs offer no coherent explanation as to why Capital One would enter into a $35 billion transaction and buy a payment network—"a very, very, rare asset"—just to deliberately degrade it. *See id.* ¶ 71. To the contrary, the Complaint alleges that a vertically integrated issuer, like Capital One will be post-transaction, is economically incentivized to use its own network because it is more profitable to do so. *See id.* ¶¶ 44–45. Further, as the Complaint notes, Capital One's CEO has been clear in statements to investors that Capital One plans to reinvigorate and grow Discover's payment network. *Id.* ¶¶ 71–74. The only economically logical conclusion is that Capital One will press the competitive advantages that Plaintiffs themselves allege exist and attempt to take market share from Visa and Mastercard.

### 2. Plaintiffs fail to allege an undue concentration of the general-credit-card market or plausibly raise any other competitive concern.

Plaintiffs also claim that the Proposed Transaction "will consolidate two of the top credit card issuers" and thereby "reduce price competition" in the market for general credit cards. Compl. ¶ 194. To make out a Section 7 claim based on these allegations, Plaintiffs must plausibly allege

that the merger will lead to "undue concentration" in the general-credit-card market. *Steves & Sons*, 988 F.3d at 703. But Plaintiffs fail to do so.

Plaintiffs rely on a formula called the Herfindahl-Hirschman Index ("HHI"), Compl. ¶ 195, which measures market concentration by "summing the squares of each firm's share of the relevant market." *Steves & Sons*, 988 F.3d at 704. But as demonstrated here, the failure to account for *each* firm's share invariably skews the HHI calculation.

Here, Plaintiffs allege that the merger will increase "the market's concentration to an HHI measure of 1,747.46 from its current 1,671.5." Compl. ¶ 195. But the Complaint itself demonstrates that those numbers are wrong. Instead of accounting for "each firm" in the market, Plaintiffs manipulate their analysis to fit their claims of market concentration. Plaintiffs calculated and summed the squares of only the top seven competitors, which account for 76% of the market, and then created a phantom eighth competitor and assigned it the entire remaining 24% share of the market. But the Complaint acknowledges that there are more than "15 credit card issuers," Compl. ¶ 123, and a government report relied on in the Complaint, *id.* ¶ 91, put that number at "nearly 4,000."[14] Needless to say, fabricating a nonexistent competitor with a market-leading share—4% larger than the 20% share held by JPMorgan Chase, the biggest actual competitor— has an outsized influence on the HHI. Plaintiffs' made-up competitor with 24% market share contributes 576 points (*i.e.*, 24 x 24) to the HHI, whereas (for example) 24 competitors with 1%

---

[14]   The   Consumer   Credit   Card   Market   at   159–72,   CFPB   (Oct.   2023), https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2023.pdf.

each would contribute a total of just 24 points (*i.e.*, 1 x 1 x 24). Plaintiffs' allegations of market concentration are thus wrong and materially inflated.

Moreover, the increase in concentration that Plaintiffs allege shows that the merger will *not* lead to undue concentration in the market. According to Plaintiffs, the merger would result in a 76-point increase in the HHI from combining Discover's 3.87% share with Capital One's 9.81% share. *See* Compl. ¶¶ 125, 195. That modest increase in concentration fails to state a claim. Both courts and the Federal Reserve routinely conclude that HHI increases in this range raise no issues. *See FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 207 (D.D.C. 2018) ("Transactions that result in an HHI increase of fewer than 100 points are unlikely to have adverse competitive effects."); *Moore Corp. v. Wallace Computer Servs., Inc.*, 907 F. Supp. 1545 (D. Del. 1995) (granting motion to dismiss and refusing to enjoin merger alleged to increase HHI by 95 points).[15] That is especially true here given the number of other competitors acknowledged in the Complaint.

Plaintiffs then re-assert that the merger will harm competition through the "elimination of" Discover and the competitive pressure that it supposedly creates in the general-credit-card market.

---

[15] There are decades of precedent from the Federal Reserve's review of bank mergers finding no anticompetitive effects from mergers that increased HHI by amounts above 76 points. *See, e.g.*, *Orders Issued Under Section 3 of Bank Holding Company Act, The Marine Corporation, Marisub of Wisconsin, Inc.*, 71 Fed. Res. Bull. 795 (1985) (238 points); *Orders Issued Under Sections 3 and 4 of the Bank Holding Company Act, Louisiana Bancshares, Inc.*, 72 Fed. Res. Bull. 154 (1986) (548 points); *Orders Issued Under Sections 3 and 4 of the Bank Holding Company Act, Boatmen's Bancshares, Inc.*, 74 Fed. Res. Bull. 821 (1988) (439 points); *Orders Issued Under Section 3 of the Bank Holding Company Act, First Interstate Bancorp, First Interstate Bank of California*, 75 Fed. Res. Bull. 708 (1989) (79 points); *Orders Issued Under Section 4 of the Bank Holding Company Act, U.S. Bancorp*, 77 Fed. Res. Bull. 342 (1991) (204 points); *Actions Taken Under the Federal Deposit Insurance Corporation Improvement Act*, 78 Fed. Res. Bull. 717 (1992) (207 points); *Orders Issued Under Section 3 and 4 of the Bank Holding Company Act, Southern National Corporation*, 81 Fed. Res. Bull. 307 (1995) (351 points); *Orders Issued Under Bank Merger Act, Centura Bank*, 83 Fed. Res. Bull. 1023 (1997) (145 points); *Gateway Bank & Trust Co.*, 2004 WL 1772457 (2004) (349 points); *Regions Financial Corporation, Regions Bank*, 2006 WL 3382414 (2006) (478 points); *Citizens Banking Corporation*, 2006 WL 3851162 (2006) (403 points); *Orders Issued Under Section 3 of the Bank Holding Company Act, 1st Source*

Compl. ¶¶ 198–99. Again, Plaintiffs are incorrect that the merger will eliminate anything; Discover's credit cards and network will continue to exist post-transaction. Further, Plaintiffs' theory that competition will be harmed because Capital One in particular will no longer have to compete with Discover fails to account for the competitive pressure from American Express, which, according to Plaintiffs, is also vertically integrated and has nearly twice as much purchase volume as Capital One and nearly five times as much as Discover. *See id.* ¶ 125. Plaintiffs' theory also offers no coherent explanation as to why the thousands of remaining credit-card issuers would not still foster robust competition or why Capital One's credit-card customers would be unable to use any of those issuers if Capital One offers less attractive products after the merger.

## B. Plaintiffs have not alleged a valid Section 1 claim.

To state a Sherman Act Section 1 claim, Plaintiffs must adequately allege a contract, combination, or conspiracy that imposed an unreasonable restraint of trade. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). Restraints can be unreasonable in one of two ways. First, a very narrow group of restraints, like price fixing, "are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Am. Express*, 585 U.S. at 540; *see Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 509 (4th Cir. 2002) (identifying "price fixing, horizontal output restraints, and market-allocation agreements"). Second, all other restraints are evaluated under the "rule of reason," which requires a plaintiff to show, through

---

*Corporation*, 93 Fed. Res. Bull. C77 (2007) (237 points); *Hancock Holding Company*, 2011 WL 2115103 (2011) (228 points); *Keycorp*, 2016 WL 4432525 (2016) (190 points); *Centerstate Bank Corporation*, 2017 WL 6997251 (2017) (236 points); *First Horizon National Corporation*, 2017 WL 5586311 (2017) (486 points); *First Horizon National Corporation, First Horizon Bank*, 2020 WL 4274182 (2020) (386 points); *Orders Issued Under Bank Holding Company Act, Huntington Bancshares Incorporated*, 107 Fed. Res. Bull. 27 (2021) (369 points); *Huntington Bancshares Incorporated*, 2021 WL 2499267 (2021) (453 points); *Columbia Banking System, Inc.*, 2022 WL 16753716 (2022) (144 points).

direct or indirect evidence, that the agreement has substantially harmed competition. *See Am. Express*, 585 U.S. at 541–42.

Plaintiffs assert that after the merger, agreements between Capital One, Visa, and/or Mastercard will violate the Sherman Act under either a *per se* or rule-of-reason analysis. But neither the law nor the facts alleged in the Complaint support either theory.

### 1. Plaintiffs' *per se* theory has been squarely rejected by the Fourth Circuit.

Plaintiffs' *per se* claim is a sleight of hand. Plaintiffs point out that, after the merger, Capital One will "become Visa and Mastercard's direct, horizontal competitor" in the payment-processing business and assert that it would be "*per se* illegal" for Capital One to agree with "its direct, horizontal competitors on prices—particularly interchange fees." Compl. ¶¶ 207–08. But the Complaint never actually alleges that such an agreement exists, nor could it because there is no such agreement.

Instead, Plaintiffs' Section 1 claim is about Capital One's plans to "maintain" its *vertical* agreements *as a card issuer* with Visa and Mastercard *as payment processors* while separately issuing cards on Discover's network. *Id*. ¶¶ 206, 210. That is no different than saying that Capital One will have a dual-distribution arrangement post-transaction, which the Fourth Circuit has held is not *per se* illegal. *Brewbaker*, 87 F.4th at 579–81; *see Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) ("Vertical price restraints are to be judged according to the rule of reason."). Again, *per se* treatment is reserved for a narrow category of agreements with which courts have sufficient experience to conclude that "always or almost always" are anticompetitive. *Leegin*, 551 U.S. at 886–87. Here, courts' extensive experience with vertical agreements and dual-distribution arrangements supports the opposite conclusion—they are both commonplace and typically *procompetitive*. *See Brewbaker*, 87 F.4th at 580–83. Plaintiffs' *per se* claim thus fails as a matter of law.

**2.  Plaintiffs' back-up rule-of-reason claim fails to allege facts showing an anticompetitive effect.**

In the alternative, Plaintiffs contend that maintaining "post-merger agreements between Capital One and . . . Visa and Mastercard, would violate the Rule of Reason." Compl. ¶ 250. To plead a rule-of-reason claim, plaintiffs must first identify an "anticompetitive effect resulting from the agreement in restraint of trade" and then must plausibly allege "that harm is not only possible but likely and significant, which requires examination of market circumstances, including market power and share."[16] *Dickson*, 309 F.3d at 206. Plaintiffs' conclusory allegations fall short of that standard.

*First,* Plaintiffs fail to plead any non-conclusory allegations of anticompetitive effects that would result from post-merger vertical agreements between Capital One and Visa or Mastercard. Plaintiffs make the conclusory assertion that the agreements "would strengthen barriers to entry, . . . increase switching costs, and decrease price competition." Compl. ¶ 251. But the Complaint never substantiates those allegations, which merely string together antitrust buzzwords. In fact, it fails to allege how Capital One's contracts with Visa or Mastercard (which are already in effect) would cause those effects after the merger. Plaintiffs' "unadorned conclusory

---

[16] Insofar as Plaintiffs are challenging a vertical agreement, they must allege facts showing that the post-merger entity has market power in the relevant market. *See Am. Express*, 585 U.S. at 543 n.7 ("[T]he possibly anticompetitive manifestations of vertical arrangements can occur only if there is market power."). Market share can be used as a proxy for market power, and "courts have consistently held firms with market shares of less than 30% are presumptively incapable of exercising market power." *Abbott Labs v. Adelphia Supply USA*, No. 15-cv-5826, 2018 WL 8967057, at *3 (E.D.N.Y. Aug. 7, 2018) (referring to jurisprudence collecting cases). In the network market, Plaintiffs allege that Capital One has a 0% market share and that Discover has a 2.2% share, Compl. ¶ 162, and in the credit-card issuing market, they allege that post-merger Capital One will have a 13.68% share, *id.* ¶ 125. Having failed to plausibly allege market power, Plaintiffs cannot succeed on a vertical Section 1 claim.

allegations" are insufficient to state a claim. *See Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

Although they do not come out and say so, Plaintiffs appear to be advocating that Capital One must "route its credit cards post-merger entirely through the Discover Network." *See* Compl. ¶ 252. But they fail to explain why antitrust law would require Capital One to offer customers *fewer* options when one of the purposes of antitrust law is to increase consumer choice. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 102 (1984); *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc*., 123 F.3d 301, 306 (5th Cir. 1997). And again, courts have long recognized that dual-distribution arrangements are typically procompetitive. *See Brewbaker*, 87 F.4th at 580–83.

*Second*, to the extent Plaintiffs seek to base a Section 1 claim on their speculative theory that, after the merger, "Visa and Mastercard *may* provide Capital One with a larger share of the interchange fees in exchange for [Capital One's] refraining from expanding the Discover credit card payment processing network," Compl. ¶ 203 (emphasis added), that too fails to state a claim. "The very essence of a section 1 claim, of course, is the existence of an agreement." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994). Plaintiffs' implausible theory assumes future, *hypothetical* agreements between Visa, Mastercard, and/or Capital One but none of those non-existent agreements can support a Section 1 claim. *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) ("Section 1 claims always require the existence of an agreement."); *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.,* 948 F. Supp. 2d 538, 559 (D. Md. 2013) (explaining that a Section 1 conspiracy claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made"). Not only does such an agreement not exist, but there is no reason to think it would ever exist because it makes "no

practical or economic sense." *See Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 280–81 (4th Cir. 2012).

### III.  Plaintiffs have not alleged that they will suffer an irreparable injury or that they satisfy the other elements required for a permanent injunction.

Plaintiffs seek no damages because they have suffered no damages. Instead, Plaintiffs seek a permanent injunction blocking the Proposed Transaction. That is a "drastic and extraordinary remedy" that is never awarded as of right. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *SAS Inst., Inc. v. World Programming Ltd.*, 952 F.3d 513, 527–28 (4th Cir. 2020).

To obtain injunctive relief under the Clayton Act, plaintiffs must show that (1) they face a significant threat of irreparable injury, (2) remedies available at law, such as monetary damages, are inadequate, (3) the balance of hardships favors the injunction, and (4) so does the public interest. *Steves & Sons*, 988 F.3d at 705. At the pleadings stage, Plaintiffs must plausibly allege facts that, if taken as true, would establish each of these elements. *E.g.*, *David v. Summit Comty. Bank*, 1:15-cv-179, 2015 WL 12516770, at *5 (E.D. Va. June 15, 2015) (dismissing claim for permanent injunction with prejudice because "amended complaint does not allege sufficient facts to support a plausible inference that the plaintiff has suffered an irreparable injury"); *Jones v. Bank of Am. Corp.*, No. 4:09-cv-162, 2010 WL 6605789, at *1 (E.D. Va. Aug. 24, 2010) (dismissing claim for injunctive relief where plaintiff failed to plausibly allege irreparable injury).

Plaintiffs have not plausibly alleged a "significant threat of irreparable antitrust injury." *Steves & Sons*, 988 F.3d at 705. As discussed above, their allegations of harm are entirely speculative, incoherent, uncertain, and not imminent. Moreover, Plaintiffs have not alleged an *irreparable* injury for which money damages would be inadequate. In fact, the term "irreparable" never even appears in the Complaint. Plaintiffs' theory is that the Proposed Transaction may lead to them paying "higher prices, including in the form of fewer and less valuable rewards, higher

interest rates, higher purchase prices (as a result of passed on interchange fees), and higher credit card fees." Compl. ¶ 239. But Plaintiffs fail to allege why such monetary injuries, if they ever occurred, would not be redressable by damages. *See, e.g.*, *Delco LLC v. Giant of Maryland*, No. 07-cv-3522, 2007 WL 3307018, at *19 (D.N.J. Nov. 8, 2007) (rejecting plaintiffs' effort to block a grocery-store merger, reasoning that the claimed injuries of higher prices and longer drive times were not irreparable); *Nat'l Ass'n of Chain Drug Stores v. Express Scripts, Inc.*, No. 12-cv-395, 2012 WL 3655459, at *5 (W.D. Pa. Aug. 27, 2012) (rejecting plaintiffs' attempt to block a pharmaceutical benefits management company merger, holding that the claimed injury of higher prices was not irreparable); *Taleff v. Southwest Airlines Co.*, 828 F. Supp. 2d 1118, 1123 (N.D. Cal. 2011) (rejecting plaintiffs' attempt to force an airline divestiture because the claimed injury of higher prices was not irreparable).

The alleged injury here stands in sharp contrast to the injury the Fourth Circuit found to be irreparable in *Steves & Sons*, 988 F.3d 690 (4th Cir. 2021). There, the Fourth Circuit held that the imminent permanent loss of a 150-year-old family-owned business was irreparable. *Id.* at 719. "The right to continue a multi-generational family business is not measurable entirely in monetary terms; the Steveses want to sell doors, not to live on the income from a damages award." *Id.* Emphasizing further the narrow scope of injuries that qualify as "irreparable," the Fourth Circuit held that even the "the dissolution of a new enterprise, or one that's not very important to its owner (who may own many companies), may be reparable by damages." 988 F.3d at 719. Plaintiffs' claim of future higher prices are not within that narrow scope.

Plaintiffs also fail to allege facts showing that their requested permanent injunction would be in the public interest—which the bank regulators are expressly tasked with safeguarding in their

review, 12 U.S.C. §§ 1828(c)(5)(b) 1842(c)(1)(B), or that the balance of hardships favors an injunction.

In sum, Plaintiffs have not even attempted to allege that they are entitled to the drastic and extraordinary remedy that they seek.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint because Plaintiffs' claims are not ripe (or at a minimum, stay these proceedings until they become ripe). The Court should also dismiss the Complaint because Plaintiffs lack standing. Alternatively, the Court should dismiss the Complaint for failure to state a claim, and it should reject the claim for injunctive relief.

Dated: August 26, 2024

*/s/ Ryan A. Shores*
Ryan A. Shores (VA 65934)
David Gelfand (admitted *pro hac vice*)
Kenneth Reinker (admitted *pro hac vice*)
Nowell Bamberger (admitted *pro hac vice*)
Jacob M. Coate (admitted *pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave, NW
Washington, DC 20037
Tel.: 202-974-1500
Fax: 202-974-1999
rshores@cgsh.com
kreinker@cgsh.com
nbamberger@cgsh.com
dgelfand@cgsh.com
jcoate@cgsh.com

John S. Moran (VSB No. 84236)
Emily E. Kelley (VSB No. 96252)
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Tel.: (202) 828-2817
Fax: (202) 828-3327
jmoran@mcguirewoods.com

ekelley@mcguirewoods.com

Bryan A. Fratkin (VSB No. 38933)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-4352
Fax: (804) 698-2100
bfratkin@mcguirewoods.com

Ryan McLeod (admitted *pro hac vice*)
Christina Chu Ma (admitted *pro hac vice*)
Adam Goodman (*pro hac vice* pending)
WACHTELL, LIPTON, ROSEN & KATZ
51 W. 52nd St
New York, NY 10019
Tel.: (212) 403-1000
Fax: (212) 403-2175
ramcleod@wlrk.com
ccma@wlrk.com
algoodman@wlrk.com

*Counsel for Defendant Capital One Financial
Corporation*

*/s/ Daniel J. Richardson*
Daniel J. Richardson (VSB No. 94961)
Amanda F. Davidoff (admitted *pro hac vice*)
Joseph J. Matelis (admitted *pro hac vice*)
Elizabeth A. Rose (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006-5215
Tel.: 202-956-7500
Fax: 212-558-3588
richardsond@sullcrom.com
matelisj@sullcrom.com
davidoffa@sullcrom.com
rosee@sullcrom.com

*Counsel for Defendant Discover Financial
Services, Inc.*

29

**Certificate of Service**

I certify that on this 26th day of August, 2024, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

*/s/ Ryan A. Shores*
Ryan A. Shores