**IN THE UNITED STATES DISTRICT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| TYLER BAKER, et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:24-cv-01265 (AJT/LRV) |
| CAPITAL ONE FINANCIAL CORPORATION, et al., | |
| *Defendants*. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS OR ALTERNATIVELY TO STAY**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    A.    Interchange Fees and Credit Card Competition ..................................................... 3

    B.    The Proposed Merger ............................................................................................. 5

    C.    The Relevant Markets ............................................................................................ 5

    D.    The Harm to Competition from the Proposed Merger ........................................... 6

    E.    Regulatory Proceedings and Statutory Background ............................................. 8

    F.    Defendants' Motion and Other Case Proceedings ................................................ 9

LEGAL STANDARD ........................................................................................................... 9

ARGUMENT ....................................................................................................................... 10

I.      DEFENDANTS' ARTICLE III ARGUMENTS ARE RADICAL AND WRONG .......... 10

    A.    The Asserted Claims Are Ripe Under Article III and Present a Live Case or
         Controversy ......................................................................................................... 11

    B.    Defendants' Injury-in-Fact Arguments Are Meritless ........................................ 16

    C.    The Court's Current Schedule and Recent Discovery Order Appropriately Prevent
         Any Problems that Would Warrant a Stay of this Case ....................................... 17

II.     PLAINTIFFS HAVE PLAUSIBLY ALLEGED A CLAIM FOR INJUNCTIVE RELIEF
     UNDER SECTION 7 OF THE CLAYTON ACT .......................................................... 18

    A.    The CAC Directly Pleads a Substantial Lessening of Competition in the Related
         General Credit Card and Payment Processing Markets ...................................... 18

    B.    Defendants' Fact-Bound Arguments Are Not a Basis for Dismissal ................... 22

III.    PLAINTIFFS HAVE ADEQUATELY PLEADED THAT THE POST-MERGER
     AGREEMENTS WITH VISA AND MASTER CARD ARE ANTICOMPETITIVE
     UNDER SECTION 1 OF THE SHERMAN ACT .......................................................... 25

    A.    The CAC Alleges that the Merger Will Result in a *Per Se* Violation of Section 1
         of the Sherman Act .............................................................................................. 26

    B.    In the Alternative, the Complaint Alleges a Violation of the Rule of Reason ...... 28

IV.    DEFENDANTS' IRREPARABLE HARM ARGUMENTS ARE MERITLESS ............. 29

V.     LEAVE TO AMEND ..................................................................................................... 30

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
   900 F.3d 623 (9th Cir. 2018) ..................................................................... 26

*Blenheim Capital Holdings Ltd. v. Lockheed Martin Corp.*,
   53 F.4th 286 (4th Cir. 2022) ........................................................................ 9

*Bus. Elecs. Corp. v. Sharp. Elecs. Corp.*,
   485 U.S. 717 (1988) .................................................................................... 26

*Cedra Pharmacy Houston, LLC v. United Health Grp., Inc.*,
   2019 WL 1433600 (S.D. Tex. Mar. 7, 2019) ............................................... 18

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................................... 15

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977) ...................................................................................... 28

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) .................................................................................... 26

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ....................................................................... 24

*In re Cardizem CD Antitrust Litig.*,
   332 F.3d 896 (6th Cir. 2003) ...................................................................... 25

*In re Mission Health Antitrust Litig.*,
   2024 WL 759308 (W.D.N.C. Feb. 21, 2024) ............................................... 22

*In re Sulfuric Acid Antitrust Litig.*,
   743 F. Supp. 2d 827 (N.D. Ill. 2010) .......................................................... 28

*Johnson v. Oroweat Foods* Co,
   785 F.2d 503 (4th Cir. 1986). ...................................................................... 30

*Kerns v. United States*,
   585 F.3d 187 (4th Cir. 2009) ................................................................. 9, 17

*Laber v. Harvey*,
   438 F.3d 404 (4th Cir. 2006) ...................................................................... 30

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
   551 U.S. 877 (2007) .................................................................................... 28

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
   415 F. Supp. 3d 703 (E.D. Va. 2019) ..................................................................... 27, 28, 29

*Murthy v. Missouri*,
   144 S. Ct. 1972 (June 26, 2024) ........................................................................................ 15

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n Inc.*,
   883 F.3d 32 (2d Cir. 2018) .................................................................................................. 25

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) ("NCAA") ............................................................................................. 26

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ............................................................................................... 28

*Robertson v. Sea Pines Est. Cos., Inc.*,
   679 F.3d 278 (4th Cir. 2012) .............................................................................................. 21

*Robinson v. Am. Honda Motor Co.*,
   551 F.3d 218 (4th Cir. 2009) ................................................................................................ 9

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) .............................................................................................. 25

*Sharpf v. General Dynamics Corp.*,
   2024 WL 1704665 (E.D.V.A. Apr. 19, 2024) ...................................................................... 9

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
   988 F.3d 690 (4th Cir. 2021) ................................................................................... 17, 22, 23

*Trump v. New York*,
   592 U.S. 125 (2020) ............................................................................................................. 15

*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017) ............................................................................................ 17

*United States v. AT&T Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018) .................................................................................... 21

*United States v. Brewbaker*,
   87 F. 4th 563 (4th Cir. 2023) .............................................................................................. 27

*United States v. First City Nat'l Bank of Houston*,
   386 U.S. 361 (1967) ............................................................................................................. 22

*United States v. Michigan Nat'l Corp.*,
   419 U.S. 1 (1974) ................................................................................................................. 13

## Statutes and Other Authorities

12 U.S.C. § 1828 (the "Bank Merger Act")............................................................................*passim*

12 U.S.C. § 1849 (the "Bank Holding Company Act")........................................................*passim*

Section 1 of the Sherman Act (15 U.S.C. § 1) ................................................................................ 8

Section 7 of the Clayton Act (15 U.S.C. § 18) ............................................................................... 8

15 U.S.C. § 26............................................................................................................................... 16

Jeremy C. Kress, *Modernizing Bank Merger Review*,
  37 YALE J. ON REG. 435 (2020) .............................................................................................. 14

## INTRODUCTION

This is an antitrust case challenging the proposed merger of one of the nation's largest issuers of Visa- and Mastercard-branded credit cards, Capital One, with one of the Visa and Mastercard's only competitors in the related credit card payment processing market. As set forth in detail in the operative Class Action Complaint ("CAC"), ECF No. 1, the merger of Capital One with Discover will transform two key competitors that put price pressure on Visa and Mastercard with respect to interchange fees—the key metric from which consumer welfare derives for U.S. credit cardholders.

Without the merger, Discover acts as an important price check on Visa and Mastercard as to overall interchange fee levels, and also constrains open-loop card issuers like Capital One on the level of rewards it provides to cardholders. Without the merger, Capital One is an important competitive constraint on the share of interchange fees that go to issuers (and, eventually cardholders as rewards) instead of to payment processors like Mastercard and Visa. All this works through the pressure of competition—competition from Discover with Mastercard and Visa, competition from Discover with Capital One, and competitive negotiation by Capital One with Mastercard and Visa as to interchange fee agreements.

The proposed merger will turn all this on its head—and indeed, turn two important competitors of Visa and Mastercard into *per se* collaborators with them. By folding Discover into Capital One, but otherwise continuing with business as usual vis-à-vis Visa and Mastercard, the post-merger entity would negotiate interchange fee splits among horizontal competitors. The post-merger entity would have a decreased incentive to compete vigorously in every step and side of the process that is supposed to use competition to obtain favorable terms—principally, credit card rewards—for U.S. consumers. The people challenging this merger—Capital One cardholders and

other people and entities that pay U.S. credit card interchange fees—are the precise people who will be harmed by the Defendants' merger.

Against all this, Defendants argue that this case is not ripe, and that jurisdiction is lacking. Not so. As previewed in the recently-argued stay motion Defendants filed on identical grounds, federal banking statutes make this Court the final arbiter of an antitrust challenge to the subject merger, and *require* that Plaintiffs file before a statutorily defined "effective approval" date or else lose their ability to bring antitrust claims challenging the merger. Plaintiffs faithfully followed these statutes in the filing of this suit, and this Court will be tasked with conducting a "de novo" review of the challenged merger.

None of Defendants' arguments in favor of dismissal (or a stay) fares any better than their lead, Article III argument. Their motion should be dismissed. This case should continue.

## BACKGROUND

This is an antitrust lawsuit challenging the proposed merger of Capital One, one of the nation's largest issuers of Visa- and Mastercard-serviced credit cards, with Discover, one of Visa and Mastercard's two serious competitors in the market for credit card payment processing. Defendant Capital One is one of America's largest banks and the third largest issuer of Visa- and Mastercard-branded credit cards. CAC ¶ 12. Defendant Discover is a digital banking and payment services company that issues Discover Cards and operates its own vertically integrated payment processing network, the Discover Network. *Id.* ¶¶ 16, 18-21. Defendant Discover presently competes with Capital One in the general purpose credit card market and with Visa and Mastercard in the credit card payment processing market, and the challenged merger would substantially lessen competition in both markets, harming Plaintiffs (who are Capital One cardholders) and the proposed class.

A.      **Interchange Fees and Credit Card Competition**

As explained in the CAC, the United States credit card market runs on "interchange fees"—fees collected on every credit card transaction in the U.S., typically charged as a percentage of each transaction and withheld from merchants that accept credit cards. CAC ¶ 26. The interchange fee for a credit card transaction is split between the payment processor, which operates a network that facilitates credit card transactions, and the issuer, which is typically a bank or financial institution that provides credit to a cardholder. *Id.* ¶¶ 27-28.

Credit card issuers use the revenue from their interchange fee portion to provide credit card rewards, which are provided through rewards programs designed to incentivize the use of an issuer's credit card. CAC ¶ 28. Nearly all credit card issuers—including Capital One—provide rewards and book the cost of these rewards against revenue from interchange fees. *Id.* ¶ 29. The interchange fee amount that a credit card issue such as Capital One receives is the result of negotiations with the payment processors that issuer uses. *Id.* ¶ 31. Like most credit card issuers in the United States, Capital One uses two payment processors—Visa and Mastercard—for its credit cards,[1] and as a result, the interchange fee for Capital One's millions of credit card customers is set by agreements between Capital One, on the one hand, and Visa and Mastercard, on the other. *Id.* ¶¶ 31-33, 51-62. Issuers' hardball negotiation of interchange fee rates with Visa and Mastercard is an important competitive force in the United States credit card market, as a large issuer like Capital One uses its substantial user base to extract concessions from the payment processors, thereby obtaining better interchange rates that can be passed onto its cardholders through increased rewards. *Id.* ¶¶ 33-34, 38-39, 51-62.

---

[1] As of 2022, approximately 42% of Capital One's credit cards ran over Visa's payment network, and 58% ran over Mastercard's. CAC ¶ 38.

Notably, Visa and Mastercard are not a complete duopoly in credit card payment processing—just a near one. There are two substantial competitors to Visa and Mastercard in the United States credit card payment processing market: American Express and Discover. CAC ¶¶ 36-37, 158-64. Discover and American Express operate vertically integrated credit card businesses, which means that they simultaneously issue credit cards (like Capital One) and provide credit card payment processing networks (like Visa and Mastercard). *Id.* ¶¶ 37, 40-47. Further, Discover and American Express operate "closed-loop" ecosystems wherein a Discover credit card is serviced by the Discover payment processing network, and an American Express credit card is serviced by the American Express payment processing network. *Id.* ¶¶ 40-47. Despite their comparatively small market share (Visa and Mastercard collectively service about 84% of all credit cards, and about 76% of credit card transaction volume, in the United States, with Discover and American Express servicing the remainder, *id.* ¶¶ 35-37), Discover and American Express play a vital competitive role in pressuring both payment processors (*i.e.*, Visa and Mastercard) and major card issuers (*e.g.*, Capital One) on interchange fees. *Id.* ¶¶ 41-50. The closed-loop model of Discover and American Express—both of which are now accepted at 99% of U.S. merchants that accept credit cards— enables these companies to place substantial competitive pressure on issuers like Capital One to increase reward incidence. *Id.* ¶¶ 44-49.

Visa and Mastercard have a history of anticompetitive collusion—both with each other and with the issuers (including Capital One) they are supposed to negotiate against to divide interchange fees. *Id.* ¶¶ 55-62. In a highly-concentrated portion of the U.S. economy with a history of collusion, the competitive pressure that an independent Discover and an independent Capital One place on Visa and Mastercard cannot be understated—and a lessening of such pressure

through a realignment of these companies would have serious impacts in two major United States antitrust markets. But in February 2024, that is exactly what the Defendants publicly proposed.

### B.      The Proposed Merger

On February 19, 2024, Capital One announced its intent to acquire Discover in a $35 billion all-stock deal. CAC ¶ 63. The next day, Capital One's management held an investor conference call, a transcript of which was filed with the SEC. *Id.* ¶ 67. In this call, Capital One's CEO and CFO explained that the company would integrate Discover's payment processing network, but would migrate only a small part of its credit card business to it—and over time. *Id.* ¶¶ 67-69. In fact, Capital One's CEO, Richard Fairbank, expressly told investors that the company would continue to process payments through Visa and Mastercard despite owning Discover. *Id.* ¶ 73.

As a result, Capital One's post-merger plan would result in Capital One maintaining, negotiating, and renegotiating agreements with Visa and Mastercard for Capital One credit card interchange fees, while at the same time serving as Visa and Mastercard's direct horizontal competitor in the payment processing market. *Id.* ¶ 74.

### C.      The Relevant Markets

The proposed merger impacts two relevant antitrust markets—the United States general credit card market and United States credit card payment processing market. CAC ¶¶ 82-164. Each of these markets is economically distinct, including under the relevant *Brown Shoe* factors. *Id.* ¶¶ 82-128 (general credit card market); 129-64 (credit card payment processing market). The general credit card market is moderately concentrated, and Capital One and Discover are two of the largest market participants in terms of both cards issued and purchase volume. *Id.* ¶¶ 121-28. The credit card payment processing market is highly concentrated, and Discover is one of four measurable competitors in that market. *Id.* ¶¶ 158-64.

Both relevant markets are protected by a powerful barrier to entry—the Payment Network and Issuer Rewards Barrier to Entry ("PNIRBE"). CAC ¶¶ 165-83. The PNIRBE arises from a series of network effects and feedback loops that create a "chicken or the egg" problem acknowledged by Capital One's CEO on his February 20 investor call. *Id.* ¶¶ 165, 169. That is, both acceptance by merchants and interchange fee negotiation require a large preexisting user base in order to negotiate favorable terms required to attract users, and these powerful network effects entrench sizable incumbents—and prevent disruptive new entry—in the general credit card and credit card payment processing markets. *Id.* ¶¶ 166-76. The presence and strength of the PNIRBE has been confirmed by recent history in both relevant antitrust markets—the same five credit card issuers, including Capital One, have dominated the general purpose credit card market for many years, and the credit card payment processing market has seen no meaningful entry at all in decades. *Id.* ¶¶ 172-183.

### D.    The Harm to Competition from the Proposed Merger

The proposed merger would harm competition in both relevant antitrust markets, principally because it would powerfully realign critical competitive checks in both markets. As described earlier in this fact section, Discover and Capital One currently place crucial competitive pressure on Visa and Mastercard (i) with respect to overall interchange fee levels (because Discover places a competitive check on those firms' overall interchange rates and their ability to collude to inflate them); (ii) with respect to the portion of interchange fees remitted to issuers (a large issuer like Capital One uses negotiation leverage against Visa and Mastercard to maximize interchange fee share remitted to the issuer, which can then be used for rewards); and (iii) with respect to the portion of issuer-remitted interchange fees actually provided for cardholder rewards (a vertically-integrated issuer like Discover places direct rewards pressure on large open-loop issuers like Capital One). *See supra* at Background § A.

The proposed merger would directly and substantially lessen competition in each of these three areas. That is, because Discover would no longer be a truly independent competitor of Visa and Mastercard, but instead a division of one of those firms' largest business partners, competition on overall interchange fee levels (area (i)) would be lessened by the merger. And because Capital One would be operating its own payment processing network, its incentive to negotiate issuer-friendly interchange fee terms—terms that, by virtue of Capital One's size, impact the portion of interchange fees that go to card issuers (which provide rewards to consumers) rather than payment processors (which do not) marketwide—would decrease, lessening competition in area (ii). Finally, by placing one of two vertically-integrated issuers (Discover) in the hands of one of its biggest open-loop competitors (Capital One), the competitive pressure placed by Discover on Capital One and other open-loop issuers to issue greater rewards (area (iii)) would also diminish.

For the credit card ecosystem in the United States—already on a competitive knife's edge—the proposed merger represents a near worst-case scenario, and this has very little to do with pre- and post-merger Herfindahl-Hirschman calculations. Put simply, as the CAC explains, the proposed merger will strengthen the PNIRBE, CAC ¶¶ 185-93, increase concentration in the general credit card market, *id.* ¶¶ 194-97, eliminate Discover as a vertically integrated competitor with Capital One, *id.* ¶¶ 198-99, facilitate horizontal collusion in the credit card payment processing market, *id.* ¶¶ 200-205, result in direct, horizontal agreements among competitors in the credit card payment processing market, *id.* ¶¶ 206-210, and increase prices for consumers and reduce consumer choice, *id.* ¶¶ 211-15.

Plaintiffs (two Capital One credit cardholders, CAC ¶¶ 9-10) and the proposed class (people and entities that pay credit card interchange fees, *id.* ¶ 220) would be injured by the

anticompetitive effects of the proposed merger, and on July 22, 2024, sued to enjoin it, *id.* ¶¶ 232-58 & Prayer for Relief.

### E.      Regulatory Proceedings and Statutory Background

According to Defendants' filings in this case, Capital One and Discover filed applications with the Federal Reserve, the Office of the Comptroller of the Currency (OCC), and Delaware's State Bank Commissioner in late March, 2024. ECF No. 42 at 7. As Defendants correctly point out in their motion, the challenged merger is subject to statutory review by the Federal Reserve and the OCC under 12 U.S.C. § 1849 (the "Bank Holding Act") and 12 U.S.C. § 1828 (the "Bank Merger Act").

These statutes prescribe a merger review process wherein federal bank regulators evaluate a proposed merger transaction under specified conditions, and any federal antitrust action challenging such a merger "shall be commenced prior to the earliest time under this subsection at which the transaction approval under section 1842 of this title might be consummated." 12 U.S.C. § 1849; *see also* 12 U.S.C. § 1828(c)(7)(A) ("Any action brought under the antitrust laws arising out of a merger transaction shall be commenced prior to the earliest time under paragraph (6) at which a merger transaction approved under paragraph (5) might be consummated."). If a federal antitrust suit challenging a covered bank merger is not commenced within 30 days after bank regulators' approval, "the transaction may not thereafter be attached in any judicial proceeding on the ground that it alone and of itself constituted a violation of any antitrust laws other than section 2 of Title 15 . . . ." 12 U.S.C. § 1849; *accord* 12 U.S.C. § 1828(c)(7)(c).

On July 22, 2024, prior to the earliest time the Capital One-Discover merger could be consummated under the Bank Holding and Bank Merger Acts, Plaintiffs—two Capital One cardholders, on behalf of themselves and a putative class—filed an action under federal antitrust laws challenging the proposed merger. Plaintiffs' CAC brings claims under Section 7 of the

8

Clayton Act (15 U.S.C. § 18) and Section 1 of the Sherman Act (15 U.S.C. § 1), and seeks an injunction under Section 16 of the Clayton Act (15 U.S.C. § 26).

### F.   Defendants' Motion and Other Case Proceedings

On August 26, 2024, Defendants filed a Motion to Dismiss or Alternatively to Stay. ECF No. 42. Defendants' MTD argues that Plaintiffs lack Article III standing to sue because bank regulators have not yet approved the challenged merger, *id.* at 9-15, and additionally argues that the CAC does not plausibly plead antitrust violations, *id.* at 16-26, or an entitlement to injunctive relief, *id.* at 26-28.

On August 27, the Court issued a Scheduling Order setting a pretrial conference for September 18, ordering the parties to "develop a discovery plan which will complete discovery by Friday, January 10, 2025," and setting a final pretrial conference for January 16, 2025. ECF No. 45 at 1. On August 29, Defendants filed a Motion to Stay Discovery Temporarily Pending Resolution of Defendants' Motion to Dismiss. ECF No. 46; *see* ECF No. 47 ("Mot."). According to Defendants' Discovery Stay Motion, "Discovery, much like Plaintiffs' Complaint, is premature," Mot. at 1, as "[t]he challenged banking merger is subject to active and ongoing regulatory review by the Federal Reserve, the Office of the Comptroller of the Currency, and Delaware's State Bank Commissioner," *id.*, and discovery should be stayed because this is "an antitrust case subject to a motion to dismiss for threshold Article III defects," *id.* at 2.

On September 11, after briefing and oral argument, the Court denied-in-part Defendants' motion for a discovery stay. ECF No. 63. The parties subsequently filed a joint discovery plan, ECF No. 64, and made their respective initial disclosures.

### LEGAL STANDARD

"In addressing a Rule 12(b)(6) motion, a court must assume the truth of all facts alleged in the complaint and construe the factual allegations in favor of the plaintiff." *Sharpf v. General*

*Dynamics Corp.*, 2024 WL 1704665, at *4 (E.D.V.A. Apr. 19, 2024) (citing *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009)). A complaint should not be dismissed if it pleads "enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A motion under 12(b)(1) challenging subject matter jurisdiction "must take the jurisdictional facts alleged as true—as in the case of a motion filed under Rule 12(b)(6)—and determine, as a matter of law, whether the court has jurisdiction." *Blenheim Capital Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 292 (4th Cir. 2022) (citing *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). If a defendant disputes the jurisdictional facts and provides the court "with contradicting facts," the court "may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Kerns*, 585 F.3d at 192.

## ARGUMENT

### I.   DEFENDANTS' ARTICLE III ARGUMENTS ARE RADICAL AND WRONG

Defendants' central argument for dismissal is based on the premise that the Federal Reserve, the Office of Comptroller of Currency, and a Delaware state regulator must first review the merger before this Court has jurisdiction. As explained below, this argument ignores direct federal statutes—the Bank Holding Company Act and the Bank Merger Act—that make this Court the final arbiter of whether the merger should be cleared once an antitrust lawsuit is filed to block it. Defendants also ignore the express holding of the United States Supreme Court that timely antitrust challenges brought prior to a merger should not be dismissed for a lack of case or controversy under Article III, even if the regulators have not yet weighed in on, or approved of, the merger. What is left of Defendants' argument is the radical notion that federal administrative agencies must approve a merger before this Court fulfills its statutory mandate to perform a *de novo* evaluation of the merger—a proposition for which Defendants provide no basis other than

*ipse dixit* and dissatisfaction with the workings of statute. Defendants fall back on an attempt to constitutionalize the merits of Plaintiffs' antitrust claim under the guise of Article III injury, arguing that the CAC fails to allege future injury. As explained below, this argument not only ignores the CAC's allegations about the anticompetitive effects of the merger, but also allegations that Capital One's CEO publicly stated that the merged entity plans to maintain contracts and relationships with its direct, horizontal competitors, Visa and Mastercard, while operating the Discover Network. None of this comes close to a viable Article III challenge to this case.

### A.   The Asserted Claims Are Ripe Under Article III and Present a Live Case or Controversy

Defendants' ripeness arguments are based on a misreading of the applicable federal statutes, the Bank Holding Company Act and the Bank Merger Act, and outright ignore the United States Supreme Court's ruling on the very issue of ripeness Defendants argue here, for merger challenges subject to those statutes. To begin with, both the Bank Holding Company Act and the Bank Merger Act provide for a statutory bar on any antitrust challenges to mergers after the responsible agency (*e.g.*, the Federal Reserve) approves of the merger, unless an antitrust lawsuit is brought "prior to" the earliest statutory period provided. The Bank Holding Company Act provides, in relevant part:

> Upon the consummation of an acquisition, merger, or consolidation transaction approved under section 1842 of this title in compliance with this chapter and after the termination of any antitrust litigation commenced within the period prescribed in this section, or upon the termination of such period if no such litigation is commenced therein, the transaction may not thereafter be attacked in any judicial proceeding on the ground that it alone and of itself constituted a violation of any antitrust laws other than section 2 of Title 15 [(Monopolization)], but nothing in this chapter shall exempt any bank holding company involved in such a transaction from complying with the antitrust laws after the consummation of such transaction.

12 U.S.C. § 1849(b)(1). The Bank Merger Act contains a parallel provision imposing the same statutory bar. *Id.* § 1828(c)(7)(B). Put simply, there are no post-merger challenges available for bank mergers subject to the Bank Holding Company and Bank Merger Acts.

The statutes, however, also provide for the appropriate timing of an antitrust action challenging the merger. To ensure that there is an early warning to the United States Department of Justice to file a civil suit prior to the consummation of a transaction, the Bank Holding Company and Bank Merger Acts require the responsible federal banking agency to advise the U.S. Attorney General that it has approved a transaction, starting a statutory clock requiring the assertion of a civil lawsuit before a transaction is consummated. 12 U.S.C. § 1828(c)(6). The statutes are clear that any antitrust action, whether by the U.S. Department of Justice or otherwise, must be filed "***prior to***" the lapse of the 30-day period (or 10-day period for expedited mergers) afforded by the statute after regulatory approval:

> Any action brought under the antitrust laws arising out of a merger transaction shall be commenced ***prior to*** the earliest time under paragraph (6) at which a merger transaction approved under paragraph (5) might be consummated.

*Id.* § 1828(c)(7)(A) (emphasis added); *accord id.* § 1849(b)(1). Congress was clear that an antitrust plaintiff should not wait for a merger's approval and consummation to file suit, as doing so will bar their claims to the extent they arise out of the merger. Moreover, once a lawsuit is filed "prior to" this statutory time period, any regulatory approval of the transaction is stayed, absent a court order to the contrary, and the district court must review "de novo" the challenged merger using the merger standard set forth in the Bank Holding Company and Bank Merger Acts, including a bespoke merits defense afforded to banks:

> The commencement of such an action shall stay the effectiveness of the agency's approval unless the court shall otherwise specifically order. In any such action, the court shall review de novo the issues presented.

*Id.* § 1828(c)(7)(A); *accord id.* § 1849(b)(1); *see also id.* § 1828(c)(7)(B) (standard applied by the district court "shall be identical with those the banking agencies are directed to apply under paragraph (5)"). The Supreme Court has made clear that "de novo," as used in these statutes, means "de novo"—that is, a federal court hearing a civil lawsuit challenging a bank merger is not simply conducting a review of agency action, but "should make an independent determination of the issues." *United States v. First Nat'l Bank of Houston*, 386 U.S. 361, 358 (1967).

Defendants' ripeness arguments turn this statutory scheme on its head. To begin with, Defendants argue that the antitrust claims here are unripe because they "depend entirely on the Proposed Transaction occurring," therefore requiring "three different agencies" to first approve the transactions.[2] Mem. at 10. The United States Supreme Court rejected precisely this argument in *United States v. Michigan Nat'l Corp.*, 419 U.S. 1 (1974). There, the United States filed a pre-merger challenge to a bank merger while the OCC's regulatory review was still ongoing. The district court dismissed the action as "premature,' since disapproval by the comptroller would moot the Clayton Act claim," *id.* at 3—the same argument Defendants make here—but the Supreme Court disagreed, holding that "[w]hether viewed as a dismissal for lack of a 'case or controversy' or as an exercise of equitable discretion, we believe the District Court's action was error." *Id.* at 3.

In the *Michigan National* case, two regulators were reviewing the merger, and one of them (the Federal Reserve) approved while the other (OCC) continued its review. *Id.* The government—

---

[2] Defendants do not explain how the Delaware State Bank Commissioner's determination could possibly take precedence over the statutory scheme set forth in the Bank Holding Company Act or Bank Merger Act, including the timing provisions in those statutes. Even setting aside the Supremacy Clause and preemption problems with this argument, no state agency is implicated by either statute, nor are state agencies considered "responsible agencies" under the statutes, such that their approvals would be required for clearance of a bank merger. There is simply no Article III basis for divesting a federal court of jurisdiction pending a state administrative agency's review, particularly here, where Congress has said what must happen and when—with exacting detail.

faced with the end of the statutory period for a civil action against the merger—sued immediately, without waiting for the OCC. *Id.* The Supreme Court held that dismissing this suit was erroneous, including because the U.S. risked "that complete relief will be barred" if its case was dismissed and the statutory deadline lapsed. *Id.* at 5-6. At most, a stay pending the OCC's decision was appropriate if coordination was required (as explained below, not appropriate here); dismissal for lack of jurisdiction was legal error. *Id.* This holding alone—that the possibility that a transaction may not be approved does not divest a district court of jurisdiction—is independently dispositive of Defendants' ripeness challenge.

In addition to having been expressly rejected by the Supreme Court, Defendants' arguments that Plaintiffs' challenge is constitutionally unripe are also based on a false factual premise: that there is a reasonable possibility that the banking regulators will block the merger. Specifically, Defendants argue that the merger is impermissibly based on "contingent future events that may not occur as anticipated, or indeed may not occur at all. . . ." Mem. at 11 (quoting *Trump v. New York,* 592 U.S. 125, 131 (2020)). There is no factual basis for this assertion; to the contrary, it is highly speculative to assume that either the Federal Reserve or OCC will block the merger. Federal banking regulators have not denied a merger since December 2002. *See* Jeremy C. Kress, *Modernizing Bank Merger Review*, 37 YALE J. ON REG. 435, 439 n.17 (2020) (citing *Illini Corp.*, 89 FED. RES. BULL. 85 (2003))*.* Since then, approximately 4,000 bank mergers have been consummated; none have been blocked. *See* Semi-Annual Reports on Banking Applications Activity, Board of Governors of the Federal Reserve System (available at https://www.federalreserve.gov/publications/semiannual-report-on-banking-applications-activity.htm); *see also* Letter from Jerome H. Powell, Chairman, Board of Governors of the Federal Reserve System, to The Hon. Elizabeth Warren, May 10, 2018. In other words, it is

*Defendants* that are speculating as to an improbable event—that a banking regulator will block this transaction—yet they point to not a shred of evidence to back up that speculation.

Finally, Defendants ignore two important points about the merger. *First*, the merger is likely imminent. Defendants have publicly stated that the merger will be consummated by the end of this year or the beginning of 2025. The Federal Reserve and OCC, which are currently conducting a joint review of the merger, were presented with the transaction in March of 2024 and have since completed the notice and comment period, which the agencies jointly extended through July of 2024. There is no indication that either agency has sought any divestiture or change in the transaction based on public records, including based on their publicly available information requests—and Defendants point to no such change in their briefs. All Defendants offer this Court is speculation about what a third party may do, but has not done—and has almost never done in the past. *Second*, Plaintiffs face a statutory bar that would deprive them of their antitrust claims arising out of the merger were they to wait for it. This imminent threat alone makes the merger challenge asserted here ripe for adjudication. These facts—coupled with the Bank Holding Company and Bank Merger Acts' statutory mandates on the timing of antitrust suits—plainly distinguish the *Trump v. New York* decision that Defendants rely upon. There, the Supreme Court considered a challenge to the then-President's proposed changes to census rules, which would exclude aliens without lawful status from the census count. 592 U.S. at 132. The challenge was to an affirmative act by the President that had not yet occurred, as the President had mandated fact gathering by his own cabinet prior to implementing the census change. Id. Thus, the case underlying *Trump* was a challenge solely to what the President had not yet done or defined. Here, in contrast, once a civil antitrust suit is commenced prior to the statutory period under the Bank Holding Company and Merger Acts, this Court must inevitably review the merger "de novo," as

per the text of the statute—and the merger review must be independent of any agency's review. In other words, Defendants have it backwards—the Court's merger review is now inevitable if (in view of regulatory history, when) the transaction moves forward. That determination does not depend on how an agency may require the transaction to change or what an agency says about the propriety of the transaction. Moreover, absent a suit, the Federal Reserve and OCC's determination will not be stayed, and Plaintiffs will be divested of their claims. That is not the sort of challenge that was at issue in the *Trump* case—and the issue is not close.

### B.   Defendants' Injury-in-Fact Arguments Are Meritless

Constitutional Standing for injunctive relief requires that a plaintiff show that "she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 144 S. Ct. 1972 (June 26, 2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). There can be no dispute that the antitrust laws provide plaintiffs with both a substantive claim and redress for an anticompetitive injunction—by statute. *See* 15 U.S.C. § 26. The CAC also pleads that the merger will harm competition in two relevant markets, and that Capital One has stated it plans to continue its contracts with Visa and Mastercard, as well as its relationship as one of the largest issuers of Visa- and Mastercard-serviced credit cards, after the merger is consummated. *See supra*, Background § D. Finally, the CAC pleads that the merger—and the post-merger agreements with Visa and Mastercard—will increase barriers to entry, increase interchange fees paid by plaintiffs, and lead to higher interest rates and less valuable credit card rewards. This, coupled with the statutory bar on the claims if a pre-merger challenge is not brought, renders injury concrete, particularized, actual, and unquestionably imminent. *Id.*

Defendant mostly rehashes its ripeness arguments under the guise of injury-in-fact, but also questions the CAC's allegations that Capital One will continue its agreements with Visa and

Mastercard after the merger, supposedly based only on an "incentive" to collude. Not so. In addition to describing past collusion with Visa and Master card as well as the incentive to collude post-merger, the CAC quotes Capital One's CEO, who has expressly stated that Capital One intends to continue its contracts with Visa and Master Card and continue its longstanding relationship with the competing Interchange networks. CAC ¶¶ 67-75. A challenge to the anticompetitive effect of such agreements is not based on some "speculative" future event—it is taking Capital One's CEO at his word.[3]

### C. The Court's Current Schedule and Recent Discovery Order Appropriately Prevent Any Problems that Would Warrant a Stay of this Case

A stay of the case is not warranted here. As explained above, the merger is imminent; there will inevitably be a trial before this Court that will require an independent and "de novo" review of the merger; and Plaintiffs must prepare for trial, including by simultaneously reviewing discovery provided to the Federal Reserve and OCC as part of their review under the Bank Merger and Bank Holding Company Acts. After the hearing on Defendants' motion to stay discovery pending their motion to dismiss, this Court appropriately limited discovery to balance Plaintiffs' interest in preparing for trial and litigating their claims with the review and impending approvals by the Federal Reserve and OCC—that is, the Court allowed document discovery, including information and evidence provided to the regulators, but paused other discovery, including

---

[3] Defendants argues that the passthrough effects of the anticompetitive agreements with Visa and Mastercard—*i.e.*, that merchants will pass on some or all of the interchange price inflation to cardholders—somehow requires an Article III dismissal. Mem. at 15 n.13. Defendants ignore allegations in the CAC that the agreements and the merger will reduce consumer choice, increase credit card interest fees, reduce the economic value of rewards to cardholders, and raise barriers to entry, which leads to a lack of a competitive price check in both relevant markets. As to the pass-on effects, they are simply factual allegations in the CAC that Defendants disagree with and provide no evidence to dispute. That is not a basis for a Rule 12(b)(1) dismissal. *Kerns*, 585 F.3d at 192 (jurisdictional facts pleaded assumed true unless defendants present "contradicting facts," requiring an "evidentiary proceeding").

depositions. A trial has not yet been scheduled, meaning that this Court is not set to make a merits determination as to the merger before the transaction is approved by the Federal Reserve or OCC. If the banking regulators have not completed their review and approval by the Court's January pre-trial conference, this Court can address a stay of the merits trial then.

## II.     PLAINTIFFS HAVE PLAUSIBLY ALLEGED A CLAIM FOR INJUNCTIVE RELIEF UNDER SECTION 7 OF THE CLAYTON ACT

Section 7 of the Clayton Act prohibits mergers that "substantially . . . lessen competition or tend to create a monopoly." 15 U.S.C. § 18. "A burden-shifting analysis applies to consider the merger's effect on competition," *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021) (quoting *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017)). The Plaintiff establishes a prima facie case, and the Defendants bear the burden at trial of rebutting it. *Id.* At the pleadings stage, however, a plaintiff need only allege a *prima facie* case. *See Corrente v. Charles Schwab Corp.*, 2023 WL 2244680, at *5 (E.D. Tex. Feb. 24, 2023) (*prima facie* case states a claim under Section 7); *Cedra Pharmacy Houston, LLC v. United Health Grp., Inc.*, 2019 WL 1433600, at *5-6 (S.D. Tex. Mar. 7, 2019), *report and recommendation adopted*, 2019 WL 1426248 (S.D. Tex. Mar. 29, 2019), *aff'd* 798 F. App'x 826 (5th Cir. 2020) (same).

### A.     The CAC Directly Pleads a Substantial Lessening of Competition in the Related General Credit Card and Payment Processing Markets

The CAC directly alleges facts showing that a substantial lessening of competition in two related relevant markets—the Credit Card Payment Processing Market and the General Credit Card Market—will occur if the merger is consummated. *See generally supra*, Background § D.

*First*, the CAC alleges that the merger will eliminate one of the two remaining vertically integrated payment processing networks and issuers in the highly concentrated PPM, which will result in (a) higher interchange fees in the Payment Processing Market, and (b) higher interest rates and lower rewards in the General Credit Card Market, as rewards are directly funded by an issuer's

share of the interchange fees collected from merchants in the Payment Processing Market. Specifically, the CAC alleges that Visa and Mastercard operate as payment processing networks for most credit card issuers, but that American Express and Discover are vertically integrated and closed to outside issuers. Because the vertically integrated issuers need not split the interchange fees with a network, they are able to provide greater rewards to consumers in the General Credit Card Market, putting competitive pressure on other issuers to do the same. Capital One's acquisition of Discovery will eliminate a vertically integrated credit card issuer, relieving the competitive pressure on rewards in the General Credit Card Market, where Capital One is one of the largest participants. Post-merger, Discover's payment processing network will be available only to Capital One, and Capital One will continue to issue Visa and Mastercard credit cards to its customers. As a result, Discover-issued credit cards will no longer put price pressure as to rewards on Capital One or other general credit card issuers, particularly if Capital One normalizes rewards and other prices across its post-merger business. In other words, Discover will not be a competitive check on Capital One in the General Credit Card Market post-merger, nor will it check the interchange fees charged by rival networks, Visa and Mastercard.

*Second*, the CAC alleges that the merger will facilitate horizontal collusion between Visa and Mastercard, the two dominant players in the Payment Processing Market, and Discover, which will be owned and operated by one of the largest Visa and Mastercard issuers, Capital One. The CAC is clear that Visa and Mastercard currently maintain contracts with Capital One that govern the interchange fee split, and Capital One's CEO has expressly stated that the company will maintain those contracts after it acquires Discover. The net effect will be contracts between three of the four credit card payment networks, including as to the interchange fees charged to merchants. (As explained below, Section III, *infra*, Capital One is deemed to be the same entity as

Discover post-merger under the *Copperweld* Doctrine.) These agreements also directly and substantially reduce competition in both related markets. Capital One, one of the largest Visa and Mastercard issuers, can set interchange fee splits while also setting interchange fees in the rival Discover network. Even harmonization of interchange fees across Capital One's post-merger business will essentially fix prices across a large swath of credit cards. The anticompetitive effects of the post-merger agreements with Visa and Mastercard are made more likely by the high concentration in the Payment Processing Market, with Visa possessing a 61% of the Payment Processing Market, Mastercard 25.5%, American Express 11.3%, and Discover 2.2%—a staggering Herfindahl-Hirschman Index (HHI) of 4,503 that is well beyond what the U.S. DOJ deems "highly concentrated" under its joint Horizontal Merger Guidelines with the FTC. When coupled with Capital One's CEO's expressed intent to continue post-merger contracts with competitors Visa and Mastercard, the pleaded lessening of competition in both the Payment Processing and General Credit Card Markets is not only plausible, but virtually inevitable.

*Third*, the Complaint pleads the existence of a powerful barrier to entry, referred to in the Complaint as the Payment Network and Issuer Rewards Barrier to Entry (the "PNIRBE"), CAC ¶¶ 165-183, and that the merger will substantially strengthen that barrier to entry, *id.* ¶¶ 185-93. Specifically, the CAC alleges that the PNIRBE arises from "a series of network effects and feedback loops," namely that "credit card holders will not sign up for and use a credit card that is not generally accepted by merchants," and "the more widespread the acceptance of a credit card, the more valuable the credit card becomes." CAC ¶ 166. On the payment processing side of the equation, a payment processor is required to process a credit card issuer's transactions, and whether a new entrant credit card is accepted depends on the reach of its payment processor. *Id.* ¶¶ 167-69. However, "[p]ayment processors can obtain interchange fees from merchants and purchasers only

if their Credit cards are accepted by a critical mass of merchants," but "[w]ithout widespread acceptance, a credit card payment processor is not viable and cannot charge interchange fees." *Id.* ¶ 167. These feedback loops are not surmise—they were cogently described by Capital One's CEO Richard Fairbank on an investor conference call as the "chicken or the egg" problem—that creating a payment processing network requires access to a large number of cardholders to incentivize merchants to accept the network's transactions, but cardholders will not use a credit card built on a payment processing network that is not widely accepted. *Id.* ¶¶ 169-71. This gives rise to a self-reinforcing feedback loop that creates a powerful barrier to entry surrounding both the Credit Card Payment Processing Network and the General Credit Market. Indeed, in the General Credit Card Market, a new issuer must compete by providing competitive rewards to customers, but can only do so by increasing its share of interchange fees. Without leverage against "Visa or Mastercard" to increase rewards "in comparison to incumbent credit card issuers, [a credit card issuer] cannot readily fund rewards sufficiently competitive to obtain market share from other issuers." *Id.* ¶ 174-75. The CAC alleges that the PNIRBE can only be disrupted "with the existence of a viable entrant at scale in the Credit Card Payment Processing Market or from price competition from a vertically integrated payment network/credit card issuer entrant in both the Credit Card Payment Processing and General Credit Card Markets." *Id.* ¶ 176. The merger eliminates precisely this sort of potential disrupter, strengthening the PNIRBE and preventing a competitive check from emerging.

These three competition-lessening aspects of the merger will result in direct price effects for Plaintiffs. As the Complaint alleges, interest rates paid by plaintiffs will increase as recognized by the CFPB, *id.* ¶ 213, the amount of rewards they receive (which are funded by the interchange fees) will decrease, *id.* ¶ 214, and the interchange fees paid by merchants and passed on to customers will also increase, taxing every credit card purchase made by credit card users, *id.* ¶ 215.

**B.      Defendants' Fact-Bound Arguments Are Not a Basis for Dismissal**

Defendants offer no basis for dismissal in response to these allegations. To begin with, Defendants argue that because there are supposedly vertical aspects to the merger, the merger may "generate efficiencies and other procompetitive effects," Mem. at 16 (quoting *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018)), but Plaintiffs need not rebut any procompetitive effects Defendants may offer at trial after the burden shifts. Moreover, the question of whether there are procompetitive effects arising from the merger is itself a factual question, not suitably resolved on a motion to dismiss. *See Robertson v. Sea Pines Est. Cos., Inc.*, 679 F.3d 278, 291-92 (4th Cir. 2012) ("At this early stage of the litigation, we are not in a position to weigh the alleged anticompetitive risks of the MLS rules against their procompetitive justifications. This rule of reason inquiry is best conducted with the benefit of discovery and we thus express no view on the merits of the litigation beyond recognizing the sufficiency of the complaints."); *In re Mission Health Antitrust Litig.*, 2024 WL 759308, at *10 (W.D.N.C. Feb. 21, 2024) ("Accordingly, questions about whether the procompetitive effects of the Defendants' contracts with insurers outweigh the harm to competition alleged by the Plaintiffs are best resolved after the benefit of discovery, allowing the fact finder to evaluate the purposes and competitive effects within the specific context of [the Relevant Markets] and insurance industry."). Defendants do not offer any clue as to what these procompetitive effects will be at trial, but it matters not, as they cannot offer them at this juncture to contradict the well-pleaded allegations in the CAC that the merger will substantially lessen competition—and in fact, result in direct *anticompetitive* effects.

Defendants next argue that Plaintiffs cannot plead a Section 7 claim without showing an increase in market concentration in both relevant markets. Mem. at 17. This argument conflates the presumption afforded plaintiffs in Section 7 cases upon a showing of an increase in market concentration with a necessary element of a Section 7 claim. It is true that a plaintiff can "establish

a presumption of anticompetitive effect by showing that the transaction [led] to undue concentration," which then shifts the burden to defendants, *Steves and Sons, Inc.*, 988 F.3d at 703-04, but that is not a required element of a Section 7 claim, which is focused on a substantial lessening of competition in the relevant markets. The CAC *directly* pleads this effect in both related markets, as well as the resulting effects on price, consumer choice, and barriers to entry, CAC ¶¶ 184-215; *see generally supra*, Background § D—all traditional measures of injury or lessening of competition under Section 7, which is virtually the same as the familiar Rule of Reason analysis when assessing the effects on competition, *see United States v. First City Nat'l Bank of Houston*, 386 U.S. 361 (1967).

As part of this logically spurious—"no presumption, then no claim"—argument, Defendants dismember the two highly coupled relevant markets from each other, then process rote market share and HHI calculations, Mem. at 21, without regard for the substantive allegations as to how competition will in fact be reduced by the merger; how the merger will eliminate a vertically integrated market participant that checks prices and the competition-reducing effects of the PNIRBE; and how the two markets are connected through the interchange fees, which are directly used to fund rewards in the General Credit Card Market. *See generally supra*, Background §§ A & D. Defendants quibble with HHI calculations, but do not consider allegations that the highly concentrated Payment Processing Market is as a result highly sensitive to collusion—and that the price and consumer effects of such collusion with Visa and Mastercard will be amplified in such a market. At bottom, a Section 7 claim is neither pleaded nor proven by rote algebraic calculations, such as the HHI, which are used as a tool to assess the concentration of the relevant markets, not as a talismanic pleading requirement. *See Steves & Sons, Inc.*, 988 F.3d at 704 ("courts aren't bound

by the Guidelines, they're a helpful tool, in view of the many years of thoughtful analysis they represent, for analyzing . . . mergers.").

Finally, Defendants argue that the alleged Section 7 claim does not make "economic sense," as Capital One would not likely "degrade" the Discover network post-merger, but would instead expand it, allowing it to serve as a competitive check on Visa and Mastercard. Mem. at 19. This argument is both speculative and counterfactual, as Capital One has a long history of anticompetitively colluding with Visa and Mastercard to set interchange fees. It is implausible that the post-merger Capital One will maintain vigorous competition with Visa and Mastercard while it simultaneously issues Visa- and Mastercard-branded credit cards to its customers and negotiates interchange fee splits with those companies. *See* CAC ¶¶ 55 ("The companies have had a history of anticompetitive conduct and collusion, particularly as to interchange fees. Indeed, in 2005, Capital One was sued for fixing interchange fees with Visa and Mastercard. Capital One (among other issuers), along with Visa and Mastercard settled this class action lawsuit in 2019 for approximately $5.54 billion"); *id.* ¶¶ 56-57 (Visa and Mastercard subject of investigations by U.S. government and sued by the U.S. Department of Justice); *id.* ¶ 58 (Visa and Mastercard recently sued by peer-to-peer payment company Block for colluding on interchange fees).

Indeed, the market concentration alone creates significant incentives to anticompetitively cooperate, not vigorously compete. CAC ¶ 61. It is simply implausible given these factual allegations that Capital One will use Discover—a significantly smaller network—to put competitive pressure on Visa and Mastercard. *See id.* ¶ 74 (Capital One CEO Fairbank: "So, there, it is—in the marketplace, it's not unusual for companies to be both competitors and customers of one another in different aspects of what these companies do. And we don't see this as an issue. In fact, we look forward to continuing to partner with Visa."); *see also id.* ¶ 73 ("I do want to also

24

pull up though and say that we have been partners with Visa and Mastercard for a long time. They have built a breathtaking, amazing international global network that stands alone in a lot of the reach, acceptance, brand and capabilities it has; and we're reverential about that. And so, ***we're talking about making a networking that is way, way smaller than those*** . . . ." (emphasis added)). And, of course, as a foundational economic principle underlying the antitrust laws, the strengthening of the PNIRBE—as with any significant barrier to entry—necessarily results in both a substantial reduction in and direct harm to competition. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983-84 (9th Cir. 2023) ("It is sufficient that the plaintiff prove the defendant's conduct, as a matter of economic theory, harms competition—for example that it increases barriers to entry or reduces consumer choice by excluding would-be competitors that would offer differentiated products." (citing *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n Inc.*, 883 F.3d 32, 42 (2d Cir. 2018)); *see also In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 911 (6th Cir. 2003) ("paying higher prices for a product due to a lack of competition" is harm to competition).

## III.   PLAINTIFFS HAVE ADEQUATELY PLEADED THAT THE POST-MERGER AGREEMENTS WITH VISA AND MASTER CARD ARE ANTICOMPETITIVE UNDER SECTION 1 OF THE SHERMAN ACT

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or other conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "To establish a § 1 antitrust violation, a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposes and unreasonable restraint of trade." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423-24 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015). Here, there is no dispute that the CAC alleges the existence of express agreements between Capital One and its post-merger competitors in the Payment Processing Market, Visa and Mastercard, nor is there any dispute that the CAC alleges that these agreements will continue after the merger—a fact that Capital One's CEO directly

confirmed on an investor conference call after the merger was announced. Defendants only appear to challenge the second element of the Section 1 claim—whether the CAC plausibly alleges that the agreements are unreasonable restraints. Defendants' arguments are meritless.

A.   **The CAC Alleges that the Merger Will Result in a *Per Se* Violation of Section 1 of the Sherman Act**

The CAC alleges that the express agreements with Visa and Mastercard, which directly set the interchange fee split with Capital One, contain price terms, as well as the terms on which the payment processing networks will accept the issuer's credit cards. The CAC is clear that after the consummation of the merger, Capital One will become a direct, horizontal competitor of Visa and Mastercard and that it will maintain its issuer contracts containing price and output terms. These allegations plausibly allege an impending *per se* violation of Section 1 of the Sherman Act. As the U.S. Supreme Court has explained, "[h]orizontal price-fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high. . . ." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984) ("NCAA"). In such cases, "no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *Id.* at 109.

Here, the CAC alleges that Visa and Mastercard directly compete with Discover's payment processing network. Indeed, the CAC alleges that Discover is one of four payment processing networks, and one of two vertically integrated payment processing networks with its own credit cards. In other words, Discover is a direct, horizontal competitor of Visa and Mastercard. *See Bus. Elecs. Corp. v. Sharp. Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution [are characterized] as vertical restraints"). After Capital One's acquisition of Discover is consummated, its agreements

with Discover are disregarded for the purposes of the antitrust laws under the *Copperweld* doctrine, and its persisting agreements with Visa and Mastercard become agreements with a direct, horizontal competitor. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (affiliated entities cannot conspire with each other under Section 1 of the Sherman Act); *see also Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 630-32 (9th Cir. 2018) ("A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which it is a part."). Put simply, these post-merger horizontal agreements on price and output in the two related markets, are quintessential contracts condemned under the *per se* rule.

Defendants do not address the *Copperweld* doctrine at all, but instead argue that the post-merger contracts are "dual distribution" agreements, which are evaluated under the rule of reason, not the *per se* rule. Mem. at 23. In support, Defendants cite *United States v. Brewbaker*, 87 F. 4th 563 (4th Cir. 2023), a post-trial appeal from a criminal antitrust case under Section 1 of the Sherman Act. There, two companies competed with each other in bidding for aluminum contracts, but also maintained a distribution relationship, where one company acted as a "dealer" for the other. The Fourth Circuit held that the distributor relationship meant that the companies were "at different levels of distribution, indicating that their agreement was vertical" in addition to horizontal. *Id.* at 576. Here, in contrast, the payment processing networks are not distributors of Capital One's credit cards, and the challenged agreements set core price terms in the Payment Processing Market—the amount and split of interchange fees and the terms under which merchants will accept credit cards. There is no vertical component to these agreements—they set price and output terms at the same level of distribution, where Visa, Mastercard, and Capital One/Discover

27

directly compete. Those terms directly impact rewards paid to Capital One's cardholders in the coupled General Credit Card market. In short, nothing is alleged to be vertically distributed—and *Brewbaker*, which reached the characterization question after a trial, does not support dismissal without any discovery or a trial on the question of characterization. *See Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 713–14 (E.D. Va. 2019) ("[I]t would be premature to determine which antitrust standard—whether the 'rule of reason' or 'per se'—applies at this procedural posture. As the Supreme Court has stated, '[p]er se rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct.'"); *see also PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 837 (9th Cir. 2022); *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 868 (N.D. Ill. 2010).

**B.    In the Alternative, the Complaint Alleges a Violation of the Rule of Reason**

Even under the Rule of Reason, the CAC adequately pleads a violation of Section 1 of the Sherman Act. Under the Rule of Reason, "a factfinder must analyze 'all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp.3d 703, 711 (E.D.V.A. 2019). In doing so, the factfinder takes "into account 'specific information about the relevant business and the restraint's history, nature, and effect,' [and] the Court may 'distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and those with procompetitive effect that are in the consumer's best interest.'" *Id.*

Defendants do not challenge Plaintiffs' market definition or the allegations concerning the existence and effects of the PNIRBE. The sole question on this motion is therefore whether Plaintiffs have alleged an anticompetitive effect resulting from the alleged agreements. As explained above, the CAC alleges that the agreements will allow Capital One to set the interchange fee amount and split with its direct, horizontal competitors, Visa and Mastercard, after the

consummation of the merger. Indeed, even a harmonization of interchange fees between the Discover-issued credit cards will functionally set the price and output in both the Payment Processing Market and in the General Credit Card Markets (through rewards funded directly by interchange fees). As explained above, the CAC alleges that these agreements will (a) allow Capital One, Visa, and Mastercard to raise interchange fees; (b) result in high interest rates and lower customer rewards; (c) reduce consumer choice; (d) restrict the output of rewards in the General Credit Card Market; and (e) strengthen the PNIRBE, impeding entry in both markets and thereby reducing price and other merits competition. CAC ¶¶ 184-215. The CAC also alleges that Capital One, Visa, and Mastercard have a long history of collusion on interchange fees, which has resulted in government investigations, government lawsuits under the antitrust laws, and civil antitrust suits. These alleged facts establish harm to competition, and any procompetitive justifications for the agreements as well as the necessary requirement that they be weighed against the anticompetitive effects, must await trial—such fact-bound questions cannot be resolve on a motion to dismiss. *See Lumber Liquidators, Inc.*, 415 F. Supp. 3d at 714 (E.D. Va. 2019).

## IV.   DEFENDANTS' IRREPARABLE HARM ARGUMENTS ARE MERITLESS

In a final section of their motion, Defendants argue that Plaintiffs have not alleged they will suffer an irreparable injury, or otherwise satisfy the requirements for a permanent injunction. This is transparently incorrect. As explained above in this brief, the CAC has alleged an imminent substantial lessening of competition due to the challenged merger, and the statutory scheme for challenging and reviewing the merger under the Bank Holding Company and Bank Merger Acts *requires* Plaintiffs to sue "prior to" the merger's effective approval, else lose their antitrust claims challenging the merger.

Each element of the applicable standard for injunctive relief is clearly met here. *First*, Plaintiffs face a significant threat of irreparable injury: As explained in the CAC and throughout

this brief, the merger would significantly harm competition in two relevant markets, and in doing so would injure Plaintiffs and class members, who among other things would pay more in interchange fees and receive less in credit card rewards. This injury would be "irreparable," because (among other reasons) federal banking statutes deprive Plaintiffs of their ability to challenge the merger after it is effectively approved. *Second*, remedies available at law, such are monetary remedies, are inadequate for essentially the same reasons—most notably, the federal statutes depriving Plaintiffs of merger-related antitrust claims if they don't sue now. *Third*, the balance of hardships favors granting an injunction: Under the Bank Holding Company Act and the Bank Merger Act, Congress made this Court the final arbiter of this merger's legality under the antitrust laws, with the understanding that the Court's review would be of whether the transaction should go through. Defendants identify no competing hardship in their motion, and indeed to do not appear to contest this prong. *Fourth*, the public interest clearly favors the enforcement of the antitrust laws, under the specific procedure and substantive standard set forth by Congress for bank mergers such as this one—this Court is the final, "de novo" arbiter of whether the challenged merger should go forward or not. The antitrust bench trial directed by the relevant statutes to determine whether the merger is illegal or not will among other things evaluate whether an injunction is the public interest; it is specious for Defendants to argue it's in the public interest *not to evaluate the sought injunction*.

## V.   LEAVE TO AMEND

Should the Court dismiss one or more of Plaintiffs' claims, Plaintiffs respectfully request leave to amend the Complaint. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

Dated: September 16, 2024

*/s/ Yavar Bathaee*

**BATHAEE DUNNE LLP**
Yavar Bathaee (*pro hac vice*)
yavar@bathaeedunne.com
Andrew Williamson (VSB 83366)
awilliamson@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (*pro hac vice*)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Attorneys for Plaintiffs and the Proposed
Class*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2024, a true and correct copy of the foregoing document was served through the CM/ECF system on all counsel of record.

Dated:  September 16, 2024          By:    _/s/ Andrew M. Williamson_