1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION

3  TYLER BAKER, *et al.*,          )  Case 1:24-cv-1265
                                   )
4            Plaintiffs,           )
                                   )
5        v.                        )  Alexandria, Virginia
                                   )  October 18, 2024
6  CAPITAL ONE FINANCIAL           )  10:30 a.m.
   CORPORATION, *et al.*,          )
7                                  )
             Defendants.           )
8  _____)  Pages 1 - 100

9

       TRANSCRIPT OF DEFENDANTS' MOTION TO DISMISS OR,
10
                  ALTERNATIVELY, TO STAY
11
          BEFORE THE HONORABLE ANTHONY J. TRENGA
12
             UNITED STATES DISTRICT COURT JUDGE
13

14

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

1  APPEARANCES:

2  FOR PLAINTIFFS:

3       YAVAR BATHAEE, ESQUIRE
         ANDREW WILLIAMSON, ESQUIRE
4        ANDREW WOLINSKY, ESQUIRE
         BATHAEE DUNNE LLP
5        445 Park Avenue, 9th Floor
         New York, New York  10022
6        (332) 322-8835

7  FOR DEFENDANT CAPITAL ONE FINANCIAL CORPORATION:

8       JOHN S. MORAN, ESQUIRE
         BRYAN A. FRATKIN, ESQUIRE
9        MCGUIRE WOODS LLP
         888 16th Street, N.W., Suite 500
10       Black Lives Matter Plaza
         Washington, D.C.  20006
11       (202) 525-0356

12       DAVID I. GELFAND, ESQUIRE
         JACOB M. COATE, ESQUIRE
13       CLEARY GOTTLIEB STEEN & HAMILTON LLP
         2112 Pennsylvania Avenue, N.W.
14       Washington, D.C.0037
         (202) 974-1500

15

16  FOR DEFENDANT DISCOVER FINANCIAL SERVICES:

17       AMANDA F. DAVIDOFF, ESQUIRE
         JOSEPH MATELIS, ESQUIRE
18       SULLIVAN & CROMWELL LLP
         1700 New York Avenue, N.W., Suite 700
19       Washington, D.C.  20006
         (202) 956-7570

20

21

22

23

24

25

        Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

1          P R O C E E D I N G S

2                THE COURTROOM DEPUTY:  Civil Action

3   2024-1265, *Baker, et al. v. Capital One Financial*

4   *Corporation, et al.*

5                Counsel, will you please note your

6   appearances for the record.

7                MR. MORAN:  Good morning.  John Moran for

8   Capital One joined by David Gelfand, also for Capital

9   One.

10               MR. GELFAND:  Good morning, Your Honor.

11               MR. WILLIAMSON:  Good morning, Your Honor.

12  Andrew Williamson with Bathaee Dunne with my colleagues

13  Andrew Wolinsky and Yavar Bathaee.  Yavar Bathaee will

14  be arguing today.

15               THE COURT:  All right.  Welcome.

16               MR. MORAN:  Your Honor, I'm also joined by

17  Amanda Davidoff and Joseph Matelis on behalf of

18  Discover.

19               THE COURT:  All right.  Welcome.

20               MR. MORAN:  So, Your Honor, we're here on --

21               THE COURT:  Hold on one second.

22               All right, Counsel.

23               MR. MORAN:  Your Honor, we're here on

24  defendants' joint motion to dismiss the complaint.

25  With the Court's indulgence, defendants plan to have

1 Mr. Gelfand present argument on the ripeness issues and

2 Ms. Davidoff present on the *Twombly* failure to state a

3 claim issues.

4          THE COURT:  That's fine.

5          MR. MORAN:  Thank you.

6          THE COURT:  All right.  I've read the briefs.

7 I'd be pleased to hear further from counsel.

8          Before we begin, what's the status of the

9 regulatory review?

10          MR. GELFAND:  There are regulatory reviews

11 pending in front of the Federal Reserve, Office of the

12 Comptroller of the Currency, and the Delaware agency.

13          THE COURT:  Any sense of what the schedule of

14 all of those is?

15          MR. GELFAND:  We're hopeful that it will be

16 soon, but it's impossible to predict.  That's within

17 their discretion and authority.  There's also a Justice

18 Department investigation.

19          THE COURT:  Right.

20          MR. GELFAND:  One point I want to make about

21 that, Your Honor -- I think Your Honor knows this, but

22 the pendency of these investigations should not be

23 taken as an indication that there is any illegality

24 about this merger or that there's a problem with the

25 merger.  This is routine in bank mergers and in many

 1  other types of mergers that require regulatory

 2  approval.  I just make that point so there's no

 3  inference from the pendency of the investigations that

 4  there might be some smoke there that gives credence to

 5  the plaintiffs' claims.

 6          THE COURT:  All right.

 7          MR. GELFAND:  Your Honor, I do have some

 8  prepared points I am ready to go through.  I'm happy

 9  to, of course, address any questions Your Honor has.

10          THE COURT:  All right.

11          MR. GELFAND:  I'm going to start by saying

12  something we said in our papers, Your Honor, which is

13  this is truly an unprecedented attempt -- well, it's

14  not an unprecedented attempt.  But if the plaintiffs

15  were successful in pursuing this case, it would be an

16  unprecedented situation in my experience.  I've been

17  practicing in this field for many years.  We've

18  researched it.  And as far as we can tell, there has

19  never been allowed by a court a private litigation to

20  proceed while regulatory approval is pending.

21          And there's good reason for that, Your Honor.

22  The regulatory approval could result in the merger

23  becoming moot, could result in conditions that change

24  the outcome of the regulatory review, that change the

25  circumstances under which the parties compete going

1  forward.  And for that reason, courts that have been

2  confronted with those few plaintiffs who have attempted

3  to file a case pending regulatory review have found

4  those claims to be non-ripe.

5        In one or two instances, there have been

6  stays entered because the plaintiff would be prejudiced

7  by an outright dismissal.  The *Michigan National* case

8  is an example of that that the plaintiffs have cited.

9  I'll talk about that a little more in a minute.

10        But we are truly in uncharted territory here,

11  Your Honor, if we go forward with a private litigation

12  while the expert agencies and while the Justice

13  Department is doing its important work.

14        Plaintiffs don't really engage on that case

15  law that we've cited in the context of merger

16  challenges other than to claim that the banking

17  statutes create -- and it's a little unclear to me, but

18  either circumstances or special rights that allow them

19  to bring a case earlier than one would expect with a

20  private litigation that follows on from a merger

21  investigation.

22        Those laws say no such thing.  This case is

23  brought under Section 16 of the Clayton Act, 15 U.S.C.

24  Section 2826.  And that section says -- that's invoked

25  in their complaint, Your Honor.  That section of law

says that in antitrust cases, injunction proceedings

are to be conducted as any other injunction proceeding

heard by a court of equity.  There's no special

treatment for antitrust cases, and there's nothing in

the banking statutes that are cited by plaintiffs that

attempt to supersede that or override that.

And so, in our view -- and I'll go through

some of the details -- the plaintiffs have brought an

unripe case.  It's unripe under the Constitution under

Article III.  It is premature under applicable law, and

it is not entitled to some kind of special treatment

because of the Bank Merger Act or the Bank Holding

Company Act.

And I want to talk for a moment about the

claim that plaintiffs will be prejudiced here by a

dismissal.  They will not.  The prejudice that they

have claimed, Your Honor, is that they will be forever

barred from bringing their case if this case is

dismissed.  We do not believe -- that is not correct.

Under the law, if and when the banking authorities

approve this merger, there will be a mandatory waiting

period after the approval.  And that period will be at

least 15 days under the law and could be as long as 30

days.

So plaintiffs can bring their case within

1  that period of time.  And if they think they have a

2  case at that point, based on whatever further

3  developments have occurred -- and Your Honor can

4  certainly hear them out at that time as to whether

5  there should be some kind of preliminary injunction

6  granted.  We don't think they would have the grounds.

7  They don't have an inherent right to stop every merger

8  in its tracks just because they file a case.

9        But their claim of prejudice in their papers

10  is that they will have no ability to file a case at

11  all.  They're trying to track the *Michigan National*

12  holding, but it's just simply not correct that they

13  will have no opportunity to bring that case.  So we

14  think the claim of prejudice is without merit.

15        THE COURT:  Well, as a practical matter, what

16  would be the difference in impact on defendants of

17  process by simply a stay as opposed to a dismissal?

18        MR. GELFAND:  I think both would probably

19  come out in about the same place.  We think those are

20  the two alternatives before Your Honor.  The *Michigan*

21  *National* case really only considered those two

22  alternatives.  I think what the court there said was if

23  there is going to be prejudice because of a dismissal,

24  if that's going to put at risk the ability of the

25  plaintiff -- there the Justice Department -- to bring

1 the case at all, then a stay is appropriate.

2      Now, those circumstances don't exist here,

3 Your Honor.  In our view, dismissal is appropriate.  We

4 just don't think the Court, with all due respect, Your

5 Honor, has jurisdiction over this.  It's premature.  It

6 does not satisfy the case or controversy requirement of

7 Article III.  But of course, I think as a practical

8 matter, as long as the case is fully stayed and we

9 don't have to be dealing with discovery and motions

10 practice and constant attempts to distract us from the

11 number one task at hand -- which is the work with the

12 regulatory agencies and the Justice Department to

13 figure out where this process is going to end up -- I

14 think as a practical matter they're probably the same

15 outcome.

16      THE COURT:  All right.

17      MR. GELFAND:  I know Your Honor is familiar

18 with these principles.  I'll be brief on the

19 background.  But the doctrine of ripeness arises from

20 Article III's case or controversy requirement.  We've

21 cited case law on that.  I don't think there's any

22 dispute about that.

23      As the Supreme Court explained in *Renne v.*

24 *Geary*, "We presume that federal courts lack

25 jurisdiction unless the contrary appears affirmatively

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

1  from the record." It is the plaintiffs' burden to

2  establish jurisdiction. It is not our burden to

3  disprove it. And here, in our view, plaintiffs have

4  failed to satisfy that burden because of the pendency

5  of the three regulatory reviews that I mentioned, as

6  well as the pendency of a Justice Department

7  investigation.

8         The plaintiffs cite some statistics, Your

9  Honor. I just want to talk about those briefly.

10        THE COURT: Yes.

11        MR. GELFAND: I think they're trying to

12 persuade Your Honor that somehow these banking reviews

13 are perfunctory, they're rubber stamps, it's definitely

14 going to get approved. We think it's going to be

15 approved. We're not arguing that our bank is unlawful

16 and we'll be rejected. But if the plaintiffs are

17 correct that there are serious antitrust issues here,

18 those will be addressed by the banking authorities.

19 And this is quite an involved procedure that the

20 agencies go through. It's unusual in my experience.

21        The Justice Department performs an

22 investigation. They're experts on the competition

23 issues. They prepare a report for the banking

24 authorities. The banking agencies are by law

25 prohibited from approving a transaction if there's

1   going to be a substantial lessening of competition not

2   outweighed by other factors under the applicable

3   statute. And I think it's just without merit to say

4   that this is a perfunctory or a rubber stamp exercise.

5       And in fact, the statistics themselves are

6   misleading. Because in the banking field, what

7   typically happens if the agencies identify a serious

8   issue, they bring that to the party's attention. And

9   it is pretty typical in those situations where a real

10   issue has been identified.

11       Again, we don't think there is a real issue

12   here, but where the real issue is identified, it's

13   typical for parties to abandon the transaction before

14   the fed or the Office of the Comptroller of the

15   Currency has to render a decision.

16       So citing statistics saying that there's some

17   kind of 20-year unbeaten streak with no transactions

18   challenged for any reason is just not accurate. They

19   just don't show up in the statistics because they're

20   abandoned transactions.

21       And even if we're right that there's no issue

22   here and that this ought to be approved, we don't know

23   that, Your Honor. We don't know that it's going to be

24   approved. So there is at least a possibility -- we

25   think small, granted, but there is a possibility that

1  something will happen that causes this transaction not

2  to move forward as a result of the regulatory process.

3  But I want to put that aside.   That is not our major

4  argument.

5       Regardless of whether it gets approved, there

6  is often conditions.   There are often conditions

7  imposed on mergers that get approved by the banking

8  authorities and that go through DOJ review.   And we

9  cited several examples of that in our brief.   A variety

10  of conditions can be imposed.   And once that happens,

11  there is a new circumstance that could be presented to

12  the Court.   And it is a waste of time and premature for

13  us to litigate about a merger when we don't know what

14  the contours of that will be or what types of binding

15  conditions might be imposed on the banks.

16       We've already offered one commitment.   It's a

17  community development plan.   My client, Capital One, is

18  very willing to agree to these kinds of conditions.

19  It's ignored by the plaintiffs in their complaint, in

20  their papers.   I don't know if that matters to the

21  competition issues.   We haven't figured that out.   But

22  it's an example of the kinds of things that can happen

23  as you go through this process.

24       And the courts have recognized this, that

25  until that process plays out, we simply don't know what

1    we're going to be litigating here.  And we cite *Trump*

2    *v. New York*.  That's a very recent case obviously, but

3    this is a fundamental principle of constitutional law,

4    that a claim is not ripe if it is, quote, dependent on

5    contingent future events that may not occur as

6    anticipated or indeed may not occur at all, end quote.

7           As I have said, it's rare for private parties

8    to attempt to do what plaintiffs are doing here, but it

9    has happened.  On occasion we have cited that case law

10   in our brief.  The courts have consistently found that

11   the claims are not ripe.

12          Here's one case, *DeMartini*, that we mentioned

13   in the brief, but there the FTC review had been

14   concluded and the defendant provided no evidence of a

15   European review that they claimed created uncertainty.

16   So the court rejected the claim there.  But otherwise,

17   every case that I'm aware of, that we were able to find

18   in our research, where private plaintiffs have

19   attempted to bring a claim while regulatory approval is

20   pending have been dismissed for ripeness grounds, or

21   *Michigan National* had that unusual circumstance where

22   there was one approval and one pending.  And that was

23   the stayed case.

24          Illustrative is *South Austin Coalition*

25   *Community Council v. SBC Communications*.  It's a

1  Seventh Circuit opinion authored by Judge Easterbrook.

2  That's the one I highlight here because I think the

3  language in the opinion is very clear.  It's really on

4  all fours with our situation.

5  There you had two telecom companies merging.

6  That was subject to review by the Federal

7  Communications Commission comparable to the banking

8  authorities here.  It was also subject to review by two

9  state regulatory agencies comparable to Delaware

10  banking authority here.  And a private action was

11  brought while those reviews were pending.  The case was

12  dismissed as not ripe.  It went up to the Seventh

13  Circuit, and the Seventh Circuit easily found there on

14  the facts there that the case was not ripe.

15  The opinion states at page 845, "Courts often

16  wait for agencies, even when the agencies' views are

17  not legally conclusive."  We don't argue that the

18  banking authorities are conclusive here.  Your Honor

19  will have an opportunity to review the evidence if a

20  case is brought and it passes a motion to dismiss, etc.

21  But even where not legally conclusive, "not only

22  because the agencies may have something helpful to say,

23  but also because what the agencies do may shape the

24  litigation."  Exactly the point I've made, Your Honor.

25  The opinion goes on to conclude, "Until the

agencies have had their say, it is impossible to

perform the sort of antitrust analysis that is

integral" to the antitrust theory.  I put that in

square brackets.  There was a different antitrust

theory there.

"And it therefore would be a waste of

everyone's time to proceed.  Antitrust litigation can

be very costly; an expensive challenge to a moving

target is worse than pointless."

And so that is one of the cases we rely on

that plaintiffs don't really engage with.

I want to also make this point, and it goes

to the ripeness.  But the plaintiffs have kind of

revealed how they view their role here as sort of

another regulatory agency.  And they're in effect

asking the Court to become a parallel advisor to the

regulatory agencies.  Not in the papers on this motion,

but in their opposition to our stay brief the

plaintiffs say at page 10 of that opposition brief,

"Anticompetitive harm shown in this case... may require

a change to the transaction presented to regulators for

approval."

They're reviewing that what they really want

Your Honor to do is move along with this case so that

the opinions that you render in the course of the case,

maybe even get to a final judgment before the agencies
have even decided what to do, so that you can provide
advisory opinions to the expert agencies that are
reviewing the merger.

Your Honor, that is not the role of the
federal courts.  That is exactly a textbook example of
asking the Court to do something that is not ripe
before a final agency action has even occurred.  I
think that part of their opposition brief is telling in
that regard, Your Honor.

Now, the plaintiffs have various responses to
our arguments and, in our view, are all without merit.
They say our arguments are radical and wrong.  Our
arguments are right in line with that Seventh Circuit
opinion and all of the decisions that have dismissed
merger challenges as being non-ripe.

And it's the plaintiffs really who are being
radical and wrong here -- I wouldn't choose that word
on my own, but since they're accusing us of that --
because they're asking the Court to do something that
has to our knowledge never been done.

And one would expect them to have very, very
strong support for that proposition.  But, like I say,
their entire argument is based on the two banking
statutes at issue.

1     And if I read their argument correctly, Your

2 Honor, I think what they're saying is these banking

3 statutes express an interest in having a court perform

4 an important role -- there's no question about that --

5 and that they create certain procedural hurdles for the

6 plaintiffs to clear if they're going bring this case.

7 But for the reasons I'm about to describe, I think both

8 of those arguments are without merit.

9     I want to just back up for a minute.  And I

10 know the Court has had the benefit of some of the case

11 law we've cited, but you can see the legislative

12 history discussed in some of those cases.  This act,

13 the Bank Merger Act of 1966, was a response to a

14 Supreme Court decision in *United States v. Philadelphia*

15 *National Bank*, which had blocked a banking merger under

16 circumstances that were somewhat controversial then.

17     The decision itself found that there was

18 going to be an anticompetitive effect here and the

19 court in that case had refused to consider benefits to

20 other groups of customers over here.  And many people

21 thought that was a poor decision and bad public policy,

22 and Congress reacted to that by passing the Bank Merger

23 Act.

24     The important point that I'm trying to make,

25 Your Honor, is that statute was intended to narrow the

1  ability of a plaintiff. And, honestly, all Congress

2  was thinking about in 1966 was the Justice Department.

3  I can't see any evidence anywhere that they were

4  worried about or thinking about private plaintiffs.

5          But that entire opinion -- entire legislative

6  history reveals an intent to rein in the ability of the

7  Justice Department to block a bank merger after it has

8  been approved by the expert agency. That's the policy

9  that's reflected in that statute.

10          And it is inconceivable, Your Honor, that a

11  statute that was intended to rein in the Justice

12  Department and make it harder to challenge a merger

13  would somehow simultaneously and in unspoken terms make

14  it easier for private plaintiffs to bring cases early

15  and override constitutional principles of ripeness,

16  which Congress probably didn't have the authority to do

17  anyway. So I just mention that as background.

18          But as I said, the case is brought under

19  Section 16 of the Clayton Act. That law says that a

20  plaintiff -- we don't dispute this -- has every right

21  to file a lawsuit at the right time if they wish; that

22  a plaintiff is allowed, quote, to sue for and have

23  injunctive relief when and under the same conditions

24  and principles as injunctive relief against threatened

25  conduct that will cause loss or damage is granted by

1  courts of equity.

2         Congress made clear that there was no special

3  role for antitrust cases when bringing an injunction

4  claim.

5         Now, the plaintiffs argue that the provision

6  of Sections 1828, 1849 that says you can only bring a

7  case if you bring it before X date -- and I'll come

8  back to X date in a moment -- means that they can sue

9  whenever they want.  Presumably, they could have

10  sued -- I don't know -- maybe while the deal was still

11  under consideration before it was even agreed to.  I

12  don't know what the limiting principle for them is.

13         But that is not what the statute says.  The

14  statute works as, in effect, a very short-term statute

15  of limitations.  And in fact, that's the way Congress

16  viewed what they were doing.  We went back and looked

17  at some of this legislative history that is cited in

18  our -- well, that is discussed in the cases that we've

19  cited.  And one of the bill's sponsors, Representative

20  Patman, called this a 30-day statute of limitations.

21  That was the word that was used to describe it.

22         So Congress certainly didn't think it was

23  allowing plaintiffs to bring cases earlier.  And in

24  fact, the very use of that term "30-day statute of

25  limitations" suggests to me that the action would

1   accrue upon regulatory approval because that 30 days is

2   pegged to the first date when an approved merger can

3   close.

4           The statutes have a waiting period as I

5   mentioned.  After a regulatory approval, 15 to 30 days,

6   and you have to bring the case within that time frame.

7   I appreciate it's a short time frame, but everybody is

8   going to know when this approval happens.  That is

9   going to be public.  There's a suggestion in their

10  papers it may be only the Justice Department will find

11  out about it and the merger will close without any

12  advanced warning.  But these things are public when

13  they happen.

14          And they will have an opportunity to come

15  back before Your Honor once they look at the final

16  version of this merger and ask you to do whatever they

17  want to ask you to do at that point.  They are not

18  going to lose that opportunity.  And their suggestion

19  that this is the only way to pursue the case is to

20  pursue it now is simply wrong.

21          So they're wrong on that end date point.

22  That's an end date like a statute of limitations, not a

23  change in the law as to when you can bring a claim and

24  still claim that it's ripe.

25          They also make much of the fact that there's

going to be *de novo* review. That's in the statute.
There's nothing particularly special about that. I've
done a number of these merger litigations, Your Honor,
where private parties came and challenged it after
approval or after the regulatory process. And it is
correct that Your Honor or whatever court they come
before will have an opportunity to review the evidence
and make your own determination about the legality of
the merger.

The decision of the banking agency is not
going to be binding on Your Honor at the time they
bring that case. But *de novo* doesn't mean that their
clients get to become a fourth or fifth banking
regulator and be part of an investigative process. In
fact, if Congress had intended that, they would have
used a phrase like simultaneous review or maybe a
priority review. But Congress said *de novo*.
Afterwards you can make a new determination as to the
legality of the merger.

And I'm sure Your Honor is familiar with *de
novo* review and other circumstances. It's not
something that happens simultaneously. It's not
something that happens before. It's something that
happens after, *de novo*, do it anew. So I don't think
that that helps them at all.

1          The Supreme Court decision in *United States*

2    *v. First National Bank of Houston* talks about this

3    *de novo* standard.  The court explains that it's simply

4    a fresh look at the evidence.  But importantly, the

5    Supreme Court there said, actually, it is a good thing

6    that the agencies resolve these matters through a

7    regulatory process first because the court can benefit

8    from that analysis said the Supreme Court in *First*

9    *National Bank of Houston*.  And in fact, maybe the

10   circumstances will change, as the Seventh Circuit said

11   in the *SBC Communications* case and you'll have new

12   facts to review at that point.

13          So *de novo* doesn't give them some kind of

14   special exalted place in the ecosystem of bank mergers

15   where they get to be a fifth agency doing a

16   simultaneous review.  And in fact, the statutes

17   themselves also talk about approved mergers.  We've

18   cited that language.  And that suggests the statute was

19   expecting mergers to be approved.

20          Now, *Michigan National* I've already

21   mentioned.  They rely very heavily on it.  That case

22   arose at the very unusual circumstance of one agency

23   having approved it and one agency still being pending.

24   And the Justice Department went in and sued in between

25   and said to the court, "If we don't sue now, there is a

reading of these statutes that say we can never sue."
And under those very unusual circumstances not present
here, the court said, "Well, we don't want the
government to forever lose its right to sue; therefore,
we're going to enter the stay."  There's no part of
that opinion that I can find that says a third option
might be to just let the case proceed.  That entire
decision is about do we dismiss for ripeness or do we
stay.

        And the stay happens because of all the
reasons I've mentioned.  There's a benefit to letting
the regulatory process play out.  The dismissal will
happen if there is no showing of prejudice, which
plaintiffs have not made here.

        I think I've managed to cover all of my
arguments, Your Honor.  I guess I'll make one final
point before I hand it over to Ms. Davidoff.

        There's an unusual theory asserted here --
and I'll let Ms. Davidoff talk about the substance of
the unaddressed theory that's asserted -- but it sort
of makes this doubly unripe.  And the reason it's
doubly unripe is because what they're arguing in this
complaint is that something is going to happen after
this merger closes as a result of Capital One issuing
Visa and Mastercard and also owning the Discover

1  network.

2          That act does not lessen competition on day

3  one because there really isn't going to be a change in

4  the structure of the market.  Their argument is that,

5  well, this is going to put Capital One in a position to

6  do something untoward some day, maybe use this

7  opportunity to somehow violate Section 1 of the Sherman

8  Act and coordinate.  That hasn't happened yet.  And

9  it's completely speculative and hypothetical.  I'm sure

10  Ms. Davidoff will talk to you about that.  But that

11  makes it doubly unripe.

12          And the one case that we cite on that is the

13  *SureShot Golf Ventures v. Topgolf* from the Fifth

14  Circuit.

15          So thank you very much, Your Honor.

16          And unless Your Honor has questions, I'll

17  turn it over to my colleague.

18          THE COURT:  Thank you.

19          MR. GELFAND:  Thank you very much.

20          MS. DAVIDOFF:  Good morning, Your Honor.

21  Before I -- I'm Amanda Davidoff from Sullivan &

22  Cromwell for Discover.

23          And before I begin, I wanted to -- we didn't

24  check with Your Honor on whether you prefer to hear a

25  response to the arguments --

1          THE COURT:  I'll hear yours.

2          MS. DAVIDOFF:  Thank you, Your Honor.

3          So I'm going to turn to why if the Court does

4  not dismiss on ripeness grounds or standing grounds, it

5  should dismiss on the merits.

6          Plaintiffs' burden here, as you know, was to

7  plead plausible allegations that the merger violates

8  Section 7 of the Clayton Act by substantially lessening

9  competition and Section 1 of the Sherman Act because

10  it's going to result in a contract that will

11  unreasonably restrain trade.  And they haven't done

12  this.

13          So starting with Section 7, plaintiffs

14  concede in their opposition that they have not alleged

15  that the merger is going to materially increase

16  concentration in either of the two markets that they

17  pleaded in their complaint, and you can find that at

18  pages 22 to 23 in their opposition brief.

19          The complaint actually alleges it's going to

20  deconcentrate the market for payment networks making it

21  less concentrated.  That's at paragraphs 68 to 69 of

22  their complaint and, you know, some of the paragraphs

23  after that, including paragraph 73.

24          And for Section 1, they identified no

25  restraint of trade in the vertical contracts by which

1  Capital One obtains payment network services from Visa

2  and Mastercard which, again, plaintiffs concede are

3  currently legal.  They don't identify any way, based on

4  the high-level of competition that now exists in the

5  credit card market, that those contracts once Capital

6  One and Discover are merged would impact competition in

7  that market.  They couldn't.  Capital One only has

8  9 percent of the issuance.  Discover only has 3 percent

9  of the issuance according to the allegations in the

10 complaint.

11         So without being able to allege that increase

12 in concentration in either of their markets or any

13 impact on competition, plaintiffs are just left with

14 speculation about what's going to happen after the

15 merger.  And they're really implausible speculations.

16         The principal one -- and this is really their

17 key argument -- is that after the merger, Visa and

18 Mastercard through their agreements with Capital One as

19 a credit card issuer may try to bribe Capital One to

20 degrade the Discover network in exchange for getting

21 better interchange fees from Visa and Mastercard.  And

22 then that Capital One might not pass on those savings

23 to its customers.  That's truly the theory that they're

24 putting forward.  *Twombly* says courts don't allow

25 complaints to proceed based on that kind of

1  speculation.

2          I want to emphasize one more feature of this

3  case that makes it a very straightforward one for

4  dismissal, and that's that defendants are usually in a

5  position of moving to dismiss on the basis that the

6  market that the plaintiffs have alleged is implausible

7  or the market shares that they've alleged are

8  implausible.  And the court has to do an analysis of

9  whether, you know, the plausibility of the market:  Are

10 the products reasonably interchangeable, are they

11 substitutable, or is the market itself not properly

12 alleged.  Your Honor doesn't have that situation.

13         Here, defendants for the purpose of a motion

14 to dismiss are accepting the markets that the

15 plaintiffs have alleged.  These are their markets, the

16 credit card market, the payment network market.  We're

17 accepting for the purposes of the motion to dismiss the

18 market shares that the plaintiffs allege.  So you don't

19 have to wade into any of that.

20         The only thing Your Honor has to do is decide

21 whether this situation where plaintiffs have alleged

22 that the merger is going to substantially -- is going

23 to decrease concentration in one of the markets and

24 keep it materially the same in the other, whether they

25 can also go forward with the Section 7 claim and

1 whether when -- we've got a contract in front of the

2 court.  The key contract, they say, violates Section 1

3 that is currently legal.  And the only basis for this

4 Section 1 claim is speculation about what might happen

5 in the future.  Your Honor just has to decide whether

6 that set of allegations states a claim under the

7 Clayton Act and the Sherman Act, and it doesn't.

8           So I would like to sort of dig a little more

9 into the Section 7 allegations on concentration, if I

10 may.  The Fourth Circuit in *Steves* -- and this is like

11 other circuits -- has explained that whether a merger

12 unduly increases concentration is the touchstone of the

13 Section 7 violation.  The language from *Steves* is that

14 the plaintiffs establish a presumption of

15 anticompetitive effect by showing that the transaction

16 is going to lead to undue concentration.

17           So what have plaintiffs pled about

18 concentration?  Well, in payment networks, the

19 complaint alleges that Discover now has a 2.2 percent

20 share and that Capital One is going to move some of its

21 credit cards from Visa and Mastercard to Discover

22 network after the merger.

23           What's that going to do?  That's going to

24 increase the 2.2 percent share of the payment network

25 market that Discover now has.  And again, that's at 68

1  and 69 of the complaint and 173.

2        Now, obviously, when Discover takes market

3  share from Visa and Mastercard, that's going to make

4  the payment network market less concentrated as the

5  payment network market.

6        And the credit card market plaintiffs'

7  claim -- and this is at page 41 of their complaint.

8  It's a heading.  The merger is going to increase market

9  concentration in the general credit card market.

10  That's their theory.  The merger is going to increase

11  concentration in that market.

12        But what are the facts alleged in their

13  complaint?  The facts alleged in their complaint say

14  the exact opposite, that Capital One and Discover are

15  going to merge, and they are among two of over 4,000

16  competitors in the credit card market.  And when they

17  combine, there's going to be a 76-point increase in the

18  HHI, a 76-point increase.

19        Courts regularly have said, as we cited in

20  our brief, that anything under 100 points is not even

21  worth thinking about.  And honestly, the threshold

22  would have to be much, much higher for the courts to be

23  concerned about competition.

24        When you look at the cases plaintiffs cited

25  in their briefing, you don't really have to go any

further than *Steves*. The HHI increases that the courts
have concerns about in those cases are in the range of
1,200 to 1,500 points, which is obviously very, very
different than here.

Now, we pointed all this out in our brief,
and plaintiffs' response was, well, whether a merger
increases competition -- sorry. Whether a merger
increases concentration doesn't really matter. You
don't have to think about that, Your Honor, in
assessing whether our claim and that claim survive.
That's in their opposition brief at page 23.

That's wrong. Plaintiffs don't cite any case
blocking a merger for any reason other than increased
concentration. No court has ever found that a merger
that decreases concentration in a market, like the
payment network market here, that that kind of a merger
is going to harm competition and blocked it on that
basis. And no court has ever found a merger that
combined two competitors in a 4,000-competitor market
to be anticompetitive, much less with an HHI increase
that's as small as the one plaintiffs allege here.

But equally important, you know, beyond the
fact that they haven't alleged an increase in
concentration in either of the markets and have alleged
a decrease in concentration in one of them is the fact

1 that plaintiffs don't have any other theory that's

2 plausible for why this merger would decrease

3 competition.

4        And I just want to briefly look at the three

5 points they make.  There are, you know, three theories

6 that they put forward in their opposition brief after

7 essentially giving up their concentration base theory

8 that had been in the complaint.

9        The first one is that the merger is going to

10 eliminate Discover as a vertically integrated

11 competitor.  Obviously, when the Court looks at the

12 complaint, you can see that there's no elimination of a

13 vertically integrated issuer, and the complaint pleads

14 that.  There's no elimination of anything.  The

15 complaint pleads that Capital One is going to issue

16 cards on the Discover network after the merger and that

17 Capital One will be vertically integrated according to

18 plaintiffs' own definition because they define

19 vertically integrated as an issuer that need not split

20 its interchange fees with the network.  That's

21 opposition page 19.

22        So, you know, we've got an assertion that

23 there's going to be an elimination of Discover as a

24 vertically integrated issuer, but the facts pled in the

25 complaint say the exact opposite, that Capital One is

1  going to be the replacement vertically integrated

2  issuer for Discover.

3          Now, accepting plaintiffs' allegation that

4  vertically integrated issuers enhance competition

5  strengthening one of the two vertically integrated

6  issuers that's now in the market -- and Discover being

7  the smallest -- is going to enhance competition.  It's

8  going to be good for competition, and that's really

9  what the facts of the complaint say.

10          Plaintiffs' second argument is that the

11  merger will strengthen the -- and I have to read this

12  because I want to make sure I get the phrase right --

13  strengthen the payment network and issuer rewards

14  barrier to entry for the PNIRBE, P-N-I-R-B-E.  One of

15  the places that's pointed out is in the complaint at

16  page 39.  This is actually a term that plaintiffs

17  coined to refer to barriers to entry.  It exists

18  nowhere in the industry or in the economic literature.

19          So let's talk about barriers to entry.  The

20  complaint does not plead any plausible barrier to

21  entry -- to entering into the credit card market.

22  There are 4000 credit card issuers, and under those

23  circumstances, it really would be impossible to plead a

24  barrier to entry.

25          But as for payment networks, it's a little

more complicated.  The complaint doesn't plausibly

plead that any barrier would be strengthened by the

merger.  So let's talk about that.  According to the

complaint, the barriers to entering the payment network

market exist because of network effects, because

merchants and credit card holders are reluctant to

adopt a new payment network until there's a critical

mass of others on that network.  That's their

allegation of what the barriers to entry are based on

these network effects.  That's at paragraph 165 of

their complaint.

The problem with this theory that the PNIRBE

for the barriers to entry are going to be increased by

the merger is that there's no pleading of how these

network effects are going to be increased by the

merger.  They exist before the merger.  They exist

after the merger.  There's no -- there's no

strengthening of the barriers to entry.

If anything, what the complaint pleads is

that the barriers to entry are going to be reduced by

the merger.  And that's because the merger, again,

according to the complaint, is going to strengthen the

Discover network.  Capital One is going to move volume

from Visa and Mastercard to Discover, and that's going

to reduce the Visa and Mastercard dominance.

1          Actually, at paragraph 176 of the complaint,

2    plaintiffs allege that the way to reduce barriers to

3    entry in the payment network market is through having a

4    vertically integrated payment network market entrant,

5    that that would disrupt the barriers to entry.

6          But here, what they're pleading is that one

7    of the payment networks already in the market is going

8    to become stronger as a result of the merger.  Well,

9    that's the same thing.  It's going to disrupt those

10   barriers to entry, if anything.

11         So we can put aside those two theories for

12   how the merger is going to harm competition.  The idea

13   that we've lost a vertically integrated competitor or

14   the idea that there will be barriers to entering the

15   payment network market are going to be strengthened.

16   Both of those are not plausibly pled in the complaint.

17         And we come to the main point that plaintiffs

18   are trying make, which is that the merger is going to

19   facilitate horizontal collusion in the payment network

20   market.  That claim of potential collusion -- and

21   Mr. Gelfand stole my thunder for a little bit -- is

22   pure speculation.

23         The key paragraph here is paragraph 203 of

24   the complaint, and the theory there -- it's a little

25   convoluted -- is that Visa and Mastercard might bribe

1  Capital One with higher interchange fees in exchange

2  for not growing the Discover network even though the

3  complaint says Capital One plans to do the exact

4  opposite, grow this, what it calls a rare and valuable

5  asset.

6         And part of plaintiffs' theory here is that

7  Capital One might not pass on to customers those higher

8  interchange fees that it gets from this hypothetical

9  bribe because there's less competition from Discover

10 cards.  And they're making this assertion even though

11 they allege in the complaint Discover only has

12 3 percent of the issuance market and even though the

13 complaint says that issuers do pass interchange fees on

14 to customers through awards and in other ways.

15        So under *Twombly*, the Court really can't

16 accept these conclusory allegations of conspiracy that

17 are, you know, just totally speculative.

18        And it goes -- it gets even worse because the

19 claims of collusion are actually refuted by the

20 complaint.  There's an allegation in paragraph 59 that

21 it is because of the large market concentration in the

22 payment network market that Visa and Mastercard have

23 large incentives to collude.  But again, the complaint

24 is alleging that the merger network is going to reduce

25 concentration in the payment network market when

1  Capital One shifts volume from Visa and Mastercard to

2  the Discover network.

3         So, according to the compliant, the factual

4  allegations in the complaint as opposed to these sort

5  of conclusory speculations, the merger reduces

6  incentives to collude.

7         I have to address this supposed past

8  collusion between Visa and Mastercard that comes up in

9  a few places in the complaint.  The idea is that

10 there's been collusion in the past between Visa and

11 Mastercard and Capital One to fix interchange fees.

12 That's an assertion at paragraph 55 of the complaint.

13        And so collusion is likely in the future.

14 That allegation does not hold up.  We are -- the

15 complaint is talking about a lawsuit from 2005 against

16 Visa, Mastercard, and numerous issuers.  And the only

17 thing the plaintiffs in that case alleged about Capital

18 One was that it had a representative on the Mastercard

19 board of directors at the same time it was an issuing

20 and acquiring bank.  It has -- you know, that position

21 on Mastercard's board of directors for Capital One had

22 nothing to do with the claims here, the idea of

23 collusion arising from an issuer payment network

24 agreement to distribute payment network services.  And

25 that case also settled without any admissions of

1  liability.

2        So at bottom, Your Honor, there's nothing

3  suspicious about selling one's own products, Capital

4  One selling the Discover network, as well as those of

5  the competitor, the payment network services of Visa

6  and Mastercard.  It's a necessary part of the dual

7  distribution arrangements that we all recognize are

8  common in the economy and that the Fourth Circuit said

9  in *Brewbaker* are common in the economy.

10        It's the example like Footlocker selling

11  Footlocker branded material and key branded material.

12  It's an example like Harris Teeter selling Harris

13  Teeter Old Fashioned Oatmeal and Quaker Oats.  It's

14  something we see every day.

15        Market participants regularly distribute

16  competitor's products, and there's no case finding that

17  this creates enough incentive to collude that there

18  could ever be an antitrust claim based upon that.

19        I do want to briefly address the Section 1

20  theory as well, Your Honor.  For the Section 1 claim --

21  and I went over it earlier, so I won't spend too much

22  time on it.  But plaintiffs asserted that the existing

23  vertical arrangements between Capital One as issuer and

24  Visa/Mastercard as payment network could be transformed

25  into a legal agreement once Capital One is a horizontal

1  competitor to Visa and Mastercard in the payment

2  network market.

3          And to be clear, plaintiffs agree these are

4  legal now.  They talk about them at paragraph 206 of

5  their complaint.  No suggestion of illegality.  So it's

6  just a suggestion that automatically upon the merger

7  they become illegal.

8          Plaintiffs cite no court decision that even

9  hints a merger could be illegal on the ground that it

10 could transform an otherwise legal contractual

11 arrangement into one that is illegal.  So again,

12 they're asking the Court to do something that no other

13 court has ever done.

14         We can very quickly, I think, dispense with

15 the idea of applying the *per se* rule to these

16 allegations.  *Per se* only applies to the types of

17 arrangements that always or almost always hurt

18 competition.  Those are things courts know well, like

19 price-fixing, market allegation, bid rigging.  This is

20 not one of those cases.  This is a vertical agreement

21 to supply payment network services.

22         The Fourth Circuit actually held in *Brewbaker*

23 that it was legal error to apply the *per se* rule to a

24 single agreement between parties related both

25 vertically and horizontally.  It was legal error.  And

there the agreement was a little different.  It was an
agreement to do horizontal bid rigging.  And the court
said because there was a vertical aspect to the
agreement, it was error to treat it as a *per se*
violation.

Obviously, we're talking about nothing close
to bid rigging here.  We're talking about legal
agreements to distribute services.  So I think the
Fourth Circuit would have a very negative reaction to
the idea of applying the *per se* rule here.

So we are under the rule of reason analysis.
To plead a rule of reason claim, plaintiffs have to
allege a contract that unreasonably restrains trade.
That means pleading significant and likely
anticompetitive effect from the agreements based on
market power and market share that Capital One would
have in the credit card market after the merger.  And
that standard is set out in *Dickson v. Microsoft*,
another Fourth Circuit case.  This one is from 2002.

There's no significant and likely
anticompetitive effect of these agreements.  They're
just legal distribution agreements of network services.
But even if there were, there's no showing of market
power that Capital One after the merger would have
enough market power in credit cards sufficient to have

1  an anticompetitive effect.

2          We know from the complaint that plaintiffs

3  allege Capital One after the merger is going to have

4  about 13 percent of the credit card market.  Courts

5  have said that.  That's not market power.  It's way

6  below the threshold for market power.  And without

7  that, plaintiffs aren't able to allege that this

8  singular contract or these singular contracts between

9  Capital One on the one hand and Visa and Mastercard on

10  the other hand are going to affect competition in the

11  credit card market.

12          Again, that's very like the *Dixon* case.

13  There it was contrast between Microsoft on the one hand

14  and Compaq and Dell on the other.  Obviously, Microsoft

15  had market power.  But because Compaq and Dell did not

16  have -- or weren't alleged to have market power in the

17  PC distribution market, the court held that the

18  Section 1 claim had to be dismissed on its face because

19  there was no way that a contract Microsoft had with

20  Compaq or a contract that Microsoft had with Dell could

21  impact competition in the PC market where those

22  entities didn't have any ability to affect competition

23  because they didn't have market power.

24          Briefly on injunctive relief, Your Honor.  To

25  plead that claim, the plaintiffs had to plead a

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

significant threat of irreparable antitrust injury.
They don't.  Their principal theory is money damages.
That's not irreparable.  And all they identified beyond
money damages, as Mr. Gelfand said, is just supposed
loss for a right to bring an antitrust claim.  They're
wrong about that.  There's no loss of that right.  But
even if they were right, that wouldn't be an antirust
injury sufficient to constitute irreparable harm on any
interest case.

So just to sum up, Your Honor, the Court
should look beyond the buzz words and the jargon in the
complaint and go straight to the allegations.  The
allegations are that concentration is going to stay
about the same in one of the markets, credit cards.
It's going to decrease in the other one, payment
networks.  And there's nothing beyond those
concentration allegations other than speculation.

The Court can credit Clayton Act and Sherman
Act claims based on the kind of speculation that's been
put forth here, and the complaint should be dismissed.

Thank you.

THE COURT:  All right.  Thank you.

MR. BATHAEE:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BATHAEE:  May it please the Court.

1          Would the Court prefer I start with the

2   Article III or the merits?

3          THE COURT:  Yes, Article III.

4          MR. BATHAEE:  Your Honor, I do want to note

5   something very interesting.  Your Honor heard about

6   legislative history from one senator, and I can talk

7   about some of the others.  The Court heard about some

8   opinions about memoirs from private practice, but not

9   once did we hear the text of the actual statute at

10  issue, which is very clear.  It says if you sue prior

11  to the period set forth in the statute, you're okay.

12  But if you sue after, you're barred.  You're barred

13  forevermore from bringing any claim having to do with

14  the merger.

15          And in fact --

16          THE COURT:  Is there a case that you could

17  cite to the Court that would allow the antitrust

18  challenge to go forward under these circumstances

19  before a regulatory filing, a regulatory review?

20          MR. BATHAEE:  Well, yes, Your Honor.  The

21  *Michigan* case itself from the United States Supreme

22  Court --

23          THE COURT:  Well, that was stayed, though.

24          MR. BATHAEE:  They did stay that, Your Honor.

25          THE COURT:  That's what I'm talking about.

1          MR. BATHAEE:  Oh, Your Honor is not

2   addressing Article III but a discretionary stay?

3          THE COURT:  Yes.

4          MR. BATHAEE:  Premerger challenges happen all

5   the time.  They're often coordinated.  They usually

6   involve the DOJ.  We're in sort of in an unprecedented

7   situation where it's a bank.  And the statute is

8   different.  And the Court has a more robust role as

9   sort of the final regulator on the merger itself.

10         And there was a lot of discussion about *de

11  novo* review.  It's not *de novo* review of the agency

12  action.  It's actually *de novo* review of the merger.

13  So in a sense, this Court is the final regulator as to

14  this merger.  And that comes straight from *United

15  States v. First National Bank of Houston*.

16         THE COURT:  I understand that.  But the issue

17  is when should that take place, if ever?  Should it

18  take place in advance?  Is there any instance where

19  it's taken place in advance of the final regulatory

20  process?

21         MR. BATHAEE:  No, Your Honor, I am not aware

22  of any instance of such a challenge to begin with --

23         THE COURT:  Right.

24         MR. BATHAEE:  -- other than the DOJ actions

25  in the *Michigan* case and the *First National Bank*.

1          THE COURT:  All right.

2          MR. BATHAEE:  The issue is easily resolved,

3    though, Your Honor, by scheduling a trial date that's

4    after consummation, which sounds imminent from what we

5    heard from opposing counsel.  Anytime soon, nothing out

6    of the ordinary.  If it's imminent and it's anytime

7    soon and nothing out of the ordinary, let us do our

8    discovery -- and Your Honor has sort of balanced the

9    discovery already -- and move along.  And then it will

10   consummate.

11         And if it doesn't consummate, then we're on

12   the precipice of a trial, then, Your Honor, yes, of

13   course, we should stay.  I think we should wait until

14   we have everything done and the merger has been

15   approved.

16         But it doesn't mean the case has to be

17   dismissed.  I think that has been expressly rejected by

18   the Supreme Court.  The case or controversy issue --

19   and it's binding on this Court -- was decided in

20   Michigan law expressly.  So there is no Article III

21   issue with respect to the suit being too early.

22         We heard the argument that, well, could they

23   have brought it when they were just thinking about the

24   merger?  Well, of course not.  But they did announce a

25   merger.  They're going through the process of finishing

1   it.  They're almost done with it.

2            I think, you know, if we do comply with the

3   statute, that's enough for ripeness.  And we don't

4   really need to go to ripeness principles to get there.

5   We already have a ruling from the Supreme Court.  But

6   if we did and if we go to the *Trump v. New York* case,

7   for example, very easily distinguishable.  For one,

8   that was a challenge to the executive action.

9            And on top of that, Your Honor, the

10  injunction the district court had issued barred a

11  cabinet member from making a report with the President

12  of the United States on an issue that hadn't even -- on

13  something that hadn't even been done by the President.

14           This isn't a challenge, Your Honor, for the

15  Federal Reserve.  It's not a challenge to the action by

16  the OCC or a Delaware regulator.  This is an

17  independent claim under Title 15 under the antitrust

18  laws.

19           And Your Honor heard my friend in argument

20  say, well, there's nothing in the statute on this point

21  that would allow a private antitrust case to go

22  forward, but the text of the statute actually says

23  antitrust.  It says any action brought under the

24  antitrust laws arising out of a merger shall be

25  commenced prior to, and then it goes on.  That's at 12

1  U.S.C. 1828(c)(7)(A).

2          The term "antitrust action," any antitrust

3  action refers back to the word "antitrust action" in

4  the same statute, which refers to just anything under

5  Title 15.  Our cause of action arise under Title 15.

6  They don't arise under the Bank Merger Act or the Bank

7  Holding Act.  Those are defenses that they are given

8  under those statutes that modify the rule of reason.

9          THE COURT:  All right.

10          MR. BATHAEE:  But the point, Your Honor, is

11  that it says any action brought under the antitrust

12  laws.  That includes a private action.  That's what the

13  statute says.

14          Now, in terms of the stay, Your Honor --

15          THE COURT:  Let's stay with Article III for a

16  second.

17          MR. BATHAEE:  All right.

18          THE COURT:  What have you alleged that

19  plausibly alleges injury in fact?  What have you

20  alleged that it's particularized, concrete, and actual

21  as opposed to hypothetical or conjecture?

22          MR. BATHAEE:  Your Honor, it would be

23  increase in prices essentially.  Decrease in rewards

24  obtained if the merger is consummated.

25          THE COURT:  How is that particularized,

1    concrete, and actual based on the facts you allege?

2            MR. BATHAEE:  Well, the complaint alleges,

3    Your Honor, that -- well, I can give the merits.  I

4    mean, that's very complicated how that actually works.

5    But money damages generally are not available here,

6    right, Your Honor.  All we can do is, you know, we can

7    eliminate the potential of them happening through an

8    injunctive relief.  Because once the merger

9    consummates, the claim goes poof, and there's --

10   there's no availability of monetary damages.

11           But not only -- in that sense, it's

12   irreparable because we can't -- we can't because of the

13   statutory bar sue for damages after the merger is done.

14   We can't come back and say, well, now that our prices

15   have gone up because the rewards have dropped or

16   interest rates have increased on the cards, for

17   example, please pay us that difference.  It's

18   unavailable.

19           Now, if they independently do something

20   anticompetitive after the merger, my friend is correct.

21   That would still be available to us as a separate

22   antitrust claim.  But the merger claim itself, unlike a

23   typical merger claim like the one in the Eastern

24   District of Texas against *Schwab-TD Ameritrade*, that's

25   a postmerger claim or even *Steves & Sons*, which is a

1  postmerger claim.

2          You would have Section 4 of the Clayton Act

3  available to you for damages.  You don't have that

4  here.  The claim is completely gone.  There are no --

5  in fact, I think it says there's not even any judicial

6  review.  It says here the transaction may not

7  thereafter be attacked in any judicial proceeding on

8  the ground that it alone and of itself constituted a

9  violation of any antitrust laws other than Section 2 of

10 Title 15.  That is monopolization.

11         So the injury we have is the irreparable harm

12 of preventing the increased prices, loss of consumer

13 choice, the strengthenings of -- threats of

14 strengthening barrier entry that causes the increased

15 prices longterm, and the structural change to the

16 market.  That is the quintessential Article III injury

17 for antitrust cases.

18         THE COURT:  Well, it sounds as if you're

19 saying that because there's a potential for future

20 injury you have standing now to attack the merger

21 because it has the potential for later inflicting

22 injury that would otherwise be non-addressable.

23         MR. BATHAEE:  That's correct, Your Honor.

24         THE COURT:  I'm not sure that satisfies the

25 injury in fact.

1          MR. BATHAEE:  Well, Your Honor, Section -- so

2    Title 15's injunctive relief provision is perspectively

3    worded.  It's designed to, in fact, stop things before

4    they happen.  If that is a definition of what's

5    required for injury in fact, you could never have a

6    perspective premerger challenge.

7          There are additional facts that make it not

8    speculative, Your Honor, because the CEO himself has

9    said precisely what he plans to do postmerger.  And I

10   can get done with the merits.

11         So we have their actually expressed plan

12   stated in investor calls which, as Your Honor knows,

13   would subject them to lawsuits under the securities

14   laws if they lied during them, right.  So it's very

15   clear that they're going to maintain this sort of mixed

16   model, that they're going to change the structure of

17   the market, and they're going to have these Section 1

18   agreements going forward.

19         So if the merger closes, that's the plan of

20   the company.  If that's the plan of the company, this

21   is our only ability to -- the only ability to challenge

22   those increased -- likely increasing prices, decreased

23   rewards, and other market effects, including

24   strengthening with the barrier entry.  That time is

25   now, and there's no other way to do that.  And it's --

1 it's gone once the merger is consummated.  We would

2 have no ability to challenge that merger in any

3 judicial proceedings in this country.

4        THE COURT:  All right.

5        MR. BATHAEE:  Your Honor, the other point I

6 wanted to make is -- we hear this argument that, well,

7 we don't know what the Federal Reserve is going to do.

8 And so because there might be a difference in what the

9 Federal Reserve approves and what they've asked for,

10 that means that there is no constitutional case or

11 controversy yet.  Your Honor, that actually doesn't

12 comport with the *Department of Commerce v. New York*

13 decision in 2019 by the U.S. Supreme Court, which was

14 actually cited recently in the *Murthy v. Missouri* case

15 by the Supreme Court.

16        The question when talking about a third party

17 and what they're likely to do is not about speculation.

18 The Court won't engage in that speculation.  It asks --

19 and I'll read from the *Department of Commence* case

20 itself:  "But we are satisfied that, in these

21 circumstances" --

22        Let me step back.  The question is whether

23 the third parties will likely react in predictable

24 ways.  That's the standard.  What's more predictable

25 than an agency that has let 4,000 mergers go forward

without a squeak?  And in fact, Your Honor, we heard
something about, well, some of them aren't consummated.
The statistics Your Honor heard take that into account.
That's -- very few of them are stopped.  I mean,
essentially we consider that a block.  So when we're
talking 4,000 mergers, we're talking about the bulk of
the ones the Federal Reserve has reviewed.

We've heard there's nothing wrong with the
merger, that it looks like it's going to go through God
willingly, as he said.  We heard that there's
nothing -- there's nothing anticompetitive about it in
their view.  And this is totally normal.  There's no
reason for the Court to think that, you know, the
Federal Reserve is doing anything out of the ordinary.

So when you put all that together, it's
actually quite speculative to say that the Federal
Reserve is now going to block this merger or change it
drastically after it has already posted its notice and
comment period.  It's over.  It's made requests to them
already.  There's been an interplay.  It's all
published.

You haven't heard one word about anything
that seems to be in flux or is changing from my
opposing counsel.  If anything, they're speculating
about what the Federal Reserve, a third party, is going

1  to do in saying this Court can't then review this case,

2  which is an independent cause of action having nothing

3  to do with the Federal Reserve.

4       And so, Your Honor, I don't think we need to

5  divine what the standard is because there is already

6  binding precedent on the case or controversy question

7  by the U.S. Supreme Court as to these statutes.  But

8  even if we did, you can't look to *Trump v. New York*

9  challenging executive action that hasn't happened yet.

10 And you certainly can't ignore the *Department of*

11 *Commerce* which says you look at whether a third party

12 is going to act in predictable ways.  And when you put

13 those principles together, this is plainly within the

14 ripeness and traceability standard under Article III.

15      Your Honor, a few points.  I heard repeatedly

16 that there's no final agency action.  And, Your Honor,

17 this isn't an APA challenge.  These are independent

18 statutory antitrust claims.  They are not challenges to

19 any final agency action.  And this Court, as Your Honor

20 knows, will conduct a *de novo* review of the merger, not

21 the Federal Reserve, under 12 U.S.C. 1828(c)(7).

22      In *First National Bank*, the court said,

23 look -- and this is at 386 U.S. 358 -- sorry, 361.

24 "The courts may find the Comptroller's reasons

25 persuasive or well nigh conclusive.  But it is the

1  Court's judgment, not the Comptroller's, that finally

2  determines whether the merger is legal."

3         And so, Your Honor, it's not asking this

4  Court to be an advisor with the agencies.  The statute

5  says that this Court is the final arbiter of the

6  merger.

7         Now, should discovery proceed pending a

8  likely trial where this Court finally decides the

9  question?  I think that it should, Your Honor.  Should

10 it be measured?  Why not?  Your Honor has already done

11 that.  Should we have a final order?  As a matter of

12 discretion, I don't think so.  I think this Court can

13 stay a trial, if necessary.  I think by the time it's

14 January when this trial is set or the pretrial hearing

15 is set, this merger is consummated.  And there's been

16 not a shred of evidence that it's not likely to be.

17        So this is mostly a docket and case

18 management issue.  I don't -- it's certainly not an

19 Article III issue.  Generally, increased prices, loss

20 of consumer choice, strengthening the barrier of entry

21 that will hurt consumers are quintessential Article III

22 injuries.  That's generally not the issue, right, Your

23 Honor?

24        The question simply is should this Court get

25 ahead of the consummation of the merger?  That can be

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

1  fixed just fine with a one- or two-month trial date

2  change, or Your Honor can -- we're probably not going

3  to move for summary judgment.  But assuming we don't

4  and they do, you know, I don't even think that would

5  affect anything, right, because it would be against our

6  plaintiffs.

7        So, again, Your Honor can balance that when

8  we get there in January.  So far we're still waiting on

9  getting just basic discovery, basic document discovery.

10  We're not even there yet.

11       So a lot of this is not something that this

12  Court, you know, has to decide in the binary sense.

13  We'll have a stay until, you know, we hear back from

14  the regulators.  The regulators are likely approving

15  this.  Everyone agrees.  And it's speculative to say

16  they're not.

17       Well, let's continue with the case, and if we

18  get to a point where this Court gets ahead of the

19  consummation of the merger, well, Your Honor, we would

20  be the first to say pause at least some of it or at

21  least the trial so there's no final order on the

22  question.

23       Your Honor, I heard that this was a statute

24  of limitations in the statute, a 30-day statute of

25  limitations.  And I want to address that point.  It is

1  no such thing, Your Honor.  The text of the statute

2  does not prescribe a window.  It has a prior to date.

3  And the word "might" appears, might be consummated.  So

4  it's clearly not -- it's not saying after it's

5  consummated.  The word "might" appears in the statute

6  itself.

7          So if we look at these words together, I

8  don't think it's a reasonable reading to say that the

9  statute has prescribed some kind of window, some kind

10  of 30-day statute of limitations.  It is in a sense a

11  statute of limitations because if you sue after that

12  point, your claim is barred even if you're the

13  Department of Justice.

14          The third thing is an early warning period to

15  the DOJ, which is involved in the merger review.  So

16  it's not a surprise to them.  It just gives them time

17  to file their suit.  If they're preparing one anyway,

18  they would have, right.  That's for the DOJ.

19          The 30-day period once lapsed -- the earliest

20  period actually, it's not just the 30-day period.  But

21  the earliest period under which the transaction might

22  be consummated and lapses, you can't sue anymore, and

23  your claims are forever barred.

24          And I just read the very stern language in

25  the statute about any kind of judicial review with a

1  merger ever again being barred.  And that's because if

2  Your Honor does look at the legislative history, it's

3  because you can't unscramble all of the stuff that

4  happens after a bank merges.  Banks are unique in that

5  sense.

6        And that's actually recognized all over the

7  *United States v. First National Bank of Houston* case.

8  And, in fact, 370 to 71 the -- in fact, it explains why

9  the regulators stayed pending a judicial review at this

10  point.  It says, "The normal procedure therefore should

11  be maintenance of the *status quo* until the antitrust

12  litigation has run its course, lest consummation take

13  place and the unscrambling process that Congress

14  abhorred in the case of banks be necessary."

15        This is the important forum for this bank's

16  merger, not the Federal Reserve, not the OCC.  They

17  have to wait.  They don't get to approve anything until

18  this Court decides.  It is 180 degrees in reverse.

19        Now, is it good sense not to get ahead of

20  their approval with a trial?  Sure.  And I think we

21  should get there when we get there.  We're not there

22  yet.  We're a few months probably from this thing

23  consummating in my opinion.  I've looked at other bank

24  mergers.  I've looked at where they are in the process.

25  You're not getting much information from them other

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

1   than everything looks good, which I think probably

2   means it's getting consummated soon.

3           So there's nothing that can't be fixed with

4   just a little bit of scheduling.  And I think something

5   as drastic as dismissing our case and having me refresh

6   the Federal Reserve cite until they approve and then

7   filing another lawsuit, I mean that doesn't sound

8   right.

9           And it certainly doesn't sound right -- and

10  we get no discovery until 30 days before consummation,

11  and then we have to rush to a trial?  I think all of

12  that seems the opposite of judicial efficiency.  There

13  are much less prophylactic ways to deal with that sort

14  of thing.

15          So anyway, that -- that's my point on the

16  Article III and on the stay issue.

17          As to courts never allow, I think my friend

18  in argument must have misspoken because there have been

19  lots of premerger challenges in the United States.  I

20  mean, there was a recent airline one in the news.

21  Premerger challenges are quite common.  I think my

22  friend in argument means he hasn't seen a bank merger

23  challenge, and I think he's correct about that.  This

24  is an unprecedented situation.  In fact, the very

25  statute Your Honor is looking at, the prior to language

1  hasn't been interpreted for, you know, 50 or 60 years.

2  So that doesn't mean there's no right to.  It just

3  means it hasn't been done before.

4         And this is an important merger.  This may be

5  the rare case where, yes, a private plaintiff -- people

6  who have credit cards who, frankly, with the highest

7  interest rates in the country, they might care.  They

8  might want to enforce the community effect standard

9  that's incorporated into the statute that offsets and

10 changes the rule of reason under Section 7.

11        This might be the situation where the

12 individual consumer is uniquely affected, and a

13 regulator is not the appropriate person to sign off

14 with finality.  Perhaps a private plaintiff does need

15 to bring a matter to court, and the Court needs to look

16 at it independently.  And Congress provided for that.

17        It may be the first time someone has done it,

18 but it's not wrong.  It's not unauthorized.  It's in

19 the statute.

20        So, Your Honor, I do want to make the point

21 that I understand my friend's arguments.  I do want to

22 stress that it's important we start with the statute

23 itself, not some legislative history.  In fact, Your

24 Honor, the very legislative history cited had one

25 senator who wanted to bar all challenges from the

antitrust laws to mergers entirely. And it goes on and on for pages. I don't have them with me.

Should we take his view? Which senator do we choose? I think the right view is to look at the statute. Did Congress enact a window? Well, does the statute say window? Does the statute say in between these dates? It says prior to. So, does it say it must be consummated? It says might be consummated.

Well, the best evidence for what these people thought when they passed the statute is the text of the statute itself. And so I respectfully ask that the Court reject a lot of that argument because it doesn't -- it doesn't comport with how we can objectively interpret these laws, which have not been interpreted before, which are being interpreted probably for the first time by this Court in this context.

Your Honor, on the Article III thing, unless Your Honor has any questions, I think that's my argument.

Your Honor, on the rule of reason point -- well, let me back up. I think it's important to start with the rule of reason, and the reason it's important to start with the rule of reason is, I think, it disposes of this motion to dismiss very quickly. The

1 rule of reason is an inherently factual analysis.  It

2 is not one that can be telesmatically disposed of as a

3 matter of law by looking at some market shares.

4       In fact, there are countless cases warning

5 against doing precisely that.  Most recently, Your

6 Honor, the Fourth Circuit in *Duke Energy* just months

7 ago reversed a summary judgment decision in a Section 2

8 case, which is a modified rule of reason analysis.  And

9 there the court said, well, there's predatory pricing.

10 So let's apply the *Brooke Group* test.  And there's a

11 refusal to deal.  So let's apply the *Aspen Skiing*

12 scheme test.  And the court said, no, you can't do

13 that.  You have to look at all the conduct as a whole,

14 the market structure, and determine its affect.

15       And, Your Honor, I can just read, you know,

16 some select points from that.  This is at *Duke Energy*,

17 111 F.4th 337:  "When a court is faced with allegations

18 of a complex or atypical exclusionary campaign, the

19 individual components of which do not fit neatly within

20 preestablished categories, its application of such

21 specific conduct tests would prove too rigid."

22       "Thus, when a plaintiff alleges that a scheme

23 or course of conduct was anticompetitive, the scheme or

24 conduct must be considered as alleged, not in

25 manufactured subcategories."

1          And they quote Justice Holmes in a Section 1

2   case, and they say this applies to Section 1 and

3   Section 2 cases.  There's no reason it doesn't apply to

4   Section 7 rule of reason cases too, right.  It's the

5   same principle.

6          The plan sometimes make the parts unlawful.

7   That's from Justice Holmes.

8          The plan we have -- and Your Honor didn't

9   hear my friend, Ms. Davidoff, mention the CEO's plans

10  which are expressly stated in the complaint.  He says

11  exactly what he's going to do.  Nothing speculative

12  about it.  And perhaps right now those contracts are

13  unlawful, but in the market structure postmerger, they

14  may not be.

15         And that is not something, Your Honor, that

16  can be decided just by looking at some Herfindahls and

17  saying, Get off my lawn.  This is a totally great

18  merger.  Leave.

19         That's not what the rule of reason is.  The

20  rule of reason is probably the most factual inquiry, I

21  think, a court can possibly engage in next to

22  causation, namely, next to proximate causation.

23         And, Your Honor, in *Robertson v. Sea Pines*

24  *Real Estate* -- this is the Fourth Circuit -- the court

25  rejected it.  It's the same kind of attempt.  679 F.3d

1    at 291.  "We cannot know at this early stage" -- and

2    this was a motion to dismiss -- "whether plaintiffs

3    will ultimately prevail.  Whether defendants' conduct

4    indeed violated the Sherman Act is a question to be

5    answered on remand."

6            Your Honor recognizes the same point in

7    *Lumber Liquidators* at 415 F. Supp. 711.  And, Your

8    Honor -- and I'll get to the actually details here and

9    why this does allege a rule of reason claim with

10   granularity.  It's not nearly as dire as my friends

11   say.  It's actually quite the opposite.

12           But, Your Honor, in -- until 2012, in

13   *Robertson v. Sea Pines*, the Court explained the things

14   it looks at, and they're all factual.  Does it raise

15   barriers to entry?  Does it raise prices?  Does it

16   stabilize the market in an anticompetitive way?  Does

17   it discourage entry?

18           These are all perspective by the way

19   questions that this Court must evaluate and not in a

20   vacuum.  As this Court -- as the Supreme Court said in

21   *Continental/Orr* -- and I think it was repeated in the

22   *Robertson* case and recently in the *Duke Energy* case --

23   all the agreements need to be considered as a whole.

24   That means all of the agreements that we've seen --

25   that we allege are going to continue past the merger

1  and be created after the merger, right.  Because we

2  have to look at their plans.  They have to be

3  considered as a whole, and they need to be considered

4  as whole with all of the conduct that we allege.  And

5  I'll get to that when I get to the rule of reason

6  point.

7            All of that's considered as a whole in the

8  aggregate.  It is not to be compartmentalized wiping

9  the slate clean and then -- and that's been the rule

10  for the rule of reason since *Continental/Orr* and

11  certainly followed by the Fourth Circuit as recently as

12  a few months ago.

13            And so how can it be?  How can it be that we

14  can take all of this conduct as a whole, all of it,

15  jumble it together, and then look at the market share

16  or a Herf and say, oh, you failed the rule of reason as

17  a matter of law?  Incredibly unlikely.

18            And so I -- and I'll get to why it's not -- I

19  think it's probably inviting legal error.  But I do

20  think the point here is, Your Honor, even if we get to

21  the rule of reason under Section 1, we still have a

22  rule of reason case under Section 7.  Together we're

23  going to get to the rule of reason and the factual

24  issues are so, so complicated, and there are so many

25  pieces to it that a dismissal would be, I think, a

1  mistake.

2  Your Honor, as to what the complaint says, it

3  alleges all the hallmarks that the *Robertson* case set

4  forth.  It strengthens barriers to entry.  And if Your

5  Honor looks at paragraphs 165 to 183, it pleads the

6  strengthening to barrier entry in several ways.  It

7  reduces price pressure from a vertically integrated

8  competitor.

9  Now, this is very important.  My friend in

10  argument made the point, well, Discover is sticking

11  around.  In fact, Capital One is going to continue

12  maintaining Discover.  What's going to change?  The

13  competitive pressure changes.  When you have a

14  vertical -- vertically integrated competitor, they

15  don't split the interchange fees with an issuer.  That

16  means they keep all of it.

17  And as Your Honor knows and it says in the

18  complaint, all of that is then as a matter of

19  accounting used to fund rewards.  They're coupled.

20  That's where the rewards come from.  And when you don't

21  split any money with the issuer and you don't have to

22  haggle with an issuer to split, you can remit more

23  rewards, which essentially is price pressure in the

24  credit card market.  That comes from having independent

25  vertically integrated network -- network and issuer,

1  like Discover and American Express.

2          If Capital One is operating it, where is the

3  price pressure?  They're going to -- what are they

4  going to do?  They're going to keep -- they're going to

5  keep the entire interchange fee for all of those

6  Discover cards, and that's going to make them want to

7  lower their capital -- increase the Capital One rewards

8  why?  They own it.  It's not their competitor anymore.

9  They keep all the money.  Well, why would there be any

10 competitive pressure?

11         So, yes, this is exactly why the statistics

12 are entirely misleading if you just look at market

13 shares and Herfindahls.  Because the competitive effect

14 comes from the independence of the vertically

15 integrated credit card company.

16         After the merger, all that's left is AmEx.

17 And so you are -- in order for a new entrant to come

18 in, they would have to vertically integrate, which then

19 runs them right into that feedback loop that the very

20 CEO of the company of Capital One says exists.

21         Now, I heard a little bit of flack for the

22 PNIRBE, which I think Ms. Davidoff did a much nicer job

23 pronouncing it than I.  I was going to say Peneer

24 (phonetic), which is terrible.  PNIRBE is much nicer.

25 So I will call it PNIRBE.  It is not made up.  The

premise of the PNIRBE, Your Honor, is that there's a
feedback loop.  If you're a network but don't have
enough cardholders, merchants don't take your card.  If
not enough merchants take your card, then no one wants
to be a cardholder and round and round you go.  And
what emerges is the PNIRBE.  We call it the PNIRBE.

Now, perhaps you could call it something
else.  You can call it whatever the CEO set barrier to
entry, but it exists.  It's very real.  It's a real
business reality for the CEO of this company, and
there's evidence of it.  And it's in the complaint,
paragraphs 185 through 187, for example.

And, Your Honor, it strengthens the PNIRBE
when you take an independent, vertically integrated
credit card company and take -- and then operate it
alongside a non-integrated company where you're doing
business with Visa and Mastercard at the same time,
you're no longer feeling the price effects of having
that independent competitor competing with you.  You
have no incentive from their large interchange
collection to lower your own rewards, and thus the
price of the credit card, right.

And this is exactly by the way, Your Honor --
this is how prices -- we plead the market definition, I
think, using the *Brown Shoe*, the *United States v. Brown*

*Shoe* factors.  And one of the factors is how prices
work, and this is how regulators and the credit card
companies see profits.  It's the net of rewards and
interest, right, and fees, and it's accounted for that
way.

So when -- this is direct price pressure
that's gone once the vertically integrated Discover is
now in the possession of Capital One.  This allows
Capital One to raise interchange fees across the board,
and we say that in paragraphs 180 to 189.  It will
reduce the remittance of those rewards so we have a net
price increase.

Paragraph 191, it will discourage new entry,
right.  Because a new entrant will either have to
vertically integrate, just like Discover did to enter,
and then be independent and put price pressure on them.
Or they'll have to cut a deal with Visa and Mastercard
where the market is concentrated well over 45
hundredths, 4503 HHI, which is insane, which is one of
the highest HHIs I have ever seen as an antitrust
practitioner during my entire career.  And I bet you
it's the same for them too.  4503.

And Your Honor heard my friend say, well,
they're saying concentration went down in that market.
Well, it's not really a problem about concentration

1   increase in that market.  It's a slight change.  But

2   the very belief -- it's a 4503 HHI.  That's almost

3   three times what the DOJ calls highly concentrated.

4          So the point here is that you're removing a

5   vertically integrated competitor that can put actual

6   price pressure on them by operating them in a

7   non-independent way, right, under Capital One's roof.

8   And that happens in a highly concentrated market where

9   there's just a Visa and Mastercard.  They have almost

10  90 percent of that market.

11         And, Your Honor, it strengthens barriers to

12  entry because it increases -- it allows Capital One to

13  use the Discover base without actually growing the

14  network itself to compete with Visa and Mastercard.

15  How do we know that's what they're going to do?  The

16  CEO said so again.  He said, "We're going to keep it

17  very small."  It says that in paragraphs 73, 74 of our

18  complaint.  I'll get that to the Court in a bit.  I

19  wrote it down somewhere.

20         The point, Your Honor, is we don't have to

21  speculate.  We don't have to speculate about what

22  they're going to do.  And not once did I hear

23  Ms. Davidoff mention the words of the CEO of the

24  company about their plans.  Not offhand remarks.  Words

25  stated to their own shareholders about why they're

1  doing a very expensive, very, very big merger.

2          And I think you can take them at their word.

3  I don't think that's speculative.  And in that sense, I

4  think it raises barriers to entry pretty directly, and

5  we can assume it will.

6          We also allege, Your Honor -- this is another

7  part of it.  Ms. Davidoff said I didn't allege market

8  power.  Oh, but I did.  Market power is the ability to

9  increase prices without giving up market share.  That's

10 the definition.

11         Now, it's not a percentage cutoff.  There is

12 a presumption in the monopolization sense of 30 or

13 40 percent often being enough for monopoly power, which

14 is a unique kind of market power.

15      (Reporter clarification.)

16         MR. BATHAEE:  And, Your Honor, that's not the

17 point.  There is no magic market share number where you

18 have market power.  It's a contextual question, again

19 bringing me back to the point about why this is not a

20 motion to dismiss argument.  In the *Vons* case,

21 7 percent was enough for market monopoly power in fact.

22 I know that was a real outlier.  I'm not making that

23 point here.  I'm just saying, Your Honor, it's not a

24 market share test.

25         The question is what do we allege about

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

1  prices?  We allege the precise mechanism that will then

2  cause a price increase, and we allege that their CEO

3  plans to pursue that mechanism.  That, Your Honor, will

4  allow them to increase prices.

5          Now, if Your Honor doesn't believe me, what

6  about the CFPB?  Paragraph 197, the CFPB did a study

7  and said when you're a bank, you actually have a higher

8  ability to raise prices than you normally would.

9  Here's a quote from the CFPB study on paragraph 197:

10 Large credit card issuers charge average fees that are

11 70 percent higher than those charged by small

12 institutions.  Why is that?  Market power.

13         And so in a sense, Your Honor, the ability to

14 raise prices here in a highly concentrated market is

15 the essence of market power, and I think we've alleged

16 it with granularity.  We've alleged it with studies.

17 It's not unadorned in the pleading.

18         And, Your Honor, we say it eliminates

19 Discover, which is the vertically integrated competitor

20 in paragraph 198.  It leaves only AmEx, paragraph 199.

21         What about facilitating horizontal collusion?

22 Yes, we do say that these are recidivists.  They do in

23 fact collude Visa and Mastercard and Capital One.  In

24 paragraph 200, they do have a history of the government

25 going after them for colluding on interchange fees,

1   mind you, Your Honor.  And every time, what happens is

2   the interchange fees go up when they collude,

3   paragraphs 204 to 205.

4            And, Your Honor, I do want to make this --

5   this is pretty brand new because this just happened.

6   But the government sued Visa recently under Section 2

7   in the Southern District of New York.  And paragraph

8   107 of that complaint alleges this:  In 2023, Chase

9   wanted to add Discover's post-networks to the back of

10  its cards.  Visa cut a deal with Chase requiring Chase

11  to enter into a debit routing agreement in exchange for

12  a temporary exemption for restriction on using

13  Discover's network.

14           Now, that's not an exact quote.  That's -- I

15  just paraphrased that section.  I want to be clear I

16  was paraphrasing that section.

17           But paragraph 107 in my complaint -- and

18  that's Docket No. 124-cv-07214 in the Southern District

19  New York.  If the Court wants us to amend the complaint

20  to put those allegations in there, we can if Your Honor

21  thinks that there's not enough on likely collusion.

22  But here it is.  Precisely the kind of collusion we're

23  saying will get much worse after this merger is over.

24  That's because there's only one or two people to

25  collude with, and they have a history of doing it.

1          And *Twombly* says Your Honor should use common

2  sense.  It doesn't say any -- it doesn't say if

3  dismissed cases.  That's not the only thing that

4  *Twombly* says.  It says common sense applies.  And I

5  think, Your Honor, we have a past history of conduct,

6  we have the government coming after one of the

7  defendants for precisely the type of collusion we're

8  alleging, I think it's pretty safe to say that

9  alleges -- and at least alleges at the pleading stage

10  part of the rule of reason claim.

11          And what about the agreements themselves?

12  Those are not conjecture.  They currently exist.  No

13  dispute about it.  They have agreements right now

14  setting the interchange fees split between Visa and

15  Mastercard on one hand and Capital One's cards on the

16  other.  Those contracts currently exist.

17          Are they legal?  I don't know.  That's not

18  before the Court.  Probably.  After the merger, they

19  will not be.  Why is that?  Why do they magically no

20  longer become legal?  Well, one, we have to look at the

21  agreements in conjunction with all the other market

22  effects as part of the rule of reason to find out

23  whether or not, in fact, they harm competition.  So

24  under the rule of reason, we don't know if they're

25  legal yet.  We'll need evidence and a trial for that.

1        But what -- what -- and I'll get to why they

2  are *per se* unlawful in a second, but I just want to

3  finish my point on the rule of reason.  What do we say

4  about these agreements?  The agreements currently

5  exist, paragraph 206.  They're going to become

6  horizontally aligned with each other, paragraph 207.

7  And I'll get to the *per se* issue later.

8        Their CEO and CFO stated that they will

9  continue the agreements unambiguously, paragraph 209.

10 And they're going to maintain the agreements at the

11 same time they're setting the interchange rates for

12 Discover.  That's at paragraph 210.

13        Those are two, three competitors directly

14 competing in the interchange network getting together

15 routinely to set interchange fees.  Does it matter

16 which credit card agreement they're talking about?  Of

17 course it doesn't.  We don't allow competitors to

18 decide prices.  That's the hallmark of Section 1.

19        Now, when Your Honor takes those agreements

20 in conjunction with the other allegations that we just

21 made about market structure, about barriers to entry,

22 you not only have a Section 1 claim, you have a

23 Section 7 claim, both under the rule of reason.  They

24 have to be done factually.

25        Usually a jury will look at it.  In this

case, Your Honor will get it.  We'll get detailed

evidence on the market, on the PNIRBE, on pricing, on

the agreements themselves, and what the terms state.

How often do they meet?  How are they negotiated?  How

long have they existed?  Any entrance?  Has anyone

failed to enter?  These are things that we're going to

find out from their documents.  We're going to find out

from their testimony in a trial.

And it's not appropriate given that we

plausibly alleged facts here in the complaint to then

throw the case out because of, I think, the notion that

you look at market share and magically can tell if a

merger is unlawful.

Now, where does that market share language

come from?  *Steves and Sons* is quoting the *Philadelphia*

*National Bank* presumption of anticompetitive effect.

We need not meet a presumption to allege a rule of

reason claim.  It's an easy way to do it.  We don't

have that available to us here.  I don't think so.  At

least not in -- not in the interchange market, but we

do in the -- you know, there's some increase in

concentration in the credit card market.

We didn't change our theory.  It just happens

to be a 70-something point Herfindahl increase in the

credit card market.  That's part of the analysis under

1  the rule of reason.

2        But are we relying on a *Philadelphia National*

3  *Bank* presumption to say, look, market share go up,

4  antitrust case illegal?  No.  And we're not required

5  to.  A presumption is not the element of the claim.

6  It's not an element to meet the market share test.

7        We're not saying it's irrelevant either.  And

8  in fact, Your Honor, I tried to explain why you can

9  have exactly the same market shares but no competitive

10  pressure after the merger.  Why?  Because they now

11  operate the person who is keeping all the interchange

12  fees, and it's that mechanism that allows the

13  competitive pressure to exist.

14        If you don't -- if you don't have an

15  independent vertically integrated credit card company

16  that's keeping those fees, who is going to put the

17  competitive pressure on you?  You could have the exact

18  same market share.  It wouldn't make a difference,

19  right.  And if you own it, it's not competitive

20  pressure anymore.  You wouldn't lower your prices in

21  response.

22        I do want to -- just to get to the -- unless

23  Your Honor has any questions on the rule of reason

24  points, I can get to the *per se* point very quickly.

25             THE COURT:  All right.

1    MR. BATHAEE:  We address this on pages 26 and
2  27 of our brief.  The Copperweld doctrine would apply
3  immediately, the next day after the merger.  Discover
4  today is unambiguously a horizontal competitor in the
5  interchange market with Visa and Mastercard
6  unambiguously, undisputed.  Tomorrow it will become the
7  same entity operating as a single economic entity, as a
8  single economic unit, as the standard requires the day
9  after the merger.  So under Copperweld, this is the
10 same entity.  They're horizontally aligned now.  Now,
11 the question is are these contracts now therefore *per*
12 *se* legal?  I think they very well may be.

13    The response I've gotten is, well, no, it's a
14 dual distribution model.  There's no such thing.

15    After the merger, the CEO has stated that he
16 does not intend to issue Capital One cards through
17 Discover, that all his Capital One cards through
18 Discover.  He's going to continue to issue them through
19 Visa and Mastercard, and Discover is going to be
20 vertically integrated.  In fact, you heard them say
21 it's going to be vertically integrated.

22    So what's being dual distributed?  Dual
23 distribution, Your Honor, is, as my friend said, when
24 you sell your own product and you sell your
25 competitor's product alongside.  That's not what this

1 is.

2          In fact, the market -- and then we get the

3 response from the case that it's legal error in a

4 criminal case, *United States v. Brewbaker*, a criminal

5 case.  The court said just because you also

6 distribute -- you have a dealership model, and you're

7 directly competing.  That doesn't mean your -- it's *per*

8 *se* unlawful and you must now go to jail for antitrust

9 violations, and the court reversed.  That's not this

10 issue.

11          These are -- these are much more horizontally

12 aligned.  We're talking about price and output, and

13 we're talking about two direct horizontal competitors,

14 not some kind of dealership arrangement.  You're not

15 distributing -- Visa is not distributing Capital One's

16 cards.

17          These -- in fact, Your Honor, if you look at

18 the markets, they're not vertically aligned.  They're

19 just conjoined by the interchange fees.  The

20 interchange fees affect prices in both markets, right.

21 There are two markets alleged.  One is the interchange

22 market.  Once is the credit card market.

23          If the interchange fees go up, then there's a

24 feedback loop on the barrier to entry around them.  If

25 the interchange fees go up, it affects both markets.

1   That doesn't make them vertically aligned.

2           And, Your Honor, you can have anticompetitive

3   effect in two markets simultaneously.  In fact, *Apple*

4   *v. Pepper* makes this point, I think, pretty nicely.  It

5   does not mean that now suddenly you're in some kind of

6   vertical chain of distribution.

7           Now, I don't think this is a question that

8   can be even resolved at this point in the litigation.

9   I think Your Honor made this point in *Lumber*

10  *Liquidators*.  Whether it's rule of reason or *per se*

11  will depend -- and this is a quote from that case -- on

12  a considerable inquiry to market conditions before any

13  evidence justifies a presumption of anticompetitive

14  conduct.

15          I think that's probably right here.  It might

16  require quite a bit of development to see if the

17  contracts themselves are the sort that if they persist

18  past the merger will unambiguously be horizontal

19  agreements on output and price.  If it turns out that

20  that's the case, then the *per se* rule would be

21  appropriate.

22          But I don't think -- I think at a minimum,

23  there's a factual question on that point and not a

24  grounds for, you know, outright dismissal of a

25  potential *per se* claim.  I think we have put the

1 foundation there in the pleadings that they're going to

2 be horizontally aligned and it's about the price and

3 output and that there are two conjoined markets that

4 have anticompetitive effect from those agreements.

5 So in that sense, Your Honor, I think the *per*

6 *se* rule at a minimum needs factual development to be

7 decided one way or the other. But, Your Honor, there's

8 enough now to show that there's going to be direct

9 horizontal alignment and the subject of the agreements

10 is gong to be interchange fees in the splits.

11 THE COURT: All right.

12 MR. BATHAEE: One last point, Your Honor, on

13 irreparable harm. I find this argument entirely

14 confusing. At the reply at page 19, they say, well, we

15 can go get damages. I don't understand that. There's

16 no damages here. Once this merger goes through,

17 there's no lawsuit. And on top of that, the way we're

18 being harmed, we might even have all of these *Illinois*

19 *Brick* issues. This is it. This is -- there's only the

20 injunctive relief claim here.

21 I don't know how we could get damages from

22 the allegations here. Perhaps under Section 1, if

23 there's independent -- an independent violation of

24 Section 1 after the merger, Your Honor, we would

25 probably be free to bring that suit. We didn't hear

1  one way or the other whether they think so for damages.

2  But that doesn't preclude the injunction here for the

3  merger itself, which has no damages claim available to

4  it.

5          THE COURT:  All right.

6          MR. BATHAEE:  Thank you, Your Honor.

7          THE COURT:  All right.  I'm going to take a

8  short recess, and then we'll finish up with counsel's

9  rebuttal.  Let's reconvene at 12:35.

10     (Recess from 12:25 p.m. until 12:35 p.m.)

11         THE COURT:  Counsel, I'll give you the last

12  word on this.

13         MR. GELFAND:  Thank you, Your Honor.  I'll

14  try to be brief.  And Ms. Davidoff, again, will cover

15  the subject that she had covered.

16         THE COURT:  All right.  Well, let me just ask

17  one question that cocounsel may be thinking about, and

18  that is with respect to the motion to dismiss.  How

19  does the Court's jurisdiction to conduct a *de novo*

20  review at some point, if the merger goes through,

21  affect the analysis that applies to the motion to

22  dismiss and whether that impact what would otherwise be

23  a traditional *Twombly* analysis for a private civil

24  antitrust case?

25         MR. GELFAND:  Well, maybe Ms. Davidoff will

have additional thoughts on that, but I will tell you that my thought on it is the *de novo* review is no different from any other merger case. When a court is -- when a court has before it a challenge to a merger -- and I've litigated a number of these, and I'll give you an example in a moment -- the plaintiffs do have an opportunity to make their case, allege that the transaction is unlawful, allege that they are harmed by the merger in some specific way.

And I think it has no impact. Those are words that Congress chose in 1966 to indicate that the banking authorities are not going to be binding on the Justice Department.

But, for example, the Supreme Court said in *First National Bank of Houston*, a court can learn from what the agencies do. And, certainly, if the agencies modify the transaction in some way, that becomes a fact that the court has to take into consideration.

But I don't think it has any impact on *Twombly* standards. You still have to come forward and plead with reasonable particularity and non-conclusory factual allegations that you have a cause of action under Section 7. And here, the unusual Section 1 -- the unusual Section 1 claim.

I have to say, I don't remember -- I guess

the *Topgolf* case is an example of a plaintiff in effect

alleging something that's going to be independently

actionable happening after the merger as a result of

the merger. But usually you just bring these cases

under Section 7, Your Honor.

And let me give you an example I think might

illustrate it for the Court.

First of all, I just want to correct one

thing that my colleague on the other side said, which

was that I had misspoken by saying that there's never

been a premerger challenge. That's not at all what I

said. What I said is --

THE COURT: Right.

MR. GELFAND: -- there's never been a

challenge by a private litigant allowed to go forward

during a regulatory review process. That's the point

that's unprecedented here.

THE COURT: Right.

MR. GELFAND: But let me give you an example

of one of the cases I've litigated. In 2008-2009,

T-Mobile acquired Sprint, two wireless carriers, and

the Justice Department did a long investigation of

that. The Federal Communications Commission did a long

investigation of that. And at the conclusion of those

investigations, they settled the matter. They entered

into consent decrees.  The consent decrees actually

were with the Justice Department, not the FCC.  But

there was a set of conditions imposed on the merger.

And there were some divestitures.  There were some

other requirements that the company postmerger conduct

itself in a certain way.

There were some state AG offices that were

not satisfied with that outcome.  And they waited until

that process was over, and then they brought their own

action in front of Judge Marrero in the Southern

District of New York.  And we litigated it fresh.  They

were allowed to take discovery at that point.  They

were allowed to present their arguments about the

market, what the merger was going to do.  And Judge

Marrero denied their request for relief.  The merger

was completely lawful.

And at that time, private litigants filed an

action under Section 7 against the merger.  And we were

able to resolve that in a matter of weeks because they

moved for emergency injunctive relief to prevent the

merger from happening.  They had been able to watch the

proceedings up until then.  They were able to take into

consideration the remedies that had been obtained from

the FCC and the DOJ.

And we had two different emergency hearings,

1  and the court was able to listen very carefully to all

2  of the arguments.  And the motion for a preliminary

3  relief was denied there because there was no claim,

4  just as we think it will be denied here if --

5        THE COURT:  *De novo* review standards?

6        MR. GELFAND:  You know, we don't call it *de*

7  *novo* review.  It's just --

8        THE COURT:  The statute does.

9        MR. GELFAND:  Yeah.  The statute just says

10  you have a cause of action under Section 7 if a merger

11  is going to substantially lessen competition.  I don't

12  find any significance to the *de novo* --

13        THE COURT:  Label?

14        MR. GELFAND:  It's just a label.

15        And I think if you look at *First National*

16  *Bank of Houston*, which analyzes what that phrase means,

17  what *de novo* means, the court there says the same

18  thing.  It just means the court makes an independent

19  determination of the facts and apply the law to the

20  facts and then decide does the merger violate Section 7

21  of the Clayton Act.

22        THE COURT:  Who has the burden in that

23  process?

24        MR. GELFAND:  The plaintiff.  The plaintiff

25  has the burden -- the burden is always on the

1  plaintiff.

2          THE COURT:  That's basically just giving a

3  private plaintiff a cause of action to challenge the

4  merger --

5          MR. GELFAND:  Correct.

6          THE COURT:  -- once consummated.

7          MR. GELFAND:  Yeah.  And they have that cause

8  of action under Section 16 of the Clayton Act to bring

9  an injunctive relief motion.

10         THE COURT:  Okay.

11         MR. GELFAND:  And so these premerger

12 challenges happen all the time.  It's just that we

13 don't have litigation running in parallel with a

14 regulatory review process that could result in a

15 transaction looking different and maybe even not

16 happening at all.

17         THE COURT:  Right.

18         MR. GELFAND:  My colleague also brought up

19 the airline merger that was recently challenged.  He

20 knows that's going to break my heart because I tried

21 that case in front of Judge Young in Boston.  And I'm

22 very sorry to say that injunction was granted there.

23 The Justice Department did an excellent job of trying

24 that case.

25         But this is just illustrative of a flaw in

 1   the plaintiffs' argument, Your Honor.  They seem to
 2   think that these agencies are just there with a rubber
 3   stamp ready to waive these transactions through.   If
 4   there are serious competitive issues, those get
 5   identified by the expert agencies.  Here there are two
 6   federal expert banking agencies.  There is a state
 7   agency.  And there is one of the two federal agencies
 8   that enforces the antitrust laws.  Six hundred
 9   attorneys in that agency last time I checked, and they
10   are incredibly -- they are just excellent at what they
11   do, Your Honor.

12           So the idea that this merger could be
13   unlawful and just sail through that process is just
14   simply not correct.

15           THE COURT:  All right.

16           MR. GELFAND:  And so if there are serious
17   antitrust issues, they will be addressed either with
18   the deal getting challenged -- we don't think that's
19   going to happen -- or through some form of commitments
20   that addresses those competitive issues.

21           And the point of our argument is that until
22   those things happen, until we know what the final deal
23   looks like, the Court is not in a position to analyze
24   the Section 7 issues.  That's the learning of the
25   Seventh Circuit decision.

1          I want to just say one thing.

2          THE COURT:  Well, let me just go back.  I

3   thought the term *de novo* was in the statute, and it is.

4   It's in the Bank Holding Company Act.

5          MR. GELFAND:  Correct.

6          THE COURT:  Right.  It does say they shall

7   review *de novo*.

8          MR. GELFAND:  Correct.  That is a term that

9   Congress chose to use when they wrote that statute.

10         THE COURT:  Right.

11         MR. GELFAND:  And I think what they wanted to

12  say is the court can take a fresh look at the evidence

13  like any other *de novo* review and --

14         THE COURT:  Right.  But you're saying that's

15  predicated on the same grounds any civil action would

16  be, and that is they would have to additionally allege

17  a plausible claim of antitrust violation?

18         MR. GELFAND:  Correct, Your Honor.

19         THE COURT:  As opposed to bring me all the

20  evidence that was used to approve the merger, and I'll

21  *de novo* look at it and see if there's a problem?

22         MR. GELFAND:  Correct.  This is not a review

23  of an administrative --

24         THE COURT:  An administrative agency, right.

25         MR. GELFAND:  And it's not an APA claim.

1          THE COURT:  Okay.

2          MR. GELFAND:  It also -- this is a side issue

3   at this point.  But their request for discovery of the

4   entire administrative record is simply beside the

5   point.  They have specific claims that they have

6   alleged in their complaint, and those are not

7   necessarily the same as the things that the agencies

8   look at.

9          THE COURT:  All right.

10         MR. GELFAND:  So the issues that you would

11  review *de novo* or just simply try the same way that

12  every merger case I've ever seen gets tried is you

13  would look at the evidence relating to the theories of

14  harm that they articulate in their complaint.

15         THE COURT:  All right.

16         MR. GELFAND:  If you would indulge me for 30

17  seconds, Your Honor?

18         THE COURT:  Yes.

19         MR. GELFAND:  Several times my colleague said

20  something to the effect of there's going to be injury,

21  there's going to be higher prices, there's going to be

22  worse rewards for credit cards, and then he --

23         THE COURT:  That would be terrible.

24         MR. GELFAND:  Yeah.  And then he juxtaposed

25  that with just read what the CEO said.  Just read what

1    the company said under the securities laws.  Very

2    misleading, Your Honor.  The statements that this

3    company has made have been truthful.  We don't dispute

4    them.  There will continue to be a Capital One issuance

5    of Visa and Mastercard, and there will be a Capital One

6    ownership of the Discover network that itself will

7    issue Discover cards.  That's all that those statements

8    said.  It didn't say we're going to raise prices or

9    diminish rewards.

10            In fact, this transaction is going to bring

11   enormous benefits to the community, and it's going to

12   be pro-competitive.  The idea is that it's going to

13   make Discover, which has languished for years as a

14   3 percent player in the credit card market, it's going

15   to bring new resources, new capabilities to that

16   struggling credit card, and they are going to become a

17   more effective competitor of Visa and Mastercard as a

18   result of this transaction.  That's what the company

19   has said in its public statements.

20            I apologize for being animated, Your Honor,

21   but I think it's very important to be precise when you

22   say the company has said something.

23            Now, my colleague also said we didn't read

24   the text of the statute.  I'll do that now because I

25   think they make this argument that -- I'm not sure

        Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

1  quite how to respond to it because it's a little bit of
2  a *non sequitur.*  They say the statute says any action
3  can be brought; therefore, we can bring it as early as
4  we want.  And then they concede, okay, we can't bring
5  it before there's even an agreement.

6  But the statute says nothing about how early
7  the claim can be brought.  It only says the end date on
8  when the claim can be brought.  So let's read the
9  statute language, the whole sentence.  This is 1828 --
10  12 U.S.C. 1828(7)(A):  "Any action brought under the
11  antitrust laws arising out of a merger transaction
12  shall be commenced prior to the earliest time under
13  paragraph (6) at which a merger transaction approved
14  under paragraph (5) might be consummated."

15  It has to be brought prior to that date when
16  the merger can be consummated, which as a result of the
17  other paragraphs is 15 to 30 days after regulatory
18  approval.  That is an end date.  And as long as they
19  bring their case -- and I'm quite confident they will
20  have a new stickler on their computer to let them know
21  when the regulatory approval happens -- they can then
22  look at their complaint, see if any of it still matters
23  given whatever the regulators do, and they can bring
24  that case right back to Your Honor's court or to any
25  court that they want to file it in or other claimants

1  can.  They're not the only people allowed to bring a

2  case.  And we will deal with the case then.

3            But as long as they bring it within that

4  window, they can litigate it to a conclusion.  They're

5  not -- they're not harmed by not being able to pursue

6  their case.

7            THE COURT:  Well, what is "prior to the

8  earliest time"?

9            MR. GELFAND:  I apologize, Your Honor.  I'm a

10  little --

11            THE COURT:  It says it shall be commenced

12  prior to the earliest time.

13            MR. GELFAND:  Correct.

14            THE COURT REPORTER:  Judge, I'm sorry.  Could

15  you move the microphone closer to you, please?

16            THE COURT:  Yes.  I'm sorry.

17            THE COURT REPORTER:  Thank you.

18            THE COURT:  The statute says prior to the

19  earliest time.  I understand what the earliest time at

20  which a merger transaction approved might be

21  consummated, but it's the prior to the earliest time

22  that seems to open it up to an earlier filing.

23            MR. GELFAND:  Well, if you look at everyone

24  who has thought about this statute, most importantly,

25  the Justice Department --

1        THE COURT:  Yeah.

2        MR. GELFAND:  -- it has always been

3   interpreted as meaning you have to file it by that

4   date, prior to that date, but you don't file it before

5   regulatory approval.

6        So, for example, Your Honor -- we cited this

7   in our reply brief -- the Justice Department --

8   interesting timing -- recently made an announcement

9   about bank merger guidelines.  They used to have

10  guidelines from the 1990s.  They recently withdrew

11  those guidelines, and they issued an addendum talking

12  about how they will consider the competitive issues and

13  bank mergers going forward.  Fine, that's their

14  prerogative.

15       Now, in the statement when the Justice

16  Department issued that statement, that new guidance on

17  bank mergers, they explained how the DOJ review process

18  works.  And they say, We review for competition

19  problems, and then we issue a report to the agencies.

20  And, we, the Justice Department, also have the ability

21  to file a lawsuit after regulatory approval.

22       That's what the Justice Department said in

23  describing how they view the process.  And one of the

24  points we make in our papers is it's inconceivable that

25  Congress in passing this law in 1966 wanted to make it

1    easier for plaintiffs to file early than it did for the

2    Justice Department.

3           The language itself says that the -- it's the

4    earliest date in which a merger transaction approved

5    under paragraph 5 might be consummated.  So it's

6    speaking about an approved transaction.  And I think

7    that only makes sense, Your Honor, if the action is

8    brought after approval.  Otherwise, we don't even know

9    if this mythical prior to date is ever going to exist.

10          So all indications are that what Congress

11   intended here by prior to was setting an end date --

12   you have to bring it prior to that date -- but not

13   attempting to say that means you can bring it at some

14   earlier date than under general principles of law would

15   not be a ripe claim for the purposes of Article III.

16          THE COURT:  I understand.

17          MR. GELFAND:  I want to talk for a moment

18   about injury in fact.  Your Honor asked a question

19   about that.  I do think that plaintiffs here have a

20   very serious problem with injury in fact.  We explain

21   this in our brief.  I touched on it briefly.  But when

22   you're thinking about whether this is a ripe claim, I

23   just would ask the Court to consider all of the layers

24   of speculation that have to be stacked on top of each

25   other.  And that is, is the merger even going to be

1 approved?  What will be the conditions under which it's

2 approved?  What will be the postmerger conduct that

3 might align with the plaintiffs' theories of harm here?

4        There's a bit of a Rube Goldberg contraption

5 that's been constructed here.  Typically, in a

6 horizontal merger case, like Sprint and T-Mobile, for

7 example, the states who challenged that said, look,

8 there are many customers today who get the benefit of

9 playing T-Mobile and Sprint off of each other.  If they

10 see T-Mobile with one price that they don't like, they

11 can go to Sprint and vice versa.

12        So from day one after the merger, that

13 competition is going to be gone.  And most antitrust

14 lawyers and litigators and courts, in my view, would

15 say that's a concrete enough injury to challenge the

16 merger.  But here that's not what they're saying.

17 They're saying that because Capital One is going to

18 continue to issue Visa and Mastercard, it's not Visa or

19 Mastercard acquiring Discover.  It's Capital One.

20 Because of that, some new set of incentives is going to

21 arise out of that, and then we're going to start taking

22 bribes.  That's the theory here, Your Honor.

23        But if that's true, if we start taking bribes

24 from Visa and Mastercard, who will remain independent

25 competitors after this transaction, that is

1  independently actionable under Section 1.  If it's
2  truly a bribe, probably under other sections too.  But
3  it's independently actionable under Section 1 of the
4  Sherman Act.

5       But we have no idea what form that's going to
6  take.  They just say, well, they're probably going to
7  do it, but we can't really tell you exactly how or how
8  we're going to be impacted by it or which prices are
9  going to go up or which rewards are going to go down.
10 Just take it on faith and let us to do a massive amount
11 of discovery, impose a huge cost and burden on these
12 companies while they're going through a regulatory
13 review, and we'll figure it out one day, Your Honor.
14 They even said, "We don't know if they're illegal yet,"
15 during argument.

16       THE COURT:  Does that Article III injury in
17 fact issue just conflate with the cognizable antitrust
18 injury requirement?

19       MR. GELFAND:  I think they are very similar.
20 They're very closely aligned.  The way we had read
21 their complaint and then their motion papers was that
22 they -- the irreparable injury here, that concrete
23 injury that they're litigating on this motion, is just
24 the inability to bring the action ever.  I think that's
25 now fallen by the wayside.  I don't really think they

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

 1  had their heart in it to begin with.

 2          But we have heard during argument something

 3  that's not in their papers to my recollection.  I

 4  apologize if it's there.  But now they're saying, well,

 5  the closing of the merger itself will cause the injury

 6  irrespective of what conduct the parties engage in

 7  after that.

 8          And one thing I find very curious, Your

 9  Honor, is that my colleague said, well, we'll stay the

10  trial, happy to do that.  We just want to take

11  discovery from now until then, and then we won't try

12  the case before the merger gets closed.  No, we're not

13  going to do that.  We'll just take the discovery so

14  we're prepared to try the case someday

15  post-consummation.  And that, I think, is quite

16  revealing about the motives of this litigation, Your

17  Honor.

18          I will say a couple of other things if I

19  could.

20          I'm actually done.  I am not going to say

21  anything else.

22          THE COURT:  All right.

23          MR. GELFAND:  Thank you very much, Your

24  Honor.  We're very grateful for the opportunity to

25  present such a long and detailed argument, and

1  Ms. Davidoff will now cover a couple of other things.

2       THE COURT:  Yes.

3       MS. DAVIDOFF:  Thank you, Your Honor.  I'll

4  be very brief.

5       I agree completely with Mr. Gelfand that the

6  *de novo* language in the statute does not change the

7  need to require *Twombly*.  All it means is that the

8  Court is reviewing this transaction -- reviewing

9  plaintiffs' claims after the transaction closes.  That

10 means it's *de novo* not deferring to the agency.

11      THE COURT:  So there's no binding decision?

12      MS. DAVIDOFF:  There's no binding decision,

13 exactly.

14      The Court does, though, need to apply *Twombly*

15 just like it would with any other private claim.  And I

16 heard plaintiffs list a number of sort of catch

17 phrases, point to a number of paragraphs in the

18 complaint where they say we assert prices are going to

19 go up, we assert competition will be reduced.  That's

20 exactly what *Twombly* says you can't do when faced with

21 a motion that shows that the -- that the conclusory

22 assertions like that aren't plausible.  They aren't

23 backed up by plausible factual allegations.

24      So, you know, we went through why the

25 complaint doesn't actually plead an increase in

barriers entry-wide, it doesn't actually plead there's
going to be a loss of vertically integrated
competitors, and it doesn't actually plead that there's
a likelihood of increased collusion.

The response of that under *Twombly* can't be,
look, our complaint uses those phrases.  That's exactly
what *Twombly* says is not okay.  You need to point to
plausible facts.

The last point I want to make, Your Honor, is
that there was a pretty dangerous misreading of *Duke
Energy* in the argument.  *Duke Energy* held that a
Section 2 -- it wasn't a Section 2 exclusionary conduct
case.  And there the campaign of exclusionary conduct
was alleged to amount to coordinated, anticompetitive
monopolization.  And the court held in that
circumstance, a Section 2 exclusionary conduct case
where the campaign of exclusionary conduct is meant to
be one big thing, that conduct has to be considered
together in evaluating that one Section 2 claim.

*Duke Energy* doesn't say -- no case says that
when considering antitrust claims, a court is going to
aggregate across markets or aggregate across separate
antitrust claims.  It's just not the case.

So plaintiffs here have a Section 1 claim
about contracts between Capital One and Visa and

1  Mastercard.  They have a Section 7 claim about payment

2  networks and a Section 7 claim about credit cards.

3  And, you know, you could just read the language of the

4  Clayton Act and the Sherman Act.  They say that

5  plaintiffs have to plead the elements of each based on

6  plausible factual allegations.

7          Thank you.

8          THE COURT:  All right.  Thank you.

9          Let me first commend all counsel for the

10  quality of your presentations.  It's been very helpful.

11  It was my expectation coming into the hearing that

12  after I heard oral argument, I would take the matter

13  under advisement and give you an opinion.  There's no

14  doubt that these issues invite extensive judicial

15  exposition.

16          But I think it's in everybody's interest at

17  this point that the Court rule on this motion.  I think

18  they are very substantial issues as to the adequacy of

19  the pleading in terms of *Twombly*.  I think there's also

20  substantial issues cutting both ways as to whether the

21  matter should be dismissed.

22          But what is clear to the Court is that the

23  case should at least be stayed, and the Court is going

24  to do that based principally on the *Michigan National*

25  case and all the other cases that have been decided

1  since then involving mergers and acquisitions.  I'm

2  going to stay the matter in all respects.

3          To the extent the case needs to progress

4  after regulatory approval, the Court can expeditiously

5  get us to trial fairly quickly.  So that will be the

6  ruling of the Court, and the Court will issue an order.

7          Anything further?

8          MR. BATHAEE:  Your Honor, just so we're not

9  blindsided by the merger, can we get a status report if

10 the thing gets consummated or as it gets closer?

11         THE COURT:  Yes.  Let me hear from everybody

12 every 90 days unless something happens sooner

13 definitively.

14         All right.  Very good.  Thank you.

15         The Court will stand in recess.

16         -----------------------------------
                      Time:  1:04 p.m.
17

18

19

20

21

22     I certify that the foregoing is a true and

23   accurate transcription of my stenographic notes.

24
                              _____
                                      /s/
25                            Rhonda F. Montgomery, CCR, RPR

       Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599